

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | MAR **1 6** 2005 WH |
| | ) | |
| Plaintiff, | ) | **MICHAEL W. DOBBINS** |
| | ) | **CLERK, U.S. DISTRICT COURT** |
| v. | ) | No. 01 CR 1129 |
| | ) | Hon. James B. Moran |
| | ) | |
| JOSEPH NICOSIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM IN LIGHT OF BOOKER[1]

## I. INTRODUCTION

The Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005), radically changes the approach to sentencing in federal courts. The United States Sentencing Guidelines are now advisory. *Booker*, 125 S.Ct at 757. Sentencing judges are no longer bound by the Guidelines, but by 18 U.S.C. § 3553(a), which directs them to impose a sentence "sufficient, but not greater than necessary" to comply with the following purposes: (A) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment; (B) to afford adequate deterrence; (C) to protect the public; and (D) to provide needed educational, vocational, medical and correctional treatment. 18 U.S.C. § 3553(a)(2). To that end, the judge must consider the following factors: (1) the nature and circumstances of the

---

[1] Defendant previously filed a Sentencing Submission and a Reply Memorandum. Because of the changes in the law, he files this memorandum which combines the arguments made in the previous two memoranda. He does not mean to forfeit any arguments made in those previous memoranda, but has made an effort to include most of those arguments in here so the Court can focus on a single pleading.

offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1), (3) (6), and (7). Under *Booker*, therefore, the Guidelines represent but one of several factors the Court must consider before imposing sentence.[2] *United States v. Ranum*, 353 F. Supp 2d 984 (E.D. Wis. 2005) (the Guidelines are "just one of a number of sentencing factors" to be considered).

In *Ranun*, Judge Adelman found it useful to group these factors in three main categories: the nature of the offense, the history and character of the defendant, and the needs of the public and any victims of the crime. In addition, the judge must consider the advisory guidelines. Now more then ever the Supreme Court's words in *Koon v. United States*, 518 U.S. 81, 113 (1996), ring true, that "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."

## II. FACTS RELEVANT TO SENTENCING

### A. Nature of the Offense

Mr. Nicosia has pled guilty to mail fraud. He concealed the insolvent financial condition

---

[2] The Seventh Circuit has not yet ruled on the precise weight to be given to the Guidelines. In *Booker's* wake some Courts have relied heavily on the guidelines, *See United States v. Wilson*, 390 F.Supp.2d 910 (D. Utah 2005), while other courts have not given the guidelines criteria any more weight than any of the other sentencing factors to be considered under 18 U.S.C. §3553(a). *See, e.g., Ranun*, 353 F.Supp.2d 984.

of his insurance company, First Oak Brook, from state insurance regulators, in order to continue operating in the mistaken belief that he could right the ship. Everyone, including the Government, agrees however that First Oak Brook did not become insolvent because of this fraud.

First Oak Brook wrote property and casualty insurance policies for high risk commercial businesses like restaurants and bars that larger insurance companies did not cover. A substantial book of its business was located in Florida and California. In the early to mid-1990's, intensive competition was driving down rates. Hurricane Andrew in Florida and the California earthquake (coming a few years after the Rodney King riots that destroyed 40 dry cleaning stores that First Oak Brook insured) led to unanticipated claims. On July 3, 1995 the California Supreme Court decided *Montrose Chemical Corp. v. Admiral Insurance Co.*, 913 P.2d 878 (Cal. 1995), affirming an earlier appellate court decision which had held that pre-existing constructive defects that led to progressive property damage were covered by any policy in effect during the period the property was deteriorating. The decision exponentially increased the risks that First Oak Brook had underwritten. Just the additional attorney's fees needed to defend the onslaught of new claims alone was catastrophic for small insurance companies like First Oak Brook.

The *Montrose* decision by itself caused numerous companies that wrote insurance in California to go under. Meanwhile, the combination of economic factors led a slew of insurance syndicates that operated under the umbrella of Illinois Insurance Exchange to go insolvent as well. Between 1996 and 2000, market conditions sent seven syndicates, including First Oak Brook, into insolvency.

First Oak Brook should have ceased operations and stopped writing new insurance

**3**

policies. Instead, under Mr. Nicosia's leadership, First Oak Brook fiddled with the books in order to hide its insolvency from regulators and continue to write business. Although this perpetrated a fraud on the policyholders who ended up purchasing insurance from an insolvent company, the practical effect was to substitute defrauded policyholders for a like amount of policyholders who would have been without coverage not because of any fraud, but because of the negative California Supreme Court decision and the other market conditions. In other words, some policyholders were going to be hurt regardless of the fraud.

Joe Nicosia hoped to get the company back to solvency. Between April and July 1995, he personally borrowed over $800,000 from Capital Bank and Trust and Harris Bank which he loaned directly to First Oak Brook. In that same time period United Financial Group (the 100% owner of First Oak Brook) borrowed $3,000,000, which Mr. Nicosia, among others, personally guaranteed; this money, too, was paid over to First Oak Brook in an effort to save it from insolvency. All these banks obtained personal judgments against Joe Nicosia in the aftermath of First Oak Brook's demise, although compromised settlements were reached many years ago.

Mr. Nicosia has also pled guilty to tax fraud. He reimbursed himself for tax payments and had the company pay personal expenses without reporting the reimbursements as income. As the Government notes, Mr. Nicosia's secretary, Patty Taconi, once wrote Mr. Nicosia distressed over the payment of his personal expenses. This indefensible conduct did not, however, contribute appreciably to First Oak Brook's insolvency. Had Mr. Nicosia acted appropriately, it would not have made much of a dent in the company's financial condition. We make this point not to depreciate the crime, but only to challenge the connection between the tax offenses and First Oak Brook's insolvency. Ironically, at the same time Mr. Nicosia was liberally taking

4

reimbursement from the sinking ship he was borrowing money that he put back in and signing his name to guaranties. In the end there can be no question that Mr. Nicosia himself lost a great deal financially from the failure of First Oak Brook.

Joe Nicosia attached a statement to his original submission in which he admitted his criminal conduct. He cannot defend what he did. He can only say that he was very invested in First Oak Brook, not just financially but personally. Yes, the business paid him handsomely, but that was not the only reason he did not just close up shop, an act that would have put policyholders in the same financial straits they ended up in, though absent fraud and with different policyholders bearing the brunt. Leonora's emotional condition – resulting from the painful death of their little girl to cancer – was precarious; he was proud and fearful of being a failure, especially in the eyes of his wife's family. He was a successful insurance broker long before he ever joined with his father-in-law and brother-in-law to form First Oak Brook. The three men had started this business over two decades ago, watched it grow, and Joe thought everything could work out. All these things, *including* the good living the company afforded him, led Mr. Nicosia to conceal the company's financial condition from auditors in order to maintain operations. He listened to advice from people like Michael LaMantia and Bill Murphy, his co-owner and his accountant, who made him think recovery was around the corner. It was the same advice that convinced him to borrow or guaranty over $6,000,000 in the last year of First Oak Brook's existence.

Ultimately, Mr. Nicosia approved and joined in all the decisions to conceal First Oak Brook's true financial condition from the insurance regulators. He freely decided to risk being caught doing something illegal. His conduct seems even worse in the context of what he did with

5

respect to underpayment of his income taxes. Joe Nicosia feels tremendous remorse and shame. He wishes he could turn back time and change his terrible decisions, but he cannot. All he can do is ask the Court to exercise its mercy when sentencing him.

## B. Character of the Defendant

Joseph Nicosia is 53 years old. He grew up in modest, blue-collar surroundings.[3] His father was a plumber, his mother a sales clerk at Spiegel's. She died last year and his father, now 85, suffers from heart problems. As might be imagined, confessing to his father and telling him that he will be going to jail was one of the most wrenching acts of Mr. Nicosia's life. He fears his father will not live long enough to see him again after he surrenders.

Joe and his wife, Leonora, have been married for 23 years. They have two children: Joseph Jr., 22 years old, is a recent *summa cum laude* graduate of Boston College, now attending law school at Loyola University in Chicago; Nori, 20 years old, is a student at Indiana University. A third child, Mary Katherine (often referred to as "Katie"), died in 1989 from cancer when she was not yet three years old. Those who know Joe Nicosia are hard-pressed to reconcile his criminal conduct with the decent and loving man they know him to be, and many have written letters hypothesizing that Joe's efforts to hold his family together in the wake of Katie's death somehow contributed in the ensuing years to the poor choices he made.

Nobody took Katie's death harder than Leonora. There was a time when Joe wondered if she would ever recover. For years she suffered a depression so severe that she would not get out of bed or leave the house for days on end. She awoke almost nightly from panic attacks. Joe

---

[3] Defendant has copied this section almost verbatim from his original sentencing submission.

tried to be the strength of the family, drinking at night after everyone went to bed in an effort to relieve his own pain.

Leonora feels that she would not be here today were it not for Joe's love, support and kindness. (Ex. B). She describes the pain of Katie's death on her and the family. It makes her feel terrible that she was not there for Joe the way he was for her, despite his own personal suffering. He would go to work and come home early on days when she could not get out of bed, he would stay up with her on nights when she could not sleep, and he would take care of the children, maintain the house, and try to portray a facade of familial normality to the outside world.

Though her depression has ebbed, Leonora's mournful pain never slips far beneath the surface. She expresses fear that she will fall apart again, but this time Joe will not be there to help her. Leonora's brother, a neurosurgeon, expresses this same concern in his letter to the Court in January 2004. (Ex. F, January 2004 Letter from Christopher Cascino, MD). Dr. Cascino writes that even though as a doctor he is quite familiar with loss, he was "unprepared for the unfathomable despair" he witnessed in his sister following Katie's death. Dr. Cascino has written a second letter urging the Court to take into account his sister's mental health in sentencing Joe. (Ex. F(a), March 2005 letter from Christopher Cascino, MD). In the eyes of Dr. Cascino, "Joe had more to do with [Leonora's] improvement than any psychiatrist did." He personally witnessed the deterioration of his sister's mental health after Katie's death and he believes that a lengthy incarceration term will again devastate her.

Joe's two children, Joe Jr. (Ex. C) and Nori (Ex. D), see their father as a wonderful and dedicated man who made them the number one priority in his life. When Joe Jr. thinks about his

7

own recent marriage, he aspires to be a husband and father like his own. Joe Jr. still recalls the endless string of dashed hopes that greeted the family after each new treatment failed to cure his baby sister's cancer, and his parents' hopeless quest for a miracle recovery. Looking back, Joe Jr. marvels how his father never allowed his own pain to intrude on his relationship with him and Nori. Nori agrees. Even after this case became known in their community, her father swallowed his shame and proudly attended all of her dance competitions.

Leonora's family members confirm the sense that it was Joe's devotion to his wife and children that held the family together after Katie's death. (Ex. E, Letter from Lorayne Cascino ; Ex. F, Letter from Christopher Cascino; Ex. G, Letter from Patricia Sullivan Rozzano). He was the pillar of strength without whom Leonora would not have survived. Ms. Rozzano, Leonora's first cousin, recalls Leonora's debilitating panic attacks, her running run out of the house screaming that she could not take it any more, and Joe treading after her, bringing her home, calming her down. Years after Katie's death, she remembers Joe and Leonora leaving restaurants abruptly and cutting vacations short due to Leonora's severe depression. Leonora's father once warned her that if she did not get better soon she would lose her husband as well. In fact, Joe never complained, never wavered in his love and support. He took care of the children, coached his son's teams, went to every sports event, attended every parent teacher conference, and never missed a dance or piano recital.

Ms. Rozzano fears that with Joe away, Leonora will again sink into a depression and lose her "hard-earned" ability to function. The stress of this case and the recent death of Leonora's father from a massive stroke have revived Leonora's persistent fears of abandonment and loneliness. Ms. Rozzano prays that the Court impose a sentence which will not take Joe away

8

from Leonora any longer than is necessary.

James Allegretti, a trial lawyer, has known Joe for 24 years. (Ex. H). He is Leonora's first cousin. Mr. Allegretti introduced Joe to Leonora. He too describes the deterioration of Leonora's physical and mental health after Katie's death and how Joe was Leonora's only salvation during this period. Joe spent a tremendous amount of time away from his business taking care of the family during Katie's treatment and after her death. Mr. Allegretti believes that Joe's conduct is inconsistent with the man he knows. He surmises that Katie's death, Leonora's mental distress, and the pressures of taking care of his family while trying to run a business, led Joe, in some way, to the unfortunate decisions he made with respect to First Oak Brook. He asks that the Court take into consideration that positive part of Joe's nature when it decides his ultimate punishment.

Friends feel the same way. Terry and Selma Schohn have known the Nicosia family for over 16 years. (Ex. I). They witnessed the comfort Joe provided Leonora, even while struggling with his own tremendous grief. Richard Seligman, an insurance industry lawyer, has known Joe as a client and friend for over 20 years, and describes him as a caring and considerate man who treats every person he meets with total respect. (Ex. J).

Joe Loss, long-time friend and managing partner of the law firm Loss Pavone & Orel, writes about the humble surroundings in which Joe grew up. (Ex. K). He worked hard from an early age. Over the years, he was able to establish a successful commercial brokerage. After Katie's death, Joe struggled to keep the family from falling apart. Loss stated that Joe spared no cost to distract Leonora and the children from the tremendous weight on the household. Loss is convinced that the pressures of helping his wife and keeping the family from falling apart, coupled

9

with Joe's own despair, had some influence in this case.

Even in the darkest moments of his life Joe reached out to others and helped them. Loss tells the story about how, shortly after Katie's death, Joe met a grave digger while visiting his daughter's grave. The grave digger, Rafeal Casillas, was kind to Joe. In return, Joe listened to Mr. Casillas' concerns about his wife's unemployment. Joe told Rafael to have his wife visit him at the offices of First Oak Brook. Joe hired Rafael's wife, Maria, as an entry level clerical person. Maria advanced in the company and worked there for many years.

Mr. and Mrs. Casillas confirm Joe's generosity. Rafael recalls how Joe provided his daughters with summer jobs and his wife with full time employment. (Ex. L). Maria is grateful to Joe for giving her a chance even though she had no experience in the industry. (Ex. M). She credits Joe with her daughter's success, providing her with a computer and encouraging her to go to college. Maria's daughter now attends Yale University, an accomplishment Maria feels is related in no small part to Joe Nicosia's generosity and support.

Patricia Rozzano writes that while Katie was in the hospital, Joe and Leonora met many other families with children battling cancer. (Ex. G). After Katie passed away, Joe and Leonora continued to lend emotional support for these families, attending many birthdays and, sadly, many funerals. One example is the Bailey family. Patricia and William Bailey met Joe 16 years ago at Loyola University Medical Center in Maywood. The Baileys' daughter also died from cancer. Patricia Bailey describes the experience of watching a child go through chemotherapy and radiation as the most painful experience a parent can have. (Ex. N). She believes that people who encounter each other during this kind of ordeal bond and relate in ways that nobody else can. One's true nature emerges, she believes, and there is no room for dishonesty. In these

10

desperate circumstances Mrs. Bailey met Joe Nicosia, who rallied for their daughter as if she were his own. To Patricia Bailey, Joe is one of the most genuine and caring people she has ever met. The Baileys' son, Michael, writes about how Joe helped him after his sister died, becoming a mentor after Michael had been discharged from the Navy and his future was uncertain. (Ex. O). Joe has enriched Michael's life and he will always look up to him.

Melissa Mulka's sister died from cancer two years after Katie. The Mulka family has remained close with the Nicosia's since they met during cancer treatments. Through the most difficult times for himself, Joe listened patiently to Melissa and provided her a shoulder to cry on. (Ex. P). Melissa wishes the Court could see Joe through her eyes. To her he is a wonderful family man, an excellent friend, and one of the most unselfish people she knows.

The Schohns also recall Joe opening his home to other families experiencing the death of children from cancer. (Ex. I). Dr. Steven Mash, an orthopaedic surgeon who first diagnosed Katie with cancer, describes Joe as having a "heart of gold" and being the kind of person who opens his home and heart to everyone that he meets. (Ex. Q).

We urge the Court to read these letters in full, just as carefully as the Court reads the pre-sentence report and the Government's submission.

### III. THE SENTENCING GUIDELINES

#### A. Enhancements Neither Charged Nor Admitted May Not Be Used to Calculate Defendant's Sentence

Under *Booker*, where appropriate the court must still consider the Guidelines. Here, the Guideline calculations are as follows: On the fraud count, the base offense level plus the amount of loss comes to 20. In a plea agreement, Defendant has admitted that his sentence should be

11

enhanced 2 points for more than minimal **planning and** 2 points for his role in the offense, for a total offense level of 24. On the tax count, **the base** offense level is 18.

Because the two offenses fall 6 **levels apart, one** level is added to the higher offense level, U.S.S.G § 3D1.4(b), leaving a combined **base offense** level of 25. Because Mr. Nicosia has admitted responsibility, his guideline **range is reduced** 3 points for a final offense level of 22. This places Mr. Nicosia at a sentencing range of **41 to 51** months.

The Government wants to add 6 **points to the** fraud count, based on substantially jeopardizing the safety and soundness of **a financial institution** (4 points) and abuse of trust (2 points), and the probation officer wants **to add 2 points** to the tax count based on Defendant's role in the offense. (The Government does not **agree** to this latter enhancement). In his Reply Memorandum In Support of Sentencing **Submission, Mr.** Nicosia argued that *Blakely v. Washington,* 124 S.Ct. 2531 (2004), precluded **any of these** enhancements, because they **were** neither charged in the Indictment nor **admitted by the** Defendant.

To summarize, Defendant argued **that the Grand** Jury did not charge him with substantially jeopardizing the safety and **soundness of** a financial institution; it did not **charge him** with abusing trust. Yet, a defendant has a **right to be** tried upon charges brought by a Grand Jury, *United States v. Stirone,* 361 U.S. 212, **217 (1960),** and it is reversible error to amend an indictment after the verdict. *United States v. McNeese,* 901 F.2d 585, 601 (7th Cir. 1990). Under any circumstances an Indictment may **not be amended** by the Government without re-submission to the Grand Jury if there would be a **material change** and prejudice to the defendant. Sentencing Mr. Nicosia on charges not **presented to** the Grand Jury would violate his Fifth Amendment rights because it would have **the practical** effect of broadening the bases for his

12

conviction. *See United States v. Baker*, 227 F.3d 955, 960 (7th Cir. 2000).

The conclusion is also confirmed by recalling that *Blakely* is the progeny of other misunderstood Supreme Court opinions, including *Jones v. United States*, 526 U.S. 227 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Jones,* the Court reviewed a sentencing scheme under the car jacking statute that provided for three possible penalties – up to fifteen years, twenty-five years, and life imprisonment or death – depending on the absence, or extent of, bodily injury. The *Jones* Court held that the three penalties represented three separate offenses that had to be charged in the indictment and passed upon by the jury beyond a reasonable doubt. Meanwhile, the *Apprendi* Court held that factual findings (other than a prior conviction) that raise a defendant's sentence above the statutory maximum for the crime of conviction "must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S. at 476, *quoting Jones*, 526 U.S. at 243, n. 6.

Thus, these enhancements – for substantially jeopardizing the safety and soundness of a financial institution and abuse of trust – like the three penalties in *Jones*, must also be charged in the indictment pursuant to *Apprendi*. To the extent *Jones* involved statutory enhancements that the Court considered akin to "elements" of the offense, it makes no difference: the *Blakely* Court denigrated the distinction between statutory "elements" as opposed to sentencing factors as leading to "absurd result[s]." The *Blakely* rationale is simply that *any* fact that increases a defendant's sentencing exposure falls under the rubric of *Apprendi*, and must be charged and proven whether labeled an element of the offense or not. *Cf. United States v. Turner*, 105 U.S. App. LEXIS 3621 (7th Cir. March 3, 2005) (vacating and remanding defendant's sentence under *Booker*, where defendant's sentence was enhanced by the judge's findings, which exceeded the

13

facts established by the jury's verdict).

In the instant matter the Defendant was not charged with substantially jeopardizing the safety and soundness of a financial institution or with abusing trust, and he did not admit these facts, which the Government now seeks to use to enhance his sentence. Since the Government may not now broaden the charges, neither of these enhancements may be applied. *United States v. Kelley* , 2005 U.S. Dist. LEXIS 2513 *20 (D. Neb., February 1, 2005) ("to the extent that the Government intends to rely on the proof of any fact to enhance a defendant's sentence, the fact must be pled, by indictment or information, and either admitted or proved").

## B. If the Court Were to Consider the Enhancements a "Reasonable Sentence" Requires that these Enhancements be Proved Beyond a Reasonable Doubt.

Should the Court disagree with the Defendant and hold that it can rule on the enhancements, the first question is to determine what standard of proof to apply. Proof beyond a reasonable doubt was clearly the standard that *Blakely* required. "Under *Blakely* as interpreted by *Booker*, a defendant has the right to have a jury decide factual issues that will increase the defendant's sentence. [The] Guideline's contrary assertion that a district judge may make such factual determinations based upon the preponderance of the evidence runs afoul of the Sixth Amendment." *United States v. Ward*, 377 F.3d 671, 677 (7th Cir. 2004).

The question is whether the *Blakely* reasonable doubt requirement has been eliminated by *Booker*. Not according to Justice Thomas, who wrote:

> The commentary to § 6A1.3 states that "[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet the due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." The Court's holding today corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance

14

of the evidence, of any fact that increases the sentence beyond what would have been
lawfully imposed on the basis of the facts found by the jury or admitted by the defendant.

*Booker*, 125 S.Ct. at 798, n. 6 (Thomas, J. dissenting in part). Since *Booker*, several District
Court judges have relied on this statement among other reasons to conclude that while the
remedial majority in *Booker* took care of the Sixth Amendment issue, the Fifth Amendment still
requires proof beyond a reasonable doubt when the Government seeks to raise a defendant's
sentence beyond what the defendant has admitted. *See, e.g., Kelley,* 2005 U.S. Dist LEXIS 2513;
*United States v. Huerta-Rodriguez*, 2005 U.S. Dist. LEXIS 1398 (D. Neb. Feb. 1, 2005) at *5-6;
*United States v. Barkley*, 2005 U.S. Dist. LEXIS 2060 (N.D. Okl., Jan. 24, 2005) (reasonable
doubt still appropriate under the Sixth Amendment); *United States v. Siegelbaum*, 2005 U.S. Dist.
LEXIS 2087 (D. Or., Jan. 18, 2005). The remedial majority in *Booker* neither commented on
Justice Thomas's footnote nor made any statements specifically about the burden of proof at all.
*Cf. Clark v. Martinez*, 125 S.Ct. 716, 723 (2005) (Court declines to rule on issues not necessary
to its decision).

In *McReynolds v. United States*, 397 F.3d 479 (7th Cir., 2005), the Seventh Circuit did
make a contrary statement: "*Booker* does not in the end move any decision from judge to jury, or
change the burden of persuasion. The remedial portion of *Booker* held that decisions about
sentencing factors will continue to be made by judges, on the preponderance of the evidence, an
approach that comports with the sixth amendment so long as the guideline system has some
flexibility in application." We submit that this statement was gratuitous dicta that should not be
followed. Indeed, the one other appellate court that had commented on the issue considered it
an open one. *See United States v. Ameline*, 2005 U.S. App. LEXIS 2032 (9th Cir., Feb. 9, 2005), at

15

*25, n. 7 (declining to rule on burden of proof under *Booker*). *rehearing en banc granted*, 2005 U.S. App. LEXIS, Mar. 11, 2005)

The only issue before the Court in *McReynolds* was whether the guidelines were retroactive. In the course of a negative answer, the Court made the above statement in order to support the notion that the guidelines did not work such a watershed change as might be imagined. The Court had already held, however, that a change in law changing the identify of the decision-maker or the quantum of evidence required for a sentence did not make a new ruling retroactive. *McReynolds*, 397 F.3d at 479. Thus, it made no difference in the retroactivity determination whether the quantum of evidence had been reduced from reasonable doubt to preponderance of the evidence or not. In *McReynolds* it does not appear that the issue of quantum of evidence had even been briefed.[4]

One District Court noted that while *Booker's* Sixth Amendment holding does not *require* proof beyond a reasonable doubt, "it is not precluded. It is up to the court to determine a reasonable sentence and the court will not rely on facts proved to a mere preponderance of the evidence in order to increase a defendant's sentence to any significant degree." *Kelly*, 2005 U.S. Dist. LEXIS 2513, at *20. In the instant matter the Guideline range based on what Mr. Nicosia has admitted, after the deduction for acceptance of responsibility, would be 21, which provides a sentencing range of 37-46 months (this calculation does not include the one level bump that results from the tax count). If the four points are added for substantially jeopardizing the safety

---

[4] The *McReynolds* decision came about when a trio of *pro se* prisoners petitioned the Court for certificates of appealability in the Seventh Circuit. The Court denied the certificates and issued this opinion. Thus, no lawyers presented arguments on the retroactivity issue, and even the *pro se* inmates did not get a chance to brief the issue on the merits.

and soundness of a financial institution, Mr. Nicosia would be at level 25, which provides a sentencing range of 57-71 months. That represents over a 50% increase at the low and high ends of the possible sentence. If you add in the additional two points for abuse of trust the enhancements come close to doubling the sentence. Given the large increase in potential sentence, we submit that the Court should appropriately require the Government to prove the enhancements by proof stronger than a preponderance of the evidence.

Neither *McReynolds* nor *Booker* addressed the Fifth Amendment due process considerations raised in *Blakely*; *Booker* was a product of Sixth Amendment jurisprudence. There is a long line of cases establishing the due process right to proof beyond a reasonable doubt when findings of fact increase a defendant's punishment. *See, e.g., Jones v. United States*, 526 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002). This Court, in order to guarantee the defendant's rights under the Fifth Amendment *and* to insure that his sentence is "reasonable," should therefore apply the standard of proof of beyond a reasonable doubt when analyzing the enhancements.

### C. The Fraud Count

#### 1. The Government Has Not Proved Beyond a Reasonable Doubt That Mr. Nicosia's Conduct Substantially Jeopardized the Safety and Soundness Of a Financial Institution

Thus, the Government must prove beyond a reasonable doubt that Mr. Nicosia substantially jeopardized the safety and soundness of a financial institution if it wants to add this enhancement. That standard cannot be met.

Everyone agrees that First Oak Brook did not become insolvent because of any fraud

17

perpetrated by Mr. Nicosia. Market conditions and the impact of the *Montrose* decision caused the insolvency. Between July 1996 and November 2000, seven Illinois syndicates became insolvent.[5] All seven syndicates became subject to Orders of Liquidation.

Mr. Nicosia's crime *vis a vis* First Oak Brook had to do with what he did *after* the company went insolvent. *After* First Oak Brook went insolvent Mr. Nicosia falsified documents in order to prevent regulators from discovering the company's true financial condition. And it is for *that* conduct he must pay, for those actions he took after the company had gone insolvent. Bluntly, Mr. Nicosia took money from people seeking insurance when his company lacked the appropriate assets, could not cover the policies, and should have been shut down, but his punishment for that conduct has already been incorporated in the fraud guideline.

The Government might have an argument if it could show that what Mr. Nicosia did left First Oak Brook *more* insolvent, *e.g.,* that it had even fewer assets to pay insureds as a result of his conduct than it had when he should have shut First Oak Brook down. But there is no more proof of that than there is proof that First Oak Brook may have become *less* insolvent as a result of his fraud.

Defendant has attached an affidavit from John Snyder, CEO of Strategic Consulting, Inc., in Streamwood, Illinois to this Memorandum. (Exhibit U, John Snyder Affidavit ). Mr. Snyder is a Certified Fraud Examiner in good standing with the Association of Certified Fraud Examiners,

---

[5] The seven insolvent syndicates became insolvent in the following order: Geneva Insurance (July 11, 1996); First Oak Brook Corp., Syndicate (November 12, 1996); Resure Inc. (February 27, 1997); AAI Syndicate #1, LTD. (February 9, 1997); RCA Syndicate #1 LTD. (June 5, 2000); Transco Syndicate #1 LTD. (June 28, 2000); and Agora Syndicate, Inc. (November 15, 2000).

with over 25 years of audit and consulting experience, including experience with various insurance companies where he was responsible for accounting, financial reporting, and the design, implementation, and review of accounting controls for premium and claims database systems. He was asked to review, among other things, First Oak Brook's year end annual statements, quarterly statutory financial statements, annual statutory audited financial statements, actuarial reports, IRS Ratio Report, and premium and loss date (provided by the Government). Mr. Snyder tried to determine the loss ratio between the amount of premiums written and the claims ultimately paid by the Company: if the claims paid were less than the premiums written then the Company had made money; if the claims exceeded the premiums collected then the Company had lost money.

Based on his review Mr. Snyder determined that the evidence does not lead to the conclusion that First Oak Brook was worse off because the company continued to issue insurance policies after it should have closed down. Using a reasonable loss-ratio formula of 125%, Mr. Snyder figures that the amount of the claims that could not be paid based on policies written after insolvency was basically insignificant.

Ultimately, that is why *United States v. McDermot*, 102 F.3d 1379 (5th Cir. 1996), cited by the Government, does not support the enhancement. In otherwise parallel facts, the District Court had found that "without those [fraudulent securities] going on the books, I believe Presidential would have been shut down, *and the loss would have been limited to something less than it wound up being.*" *McDermot*, 102 F.3d at 1383 (emphasis supplied). What is missing in Nicosia's case here is that the Government has no evidence, much less proof beyond a reasonable doubt evidence, that the *institution*, First Oak Brook, was less able to pay insureds or other debts

19

because of the fraud, *i.e.*, that the loss figure would have been limited to something less than it wound up being had First Oak Brook been shuttered. First Oak Brook's financial condition may just as likely have *improved* as a consequence of remaining open after the false financial statement was filed. Mr. Snyder found that the answer to the solvency question was either unattainable or that any change in financial condition was insignificant. Under either scenario the Government does not meet its burden.

Clearly, that fact has nothing to do with whether Defendant committed a crime or caused an $8,000,000 loss. The fact that his conduct did not jeopardize the safety and soundness of a financial institution is not a defense to the offense, nor is it solace for the policyholders who paid premiums at a time the company was insolvent and should not have been operating. The money from these defrauded policyholders should never have been taken. But the question here is not whether Defendant defrauded those new policyholders – he obviously did – but whether the actions he took to effectuate the fraud substantially jeopardized the safety and soundness of First Oak Brook. Looked at differently, Joseph Nicosia substantially jeopardized the financial condition of people from whom he illegally collected premiums, but in doing so he did not substantially worsen the financial soundness of First Oak Brook: it was already insolvent, based on factors having nothing to do with fraud. The Government has offered no proof otherwise.

Thus, the Court should not add these 4 points. The Government cannot prove it applies beyond a reasonable doubt. In fact, the Government has presented no evidence rebutting Mr. Snyder's affidavit and therefore cannot even prevail if the Court applied the lower standard of preponderance of the evidence.

20

## 2. The Government Did Not Prove Beyond a Reasonable Doubt That Mr. Nicosia Abused Trust

With respect to abuse of trust, the Government must show beyond a reasonable doubt that Mr. Nicosia occupied a position of trust and that he used that position to facilitate or conceal his offense. The Government tries to do this by mixing and mis-matching arguments. First it says that because Mr. Nicosia was a "trustee" with the Illinois Insurance Exchange, he held a position of trust; but it then argues that it was his position of CEO of First Oak Brook that enabled him to facilitate and conceal the offense. The Government does this because there is no evidence that the alleged trust position, assuming it exists, facilitated the offense.

The Government says that Mr. Nicosia took advantage of his position of trust *vis a vis* the Illinois Insurance Exchange when he misrepresented and concealed material facts regarding First Oak Brook's financial condition, ..." Gov't Resp. at 7. It says that the Illinois Insurance Exchange "had a right to know" that First Oak Brook was in danger of folding so it could take appropriate action. Gov't Resp. at 8. Even if that is true, Mr. Nicosia's position as "trustee" did not have anything to do with facilitation of the crime. The Government has not shown anything to suggest that a non-trustee of the Illinois Insurance Exchange would not have been able to do exactly what Mr. Nicosia did, or that Mr. Nicosia's position as trustee allowed him to accomplish or get away with the offense any easier than a non-trustee.[6]

That failed connection leads the Government to argue that it was Mr. Nicosia's position

_____

[6] Although the Government charged Mr. Nicosia with defrauding the Illinois Insurance Exchange, the Government at times argues that the abuse of trust enhancement applies because he abused the trust of policyholders. *See* Gov't Resp. at 8. As the Probation Officer points out, Mr. Nicosia did not owe a fiduciary duty to the policyholders: as to them, it was strictly a business, arms-length transaction.

21

as CEO of First Oak Brook – as opposed to **trustee** of the Illinois Insurance Exchange – that enabled him to commit the crime. Gov't **Resp. at 8.** In other words, because Mr. Nicosia was CEO, he occupied a position where he could **doctor the** books without being caught. The problem with that argument is that his **position as CEO** was *not* a position of trust *vis a vis* the Illinois Insurance Exchange. That would **be like saying** that every executive in the securities industry owes a duty to the SEC, other **than that created** by statute.

More specifically, the Government **argues** that "[w]ere it not for Nicosia's position of executive authority, he would not have **been in a position** to mislead the Illinois Insurance Exchange and falsely verify the accuracy of **First Oak Brook's** financial statements ... [or] vouch for the completeness and accuracy of the **company's** financial disclosures to the auditors." Gov't Mem. at 8. Nicosia's situation put him **in a position** where such a crime became available, but his relationship to the Illinois Insurance **Exchange was** arms-length and there can be no abuse of trust in an arms-length relationship. *See, e.g., United States v. Brown*, 47 F.3d 198 (7th Cir. 1995) (real estate sellers to commercial customers); *United States v. Dorsey*, 27 F.3d 285 (7th Cir. 1994) (car dealer to lender).

Even accepting the Government's **argument that** Defendant occupied a position of trust *vis a vis* the Illinois Insurance Exchange **because of First** Oak Brook's contract with the Exchange, the Government still cannot connect that **position with** the requirement that it helped facilitate the offense. The best the Government can **argue is that** because he was a trustee he should not have hid from the Illinois Insurance **Exchange the insolvency** of First Oak Brook, *i.e.*, that Defendant perhaps should have blown the **whistle on himself.** But again, the position did not facilitate the offense or help him to get **away with it.** The fact that he was a trustee did not lead

22

the other trustees to overlook evidence, nor did it allow him to pull some strings or somehow keep the crime hidden. It simply had no effect on what he did, and a non-trustee executive would have been equally able to commit the same offense, and stand an equal chance that it would not be discovered.

To this end, Defendant has appended an affidavit from Rich Seligman. (Ex. V, Richard Seligman affidavit). Seligman is a practicing attorney with 30 years of insurance experience, including in the area of regulation. He served for a period of time as Chief Counsel for the Illinois Department of Insurance. Mr. Seligman has also represented Nicosia and First Oak Brook in numerous matters before the Illinois Insurance Exchange and the Illinois Department of Insurance.

Seligman does not believe that Nicosia abused any position of trust in this matter. He disputes the notion that some fiduciary relationship existed between Nicosia and the Illinois Insurance Exchange. Every syndicate has a trustee or a representative in the Illinois Insurance Exchange Board so that no syndicate is viewed differently or considered to have a fiduciary relationship. In any matter having to do with First Oak Brook, Nicosia was not *allowed* to be involved, and Seligman's review of the documents shows that he abstained from any Board decisions or discussions involving First Oak Brook. In fact, Mr. Nicosia resigned from the Board in May 1996. Seligman found no evidence, and the Government has not presented any, to suggest that the Board monitored First Oak Brook less closely than other syndicates because Nicosia was a trustee on the Board.

Thus, the Government cannot prove the application of this enhancement beyond a

23

reasonable doubt.[7] Just because the position was titled "trustee" does not mean that Nicosia occupied a position of trust; and, even if he did, the Government can point to no act that Nicosia took or was able to take *because* he was a trustee that enabled him to get away with this offense. The enhancement simply does not apply.

### D. Tax Count

The tax count may not impact upon Defendant's sentence; everyone agrees that the two sentences are not grouped under § 3D1.2 and the offense level as it exists falls more than 9 levels below the fraud count. *See* PSR at 24; U.S.S.G. § 3D1.4(c). It may become an issue if the Court agrees with Defendant's arguments above and reduces the offense level on the fraud counts.[8] Therefore, Defendant finds it necessary to also object to the Probation Officer's recommendation that two levels be added to the tax count on the theory that Defendant was a manager/supervisor with respect to Patty Taconi. The Government did not join in recommending this enhancement.

Under any standard the Government cannot prove this enhancement. It doesn't try, and for good reason: the enhancement does not apply. Under § 3B1.1(c) the Court can add an

---

[7] For the same reasons, the Government cannot prevail by a preponderance of the evidence.

[8] The Government calculates the fraud offense level as 30 and the tax offense level at 18. The Probation Office, however, calculates the tax count as 20. If the Court accepts the Probation Officer's view, but agrees that Defendant does not deserve an abuse of trust enhancement, his total offense level for the fraud will come to 28, not 30, making the tax count 8 levels less serious and meaning that the tax count would add an additional level to the resultant combined offense level. U.S.S.G. § 3D1.4(b). If the Court agrees that the Defendant's conduct did not substantially jeopardize the safety and soundness of a financial institution, his total offense level for the fraud will come to 26, which will once again add an additional level under § 3D1.4(b). If the Court agrees that neither enhancement applies, the resultant offense level for the fraud count would be reduced 6 levels to 24, but the combined offense level would increase by two levels under § 3D1.4(a).

additional two levels if the Defendant "was an organizer, leader, manager, or supervisor" in criminal activity. It requires that there be at least one other person involved in the criminal activity. *See, e.g., United States v. Sierra*, 188 F.3d 798, 803 (7th Cir. 1996); U.S.S.G. § 3B1.1, Application Note 2. That other person must also be a "participant," which is defined as someone criminally responsible for the commission of the offense. *United States v. Fleischi*, 305 F.3d 643, 659 (7th Cir. 2002); U.S.S.G. § 3B1.1, Application Note 1. It is hard to fathom Patty Taconi being a participant in Defendant's tax fraud; the Probation Officer points to no evidence that she had anything to do with filling out his tax returns or determining what should be reported. As the PSR notes elsewhere, the income Defendant failed to report was not unlawfully obtained – the offense arose out of Mr. Nicosia's failure to report the money as income, not whether he was legally entitled to take it.

The Probation Officer's conclusion that Taconi was a participant because she paid his personal expenses and he did not report those expenses as income on his tax returns, hardly makes Taconi a "participant" in his tax fraud. The Probation Officer cites nothing to show she saw his tax returns or could have been charged as a conspirator in his tax crimes. The Government in its own submission in fact writes: "These payments, while not illegal in and of themselves, became illegal when Nicosia and LaMantia failed to report them on their returns." In other words, if Mr. Nicosia had reported that income as he should have, there would be no tax case at all, regardless of Taconi's conduct. Thus, this enhancement clearly has no application and the offense level for the tax count should be 18, not 20.

### E. Final Calculation Under the Guidelines

Accordingly, Defendant sees the guidelines sentence on the fraud count as follows: he

agrees with the Government (and the Probation Office) that the base offense level plus the amount of the loss comes to 20; that the levels should be enhanced 2 points for more than minimal planning; that there should be an additional two levels added for his role in the offense. The addition should end there, however, at 24.

Meanwhile, the base offense level for the tax count is 18, with no addition for role in the offense. The two offenses are not grouped, but because they fall within 6 levels of each other, one level is added to the fraud count pursuant to U.S.S.G. § 3D1.4(b). *See* page 17, footnote 3, *supra.* Adding one level and then subtracting three for acceptance of responsibility leaves a final offense level of 22, and a sentencing range of 41-51 months.

## IV. RECOMMENDED SENTENCE

The opening paragraph to 18 U.S.C. § 3553(a) states that the court shall impose a sentence that is sufficient, but not greater than necessary, to satisfy the enumerated factors, only one of which is the Guidelines. As noted at the outset, this means the Court is required to consider not only the advice of the Guidelines, but the nature and circumstances of the offense and the personal history and characteristics of the Defendant. We believe that when taking everything into consideration, particularly Mr. Nicosia's lack of prior criminal conduct, unlikely recidivism, and the impact of a lengthy absence on his family, a sentence of incarceration and/ or work release with community service would be consistent with *Booker,* and adequately meets the sentencing goals of §3553(a).

## A. The "Loss" Adequately Accounts for the Criminal Conduct
## In This Case, and In Fact Overstates It[9]

The seriousness of Mr. Nicosia's conduct cannot be understated. He caused harm to those people who bought insurance from his company believing it was solvent. However, the large loss figure in this case, $8,000,000, is not a true indicator of culpability in this case. This loss figure added 14 points to Mr. Nicosia's base offense level and represents the bulk of his sentence. But that loss did not originate from Mr. Nicosia's conduct. Rather, as everyone agrees, market conditions and the impact of the changes in the law after *Montrose* caused the insolvency of First Oak Brook, along with six other syndicates during that same time period. If Mr. Nicosia had done the right thing and shut down the company there is no indication that the loss would have been any different. The loss occurred irrespective of the fraud. Thus, the simple statement that Mr. Nicosia committed an $8,000,000 defraud, while true, does not clearly set out what happened in this case.

The only question really is whether the fraud made things worse. According to the affidavit of John Snyder, discussed previously, it is possible that the loss could have been *less* as a result of the fraud, because money that First Oak Brook collected was used to pay claims that would not have been paid had the company closed down when it should have. Mr. Snyder did not have all the information necessary to definitively make that determination. The Government

---

[9] Under the Guidelines, a Defendant may receive a departure where the loss overstates the seriousness of the offense. *See* U.S.S.G. § 2B1.1, application note 16. But even if the Court finds that the departure is inapplicable, under the advisory scheme the Court may still take this into consideration in sentencing. *United States v. Jones*, 352 F.Supp.2d 22 (D. Me. 2005) (even though Court concluded Guidelines did not permit a departure for mental conditions and extraordinary rehabilitation, these factors justified a departure from the nature of custody (Zone D to Zone C)).

has presented no evidence on this issue at all.

Moreover, when things were deteriorating Mr. Nicosia personally borrowed approximately $800,000 that he put into the company, and then co-guaranteed another $3,000,000 in loans to the company. Such factors are now being considered by District Court judges when imposing post-*Booker* sentences. *United States v. Jaber* (D. Mass., March 3, 2005) (while quantity of drugs may be an appropriate indicator of culpability for one defendant, it may not be for another defendant if it does not reflect the "true nature and circumstances of" the defendant's case). The fact that Mr. Nicosia put his name on $4,000,000 worth of loans testifies to the fact that he really *did* want the business to succeed, and that he *did not* maliciously harm potential policyholders. In fact, Defendant believes that there is presently $11,000,000 in the First Oak Brook estate for the payment of creditors and policyholders. (Exhibit W, Liquidator's Statement of Changes in Cash and Invested Assets).

### B. Character of the Defendant

Mr. Nicosia's criminal conduct stands in stark contrast to an otherwise generous and giving nature. While these factors may not be relevant to a guidelines analysis, under 3553(a) they are important in determining the defendant's ultimate sentence. *Ranun*, 353 F.Supp.2d 984; *see also United States v. Nellum*, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. February 3, 2005).

While Nicosia was suffering the unbearable sadness of the death of his child, he reached out to help others. He lent emotional support to other families with dying children. Even after Katie passed away, Mr. Nicosia positively influenced other families and helped them through their grief. Several of these families have written letters attesting to the positive influence Mr. Nicosia has been to them during times when they desperately needed emotional support.

28

Other letters from friends and family members suggest that Mr. Nicosia's efforts to help his wife cope with the tragedy of Katie's death may have clouded his judgment when the time came to shutter First Oak Brook and give up the hopeless dream that it could continue to succeed. More significantly, many of the people closest to Leonora believe that the effects of Katie's death have never left her. They express their deep concern about the impact a lengthy incarceration will have on her. *See United States v. Smith*, (No. 02-CR-163, D. Wis.. Mar. 2005) (adverse impact on defendant's family caused by lengthy incarceration of defendant proper sentencing consideration).

## C. Needs of the Public

Mr. Nicosia is 53 years old and has no prior criminal record. He does not represent a threat to the public. He is no longer in the insurance industry and has met all of the conditions of his bond and has not violated any laws during the pendency of this case. Joe Nicosia has been laboring under this case for the last two years, waiting for the second shoe to drop. He has lain awake every night thinking about the inevitability of jail, but praying for a miracle. Although he has been unable to bring himself to work and suffers from anxiety and depression, he has remained a pillar of support for Leonora and a constant care giver for his father. The Court will recall that Mr. Nicosia wanted this sentencing to take place prior to *Booker* in order to end the agony. He feels as though he has been in prison already.

The letter from friends and family members support the conclusion that Mr. Nicosia will never again be a defendant in a criminal case. *See Smith*, at 12 (Court relied on letters from the defendant's pastor and other family members attesting to the defendant's good character in sentencing the defendant). While a sentence of incarceration and/or work release is necessary in

29

this case to reflect the seriousness of the offense and to deter others, there is no need for deterrence with respect to Mr. Nicosia. The last few years have been extremely difficult for Mr. Nicosia and his family. He is deeply ashamed and sorry for his conduct and has expressed that remorse in his Version of the Offense.

In contrast to his criminal acts, Joseph Nicosia has positively benefitted the public. Acutely aware of the stress and sadness surrounding treatment of a sick child, Joe and Leonora personally contributed $50,000 for the construction of an entire wing of the Ronald McDonald House at Loyola University. The Ronald McDonald House provides a haven for families and sick children undergoing treatment in the hospital. It attempts to alleviate the anxiety and fear associated with the typical hospital environment. The "Katie Wing" provides a playroom for children. (See Loss letter, Ex. K).

In 1991, Joseph Nicosia helped found the Katie School of Insurance, also in his daughter's name. Information about the school can be downloaded at www.cob.ilstu.edu/katie. The Katie School is a part of Illinois State University's College of Business, guided by an Advisory Board of Insurance Executives that provides annual scholarships and grants totaling over $111,000. It is accredited by the American Assembly of Collegiate Schools of Business. In the 2004-04 year, 921 students were enrolled in insurance classes. [10]

---

[10] We recognize that the Court must also consider the need to avoid "unwarranted sentencing disparities" in sentencing Mr. Nicosia. *See* §3553(a)(6). Mr. Nicosia's co-defendant, Richard Murphy, a certified public accountant, received a sentence of 42 months, in a different sentencing proceeding and before a different judge. Murphy agreed to a higher loss figure and Judge Castillo applied the four point enhancement for substantially jeopardizing the safety and soundness of a financial institution under the then mandatory guidelines. Murphy he did not present evidence as we have here showing that there was no additional jeopardy to the financial institution; he was not able to argue, because he was sentenced prior to *Booker* and *Blakely*, that

### E. Recommended Sentence

We believe that strict adherence to the Guidelines in this case results in a sentence greater than necessary to satisfy the sentencing goals of 18 U.S.C. 3553(a). This is true even if the Court does not apply the additional enhancements discussed above. We urge the Court to fashion a sentence that will take into account Mr. Nicosia's personal circumstances, family circumstances, lack of a prior criminal record, and low risk to the public. In cases such as Mr. Nicosia's, where the defendant's history and character are mitigating, consideration of the §3553(a) factors may require a sentencing outside the advisory guidelines range. *United States v. Meyers*, 2005 WL 165314, *2 (S.D. Iowa 2005). Just two weeks ago, in *United States v. Smith*, Judge Adelman sentenced a defendant with a guideline range of 121-151 months, to a non-guidelines sentence of 18 months, based in part on the defendant's importance to his family. Although Smith was not married, he took care of his sick mother and lived with his two children and their mother.

If the Court chooses to sentence Mr. Nicosia under the Guidelines sentence, we of course would urge the Court to sentence Mr. Nicosia at the low end of the guidelines range (41 months). For the reasons stated above, however, we believe that the debated enhancements cannot be applied in this case. Even if the Court disagrees, the enhancements should not apply, because they do not fit snugly in these circumstances. *See, e.g., United States v. Ochoa-Suarez*,

---

the Court did not have to apply the enhancement even if it technically applied; and he did not have the opportunity to argue, as Mr. Nicosia can, that guidelines are advisory and not mandatory. Moreover, while this sentence may be different than Mr. Murphy's the disparity is not unwarranted because the guidelines sentence is greater than necessary to satisfy sentencing purposes post-Booker. *See Nellum* at *15.

2005 U.S. Dist. LEXIS 1667 (S.D.N.Y., Feb. 7, 2005) (not applying § 3B1.1 even though technically available under the Guidelines). This is not an ordinary case where a defendant's conduct caused the loss, so a guideline sentence that includes the 4 level enhancement ought be considered but not strictly followed.

As argued above, First Oak Brook became insolvent based on factors having nothing to do with fraud. The fraud allowed the company to operate when it should have shut down. Had it shut down, the loss would have been the same, maybe even more. This is not a typical situation where a defendant's conduct directly causes the insolvency, usually, in fact, to an institution not his own, or where his fraud made matters worse. Thus, even if this enhancement applies under a strict reading of the Guidelines, at sentencing the Court should either ignore it or enter a non-guidelines sentence that does not take it into consideration.

Likewise, even if the abuse of trust enhancement applies technically under the guidelines, in this case there is no evidence that Mr. Nicosia took advantage of that trust or used it in any way in order to commit his offense. A defendant who ran an insurance syndicate who was not on the Board could have committed the same offense as easily – Mr. Nicosia's position did not enable him to do something that other person could not have done. Thus, even if the abuse of trust enhancement applies, under these circumstances the Court should not apply it, or if it does, impose a sentence that does not include it.

## VI. RESTITUTION

Mr. Nicosia argued in his original memorandum that the restitution figure in this case was capped at $100,000, the amount of money that he settled with the Illinois Insurance Exchange in a civil suit based on the same facts. The Government ravages Defendant for making this

32

argument, but we are simply making legal arguments based on our understanding of the law.

The agreed upon sentencing "loss" in this case is, as the Government points out, over $8,000,000. For starters, however, "loss" and restitution are two entirely different concepts, and it does not follow necessarily that because the sentencing "loss" comes to one figure that restitution will come to the same figure. It is entirely possible that the amount of loss will exceed the amount of restitution because loss is based on the amount that a defendant has placed at risk and restitution compensates the victim only for losses that actually occurred. *United States v. Swanson*, 394 F.3d 520, 527 (7th Cir. 2005). In this case, the Government (and Probation Officer) wrongly assume that restitution to the Illinois Insurance Exchange should equal the sentencing "loss."

The Government has failed to prove the amount of restitution in this case, which is its burden. *Swanson*, 394 F.3d at 527; *United States v. Murry*, 395 F.3d 712 (7th Cir. 2005). It must specifically identify the victims in this case, the amounts that they are owed, and whether the defendant's conduct caused these precise losses. *See id.*(as part of Government's burden of proof, the Government was required to specifically connect the victims to their losses and the defendant's conduct). In this case, the Government has presented no evidence identifying the victims of the fraud, the amounts owed to them, or whether Mr. Nicosia's conduct caused their losses.

The Government asks that restitution be paid to the Illinois Insurance Exchange for distribution to the victims. We have argued that because the Illinois Department of Insurance, to whom the restitution is to be paid, settled the civil case for $100,000, that the restitution cannot be for more that $100,000. The Government suggests there is something untoward in

33

making this argument but it is based entirely on the law.

To the extent the Government suggests Mr. Nicosia is unrepentant in making this argument, we understand that the Illinois Insurance Exchange has collected $11,000,000 in the liquidation of First Oak Brook, which on the face of it is more than enough to have covered the $8,000,000 in "actual loss" used to calculate the Guidelines. We don't suggest that the loss is in fact entirely covered, nor do we know how much actually is covered. But it highlights that it is the Government's burden to show who the victims are and what the victims lost. It is neither the defendant's, nor the Court's responsibility to "root" through the evidence in a case "in order to calculate a proper amount of restitution; instead, the government has the obligation to identify specific restitution obligations and to provide a reasoned basis for a proposed restitution order." *Swanson*, 394 F.3d at 527. Mr. Nicosia does not want to walk away from his obligations, he just wants to know what those obligations are. The Government's unsupported conclusion that the sentencing loss equals the restitution, and the PSR's repetition of this bare conclusion, fail to meet this burden.[11]

---

[11] By way of example, the Liquidator, in July 1999, collected at least $1,065,230 in premiums due to First Oak Brook through a settlement with Program Underwriters Inc ("PUI"), First Oak Brook's exclusive insurance broker in the State of Florida. (See Attached Exhibit W, Order No. 96 CH 10138). This money represented premiums PUI collected in the months prior to First Oak Brook's liquidation and that were due First Oak Brook. Other filings contained in the Illinois Chancery Court file *In the Matter of the Liquidation of First Oak Brook Corp, Syndicate*, reveal other settlements entered into on behalf of First Oak Brook involving tax refunds, professional liability claims, or other monies due to First Oak Brook. However, some of these settlements are confidential and the file may be incomplete (See Exhibit X, collecting filings). If the Liquidator since 1996 has been collecting money for the estate of First Oak Brook, then for restitution purposes the victims may have already been or will be reimbursed out of the estate. This illustrates the fact that the court cannot just assume that the "loss" and "restitution" figures are equal.

With respect to the cap of $100,000, we admitted previously that most jurisdictions have held that a prior civil judgment does not cap restitution. We noted, however, that these cases were based in part on the premise that restitution is criminal in nature, as opposed to civil, but that the Seventh Circuit has persisted in a minority position that restitution is *not* criminal, but civil in nature. *See, e.g., United States v. Newman,* 144 F.3d 531 (7th Cir. 1998). Because the Seventh Circuit does not consider restitution criminal, it follows that the Seventh Circuit would find that a civil judgment can cap restitution.

True, the cases where the Seventh Circuit held restitution to be civil arose in the context of the *ex post facto* clause. The Government fails to explain, however, how the context changes the analysis, or why restitution might ever be considered civil in one context and criminal in another. In *United States v. Grimes* 173 F.3d 634 (7th Cir. 1999), the court stated that it could imagine a statutory scheme where the order of restitution was based on the total loss, and if the loss exceeds the ascertainable loss to the identifiable victims the surplus either goes to the government, back to the offender, or is held indefinitely against the chance that the presently unidentified victims may eventually come forward. "For good or ill, that is not the statutory scheme we have . . . . The statute limits an order of restitution to the sum of losses to identifiable victims – an important consideration, incidentally, to our determination in *United States v. Newman* that retroactive application of the statute does not violate the ex post facto clause . . . because the statute is compensatory in nature and not penal."

In any event, the Illinois Department of Insurance signed off on the civil settlement while well aware of the federal investigation. The Government distinguishes a case Defendant cited because in that case the Government itself signed off on the settlement agreement. We agree

35

that the circumstances are different but we believe that case informs the same result. We have a situation here where the Illinois Department of Insurance, a regulatory body, while aware of and clearly participating in the investigation of First Oak Brook, chose to settle the civil case for $100,000. The intended beneficiary of the restitution therefore knew the allegations against Nicosia and apparently brought them to the Government.

The Illinois Insurance Exchange did not have to settle for $100,000 and release Mr. Nicosia from the very conduct it turned over the United States Government, but it did. It could have even obtained a judgment for a larger amount and then settled, but chose not to. Instead, it specifically released Mr. Nicosia "from any and all Claims, ... including, but not limited to, any Claims of the Liquidator, FOB or any policyholders or creditors of FOB or its estate ...." and it defined "Claims" to specifically include "frauds." It could have omitted "fraud" from the release. The Government quotes the MVRA sections providing for "full" restitution irrespective of set-offs. (Exhibit T). The prior settlement *is* full restitution.

To the extent the Government urges the Court to consider restitution a criminal penalty, it runs headlong into the conclusion that restitution falls then under *Blakely*, and must therefore be charged and proved to a jury beyond a reasonable doubt. The Seventh Circuit has previously taken the view, in part *because* it views restitution as civil, that *Apprendi* does not apply to restitution. *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000). The Seventh Circuit alternatively noted that restitution does not include a "statutory maximum," *id.* at 1054, although that aspect of the opinion must now be reconsidered in light of *Blakely's* revised definition of that phrase. The bottom line is that if restitution is a civil remedy, to which the Sixth Amendment does not apply, then the prior civil settlement should cap the restitution

36

figure; if it is a criminal penalty, then it becomes an element that the Government must charge and prove to the jury beyond a reasonable doubt, which it has not done here.[12]

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court sentence Mr. Nicosia to a non-guidelines sentence of incarceration and/or work release, plus a condition of substantial community service. If the Court sentences Mr. Nicosia to a Guidelines sentence then we would urge the Court, for all of the reasons stated above, to sentence Mr. Nicosia at the lowest end of the guideline range.[13] Under either sentence, we ask that the Court order the Defendant to pay restitution in the amount of $100,000.

Respectfully submitted,
JOSEPH NICOSIA

By: _____
One of his attorneys

---

[12] Prior to the *Booker* ruling, the Seventh Circuit noted in *Swanson* that the *Blakely*, *Booker*, and *Fanfan* outcomes would not affect the manner in which findings of restitution must be made. 394 F.3d at 526. The Tenth Circuit meanwhile held that restitution did not fall under *Blakely* in *United States v. Wooten*, 377 F.3d 1134 (10th Cir. 2004), by finding that the amount did not exceed any prescribed statutory maximum and because the defendant did not contend that the amount of restitution exceeded the value of the damaged property. *Wooten*, 377 F.3d at 1144-45 and n. 1. In Nicosia's case, however, we contend that the amount exceeds a civil resolution of the identical issue and therefore the amount sought exceeds the value of the damaged property.

[13] If the Court sentences Mr. Nicosia to a sentence within the guideline range, Mr. Nicosia respectfully requests that the Court recommend in the Judgment and Conviction Order that the Bureau of Prisons designate Mr. Nicosia to Yankton Federal Prison Camp and that he participate in Yankton's residential drug and alcohol treatment program.

Michael D. Monico
Barry A. Spevack
Jacqueline S. Jacobson
MONICO, PAVICH & SPEVACK
20 S. Clark Street
Suite 700
Chicago, Illinois 60603
312-782-8500

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAR **1 6** 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 CR 1129 |
| v. | ) | |
| | ) | |
| | ) | Hon. James B. Moran |
| JOSEPH NICOSIA, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF FILING

To:     Brian R. Havey
        Assistant United States Attorney
        219 South Dearborn Street
        5th Floor
        Chicago, Illinois  60603

PLEASE TAKE NOTICE that on March 16, 2005, we filed with the Clerk of the District Court Defendant's Sentencing Memorandum In Light of *Booker*, a copy of which is hereby served upon you.

## CERTIFICATE OF SERVICE

Barry Spevack, an attorney, states that he caused copies of the above motion to be hand delivered to the above party at the address indicated on March 16, 2005 before 5:00 p.m.

_____
Barry A. Spevack

MONICO, PAVICH & SPEVACK
20 South Clark Street
Chicago, Illinois  60603
312-782-8500