**FILED**

MAR 1 6 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01 CR 1129 |
| | ) | Hon. James B. Moran |
| | ) | |
| JOSEPH NICOSIA, | ) | |
| | ) | |
| Defendant. | ) | |

### EXHIBITS IN SUPPORT OF DEFENDANT'S
### SENTENCING MEMORANDUM IN LIGHT OF BOOKER

MONICO, PAVICH & SPEVACK
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500

# Exhibit A

## VERSION OF THE OFFENSE

My name is Joseph Nicosia. I am 52 years old. I have been married to Leonora Nicosia for 23 years. Our marriage produced three wonderful children. Our son, Joseph Jr. is 22 years old and is a student at Boston College. Our daughter Nori is 20 years old and a student at Indiana University. Our baby, Mary Katherine, died in 1989 at age 2 ½ years old after a terrible struggle with cancer. Katie's death left our family in complete turmoil. Now I am responsible for causing another disruption in the lives of my family members. I lie awake every night and worry about how my wife and family will be able to cope when I am in jail.

I am very sorry for my conduct. I would like to apologize to the Court, the Government, and everyone else connected to this case. I have made mistakes that I must live with for the rest of my life. Those mistakes have brought shame upon myself and my family. I have caused much suffering to my wife and children. I apologize to them with all of my heart

I grew up in Melrose Park, Illinois. My father was a plumber and my mother was a sales clerk at Spiegel's. My parents were very loving and worked hard to provide for my brother and me. My mother, with whom I was very close, died last year. My father is 85 years old and suffers from heart problems. I try to visit him at least once a week. I have told my father about this case. It is very difficult for him because he knows that I am going to jail. I try not to think about the fact that something may happen to my father when I'm away.

I can't go back in time and undue my conduct. I can only try to move forward in the right direction. I feel that my guilty plea in this case was the first step in that direction. I fully accept responsibility for my conduct. I pled guilty and have agreed to a jail sentence. I was very personally invested in First Oak Brook Corp. Syndicate. I gave a lot of time, effort, and money to my company. When things started to go bad, I helped conceal my company's true financial

condition by causing false statements and representations to be made in First Oak Brook's 1995 year end financial statement and the March 1996 quarterly financial statement. We should have closed down the company, but I foolishly believed that eventually we would recover. The person I most relied upon, Michael Lamantia, who had been a respected banker before joining our company, did not help. He gave me advise that I knew was dangerous and improper. My actions were a result of my own foolish pride and my mistaken belief that if I just worked harder the company would eventually make money and all of the problems would be solved. I was wrong. I also committed tax fraud by not reporting as income personal expenses that the company paid for on my behalf. Although this money was not the proceeds of any illegal conduct, I did not lawfully report them on my personal income tax returns.

Before my in-laws and I started this insurance company, I had a very successful insurance brokerage business. My wife came from a wealthy family and her father was a well known and highly regarded business man. He helped me get started with the insurance company. I have now lost everything. My insurance brokerage company was worth over $2.5 million dollars. It is gone. I also lost millions with the demise of FOBC, which was estimated to be worth $15 million in 1995.

I don't think that a parent ever recovers from the death of their child. After our daughter died, I tried to help my family by being the strong one that everybody could rely on. We were all devastated by her death. But nobody took Katie's death harder than my wife, Leonora. It did not seem like she was ever going to recover. For years, she suffered bouts of depression where she would not get out of bed or leave the house for days on end. She also awoke almost nightly from panic attacks. I spent a lot of time at home with my family. Leonora was dysfunctional at times and she and the children needed me.

Katie's death left me with a feeling of devastating loss and despair. . I began to drink alcohol to try and deaden my pain. Around ten years ago, I began suffering from severe back pain and began to use pain killers in addition to alcohol. I have tried to overcome this behavior, but I have not been successful. I know that I have a problem and I have attended AA meetings to try and help myself. I intend to use my time in jail to better myself. I look forward to making whatever programs are available to me during my incarceration to try and understand the underlying causes for my alcohol problem and the motivation for my illegal conduct.

# Exhibit B

May 13, 2004

Honorable Judge James B. Moran
219 South Dearborn Street
Chicago, Illinois 60604

Dear Judge Moran:

Thank you for allowing me the opportunity to write to you and tell you about my husband Joseph Nicosia. We have been married 23 years. I wish that I could write that all of those years have been wonderful. But, we have suffered great losses. Through it all, Joey has stood by me and the children. Joey is a wonderful man. He is a kind and loving husband, father and son.

I know that Joe has committed a crime. My husband feels tremendous remorse for his conduct. He has been open about his sadness and shame about this case. Just as he stood by me in the past, my children and I support him today. Joe's conduct in this case does not represent who he truly is and all of the contributions he has made to the community. I pray that you take into account all of the events in Joe's life in sentencing him.

As I stated earlier, my family and I have suffered tremendously. On our eighth wedding anniversary, our youngest child, Mary Katherine (Katie) died of a malignant tumor called Neuro-lblastoma. Our journey with her had taken us to Memorial Sloan-Kettering Hospital in New York for a bone marrow transplant. It was there that she succumbed to the disease. While at the hospital, we met many other families that were suffering the same losses that we were. It was then, that I realized the miracle that God had given me. He blessed us by allowing Katie in our lives and he blessed me with Joe. Joe stood by me and the family. He took care of everything while the rest of us were paralyzed by our sadness. Joe also took care of the other women at the hospital whose husbands were not able to help them. I will never forget how Joe reached out to these women and tried to help them.

After Katie died, Joe devoted all of his time to me and our two children. His support never wavered. I was devastated by Katie's death. My depression made it difficult for me to function. Joe's undying support and love is the reason that I recovered. I am very grateful for his support of me and the kids. Joe's life took a back seat, but he never complained. He came home from work in the middle of the day when I could not muster the energy to get out of bed, and he stayed up with me at night when I could not sleep. He took care of the children and tried to restore their lives to normal. I assure you this was not an easy task. Many marriages do not survive a tragedy such as the loss of a child. And many other individuals might have walked away from such a difficult situation. Not my husband. He never left my side.

Unfortunately, all of this took its toll on Joe. I was so encompassed with my own grief that I did not realize how deeply Joe was suffering. It was during this time that Joe started drinking at night to cover his pain. In front of my own eyes, my husband became a substance abuser and I didn't even notice it, or help him.

Nothing can compare to the grief that we suffered during Katie's illness and after her death. After many years, I was finally able to live again. Then this case happened. The last few years have been very difficult. Joe has lost the company and his self-respect. He has had to deal with the embarrassment and shame surrounding this case. The worst part for me is that Joe will be taken out of my life. I have never been without Joe. My fear and anxiety about being without him has caused me tremendous pain. Joe's drinking has gotten worse and I know it is because of the guilt and shame that he feels about this case. I hope that he can get help for his problem while he is away.

Your honor, I do not think that I would be here today were it not for my husband's love, support, and kindness. He truly is a wonderful human being. Joe is genuinely sorry for his conduct. He feels terrible about the anxiety and grief he has caused his family. In sentencing my husband, I pray that you not judge him only by the events in this case. I hope that this letter provided you with some insight into what a remarkable man my husband truly is and that you sentence him to the minimum sentence under the law.

Sincerely,

Leonora Nicosia

# Exhibit C

Dear Judge Moran,

I am writing this letter on behalf of my father Joseph Nicosia in hopes of demonstrating his importance to my family over the last 22 years. Throughout my life my father has not just been a "Dad" to me, he has been a mentor and confidant and most importantly a friend. He has been a wonderful example of faith and love to my mother, sisters and me throughout our lives. Always conscious of our blessings, my father has instilled the precious virtues of faith and charity. Even when faced with the greatest of tragedies, his belief in these virtues never diminished.

When I was six years old, my two- year old sister was diagnosed with Neuro-blastoma, a deadly cancer that would later prove to be the root of tremendous tragedy and sadness for my family. Although her illness and consequent passing has been the greatest tragedy in our lives, it has also served as a reminder of how truly fortunate we are to have one another. Although only a child, I was old enough to understand the immense loss that my parents were facing. Day after day, my mother and father would wait awake with the hope that a miracle would occur and my sister would overcome her illness. Never once did my father allow his own doubts and fears to stifle the leadership and love that he expressed to his wife and children. He selflessly demonstrated the characteristics of the ideal husband and father.

My sister passed away on January 31ˢᵗ, my parent's Wedding Anniversary, a day ordinarily reserved for a celebration of a couple's love and commitment to one another. Since that day, my parents have celebrated their anniversary with the bittersweet reminder of the loss and heartache that they endured so many years ago. While many would succumb to despair and doubt my father remained steadfast and instead used his

abilities to create a lasting memorial of his love for my sister by dedicating a school at his alma matter to commemorate her life. This commitment to making a difference in others' lives exemplifies the essence of his life.

My father has been integral to my development into a man. His supportive attitude has fostered a relationship that has moved beyond that of just a "father" and "son". He has always made both my sister and I the number one priority in his life. His advice has served as a guide through life's obstacles and his smile has highlighted every triumph. He has always been a wonderful role model, teaching me the attributes of a loving and devoted husband and father.

These thoughts resonate with me today as I recently became engaged to be married. Surrounded by thoughts and questions of what it will be like to be a husband and someday a father, I cannot help but think of my own dad and the impression he has left on me in each of these capacities. I cannot imagine entering into the union of marriage with the woman I promise to be with forever without the man who has taught me what this union truly means. It is important to all those in my family that my father be able to experience this joy and be a witness to the love that will unite my fiancé and me.

With Sincere Gratitude,

Joseph P. Nicosia

Exhibit D

January 2, 2004

Dear Judge Moran,

My name is Nori Nicosia. It is your job to decide a sentence for my father. I am writing this letter to you asking for your mercy. My father is the strength of our family. He has held my mother up since the day my sister died. I know that this caused him to begin drinking silently in the dark of the night after he thought that his children were asleep – but sometimes we weren't. We would slip down the stairs and watch him. He would sit with his head in his hands crying. He wasn't crying for himself, he was crying for my mom. Her pain was so severe and my dad just couldn't fix it. Mr. Monico tells me that dad may have the chance to enter a program that will help him recover. I pray that this will be available for him.

During my entire life, my father has never missed any event in which I have participated. Even at his most embarrassed times he sat front and center for all my dance competitions. My dad is the light of my life. In two years I will graduate from Indiana University, I hope that he may be at my side.

Thank you for allowing me to tell you how much my father means to me. I pray that Our Lord guides your decisions.

Respectfully,

Nori Nicosia

Exhibit E

Dear Judge Mo n,

It is hard for me to believe that my daughter's husband, Joseph Nicosia could be guilty of a dishones act. Joey has always been a giver not a taker.

Joey is a loving husband and father. His devotion to my daughter, Leonora after the cancer death of their 2 year old daughter was what held the family together.

Leonora was devastated by her baby's death and Joey was a tower of strength for her and their other 2 small children. His incarceration for a lengthy period would be a terrible blow to this little fami

I, a mother and grandmothe beg for your mercy. Gratefully,

Lorayne Cascino

# Exhibit F

January 21, 2004

Honorable James B. Moran
United States District Court
219 S. Dearborn St.
Chicago, IL 60604

Re: Joseph Nicosia

Dear Judge Moran,

I write you today in regards to Joe Nicosia whom you will be sentencing in a few months. I am his brother-in-law. I have known him more than 20 years. My sister Leonora, his wife, and I are part of a close extended family. I am a physician with one 5 year old boy. My wife Susan has written to you as well in regards to this matter.

The most important event in Joe's life was the loss of his youngest child at age 2 from malignant neuroblastoma. I am a practicing neurosurgeon who is unfortunately quite familiar with situations involving sudden catastrophic loss. However, my extended family and I were completely unprepared for the unfathomable despair that followed. Joe's strength was great through all of this, but it took its toll. Then and now, he has needed the courage not only to somehow see himself through such a calamity but to support my sister as well. Even with psychiatric attention and a close family, Leonora would not be in her current state of mental health without Joe's constant and ongoing support. I believe this to be true of his two children also. His love and loyalty to his wife and family is remarkable.

Joe is a kind and generous person exemplified by his many charitable associations. He is a doting father and an equally attentive son.

His mother died within the last month.

He is ashamed at his admission of guilt as our two families represent professionals and business owners without criminal history. I am certain that he will never be before your court again.

Your Honor, please consider the pain that Joe and his family have gone through as you weigh his sentence.

Respectfully Submitted,

Christopher J. Cascino MD
260 Aberdeen Drive
Barrington Hills, IL 60010
(847) 277-1499

Exhibit F(a)

March 13, 2005

Honorable James B. Moran
United States District Court
219 S. Dearborn St.
Chicago, IL 60604

Re: Joseph Nicosia

Dear Judge Moran,

This communication represents a follow up letter in regards to Joe Nicosia whom you will be sentencing in the near future. I am a practicing neurosurgeon in the Barrington area, and I would like to tell you more about how Joe's absence would affect his wife Leonora. As per my earlier letter to you, Your Honor, Joe and Leonora lost a 2 year old to a malignant tumor in 1989. At that time, Leonora sought psychiatric help, and, after some 3 years or more, her life became more normal. It is my honest belief that her husband Joe had more to do with her improvement than her psychiatrist did. Frankly, I am concerned that my sister Lee will again encounter a serious affective disorder like depression when Joe is sent to prison, and in his absence her recovery will be slowed and incomplete.

This family, and Leonora in particular, have been through such hardship in the past. Determination and close family ties made the difference then. Please consider my sister Leonora as you decide on Joe's sentence.

Respectfully Submitted,

Christopher J. Cascino MD
260 Aberdeen Drive
Barrington Hills, IL 60010
(847) 277-1499

# Exhibit G

January 13, 2004

Dear Judge Moran,

My name is Patricia Sullivan Rozzano. I am a retired high school mathematics teacher, and I am Leanora Nicosia's first cousin. I met Leanora's husband Joe Nicosia a year before they were married, so I have known Joey for 24 years. I am nine years older than Lee, and since her mother was my mother's only sister, I have been very close to her from the day my aunt brought Lee home from the hospital. My own mother passed away at a young age; my aunt became like a mother to me, and my cousins and I are as close (if not closer) than most siblings. I write this letter today out of love and concern for Leanora, and wish to share with you the extent of her past and continued need for Joey's companionship and support.

As I am sure you are aware, Lee and Joey lost a baby girl named Katie in 1989, when Katie was 2 and a half years old. You may think to yourself that many parents lose children and they mourn and recover, and get on with their lives. This has not been the case for my cousin Lee. For seven years following Katie's death, our entire family was terribly concerned for Lee's mental health.

Without Joey's time, devotion, and support, Leanora may have ended her journey through depression following Katie's death without ever emerging. Joey pulled her through it. I wish for you to see its effect on Joey, and to understand the unique dynamic that exists between them and to understand why I feel Joe's prolonged absence from Lee's daily life would be so detrimental to her mental health.

Joey is Lee's rock, her strength, her source of stability. Lee was in psychiatric care for over 2 years following Katie's death. She began suffering horrible panic attacks both day and night. She was calling Joey at work at least two to three times a day every day, she was calling Joey and asking him to come from work for the rest of the day at least once a week for two to three years following Katie's death. And Joey would come home during the day just to check on her whenever he could, whenever he felt he should, which was most days. The life they resumed after Katie's death was far from normal. Joe would take Lee to a restaurant and they would have to leave before dinner was served. As Lee would explain it to me: "Joe had to throw money on the table and follow me out because I got hysterical and left." They had to fly home from vacations he tried to take her on before even getting to their hotel. She was inconsolable. This went on for years.

She never seemed to be getting better, never seemed able to begin the healing process, and, in my opinion, has never "gotten over" Katie's death; but if you had known Katie, you would understand how no parent, in fact no person, could ever completely recover from her loss.

Katie was an exceptional child. She was bright and precocious. She was always cheerful, even when she was in terrible pain and enduring cancer treatment. She would comfort her visitors, which is admirable in an adult, but amazing behavior from a small

child. Katie had such a strong personality, exuded such love for life and for other people, and seemed to possess a wisdom far beyond her age and experience—an apparent insight into her illness and its effect on her family. Katie always tried to ease her family's suffering, which she seemed to understand, by being brave and bringing as much joy to a day – even one spent in a hospital bed—as possible. To have such a person in your life for such a short time is an inexplicable loss, and I cannot do her character justice in this paragraph. Suffice it to say that when a 2 and half year old exhibits "character" and strength in the face of such a devastating and debilitating illness, you know you have been blessed just to have known her. And to lose such a gifted child to such a horrible death was just too much for Lee to bear.

For the first six months after Katie died, Lee saw her psychiatrist twice a week. Then she went to weekly visits, each time coming home and sharing the details of the session with Joey. He went to counseling sessions with her when she would ask. Their other two children, Joey and Nori, went to counseling as well. Joe did not see a psychiatrist for himself, as far as I know. He was the strong one trying to keep the family from falling apart. I do not know how Joey coped during those years, but I do know that he kept my cousin from being hospitalized or institutionalized during those critical years. Throughout this time, my admiration for him grew and grew. Few people could have handled this situation in the loving and selfless way he did.

One of the ways Joey and Lee dealt with their loss was to stay committed to the children who were still battling their cancers. In the year or so that Katie was hospitalized, Lee and Joey became very close friends with the other parents. They stayed involved with these families following Katie's death. Leanora and Joey attended all the funerals of their friends' children as each one passed away. They celebrated life by giving birthday parties for the children who had miraculously survived another year. They honored Katie's memory by staying involved with this unique circle of friends who could not have coped without each other's support.

Lee was on Xanax three times a day for the first three years after Katie died. She was also on Prozac. She would still have panic attacks that hit around sundown, between 7 and 8 p.m. which would continue through the night. She often awakened Joey between 2 and 3 a.m. Lee would be hyperventilating, vomiting, would have terrible bouts of colitis, and yet Joe never wavered in his strength. He would calm her down, and often suggested that they call her mother and father for comfort and support as well. Her own father once said (at 3 a.m., after two years of calls): "I'm not listening anymore. And you're going to lose your husband." But Leanora never lost Joey's unrelenting support. It took about 7 years for the late night panic attacks to stop.

Joe was always able to re-direct her from self-destructive behavior. Lee never attempted suicide through all these trying years, because Joey was always there with the right thing to say and the right thing to do, and the right way to handle her. If Lee said to him in the morning: "Don't leave me today, just stay and talk to me," that is precisely what he did. It was a common occurrence for her to keep him home with her on bad days. When she ran out of the house hysterical crying, went to the car and tried to leave, saying she had

completely lost all sense of hope and had nothing to live for, Joey re-directed her back into the house, calmed her down, and kept the two children who were witnessing this event calm as well.

Joey kept his children as active in life as possible during this critical time in their schooling and social development. He was a "hands on" dad, who never missed a recital or a game. Little Joe was in basketball, volleyball, and Big Joe was even coach of T-ball twice a week, every Tuesday and Thursday during the summers. He took his son golfing, went to every science fair and to every parent-teacher conference. Both kids took piano lessons, Nori was in ballet. He never missed a performance. Nori has been diagnosed with Attention Deficit Disorder (ADD), but she succeeded in school and is now succeeding in college because Joey was always there supporting her. His weekends were spent with the family as a whole, trying to distract them, cheer them up, get them out of the house, and cement their family together so they could withstand the torrents of emotion that threatened to take them all down.

Lee is still scared sometimes. She has a persistent fear that the people she loves will die and leave her alone. Her father passed away a month ago (December 7, 2003) after an unexpected massive stroke, and her mother-in-law passed away in the last few weeks. Joey's father in currently in the hospital, seriously ill. The children are away at college. My aunt, Lee's mother, is mourning the sudden loss of her husband, and is spending the winter in Florida, away from the cold.

My concern is for my cousin, Leanora, and her feelings of loneliness and abandonment at this particular time in her life. Our family is experiencing a great sense of loss again right now with the loss of Lee's father, the patriarch of the family. Lee has an "empty nest" with her kids away at college. Joey continues to be her rock, her strength, her stability. I am afraid for her to be alone for too long. I am afraid that her hard-earned ability to stay sane and to function will be compromised without Joey's constant support and reassurance. I am worried that she will decompensate into a depression that only Joey has been able to see her through.

Your Honor, I pray you will have compassion on the suffering this family has endured, and that Joey's sentence does not take Joey away from Leanora for any longer than is absolutely necessary. I ask that the effect of his absence on Lee will be considered in determining the length of his confinement, and that his love and devotion to his family and to other families struggling through the horror of childhood cancer will be a mitigating factor.

Respectfully Submitted,

*Patricia Sullivan Rozzano*

Patricia Sullivan Rozzano
5114 Estates Circle
Sarasota, FL 34243          Home Phone: (941) 355-4524

Please feel free to call me to discuss any issues in further detail. Thank you.

# Exhibit H

JAMES L. ALLEGRETTI
—
OF COUNSEL
DIFRANCO & ASSOCIATES

FAX
(847) 825-8619

January 30, 2004

Hon James B. Moran
219 S. Dearborn St.
Room 1843
Chicago, Illinois 60604

Re: United States vs. Joseph Nicosia

Dear Judge Moran:

My name is James Allegretti. I am a lawyer licensed to practice law in Illinois and a member of the Federal Trial Bar. My practice consists of both civil and criminal matters. Leonora Nicosia, the wife of Joseph Nicosia, is my first cousin. I have known Joe for twenty-four years. A law school classmate of mine was a friend of his and introduced him to me. We both thought he might be a nice match for Leonora and I made the introductions. They "hit it off" and married in 1981. I have remained close to both Joe and Leonora since they met.

Throughout the years my wife and I have socialized with them extensively and I have spent many hours in quiet conversation with Joe. I have found him to be a devoted husband and father. The welfare of his wife and children is always foremost in his thoughts. I have never known him to wish ill or do ill to anyone.

Joe and Lee had three children. Joe, III. and Nori are both in college and doing well because of Joe's guidance and good example. Their youngest child, Kati, died of cancer at age 2 1/2. Her death followed a long struggle with the disease and many trips to hospitals all over the country in an effort to find a cure. When she died, in 1989, both Joe and Lee were devastated. But Kati's death weighed heavily on Lee. Her physical and mental health began to deteriorate and Joe's support and quiet understanding have been her only salvation. No matter how bleak life looked or how depressed Lee felt Joe was there to reassure her and help her in her recovery from the loss of their youngest daughter.

The early and middle 90's were particularly hard on Joe. Lee was not getting any better and business was difficult at best. He spent time with his wife and family at the expense of his business and the business failed. I believe that the pressure of his daughter's loss, his wife's physical and mental distress and the pressure's of his business caused him to make the bad

decisions that now necessitate this letter. Had he been thinking clearly I do not think Joe would be before Your Honor pleading guilty to criminal charges.

I know that this is only mitigation and not reason to commit a crime. However, when good people make mistakes I think it is important to know something about the person who made the mistake. Neither Joe's family nor our family has ever been charged with a crime. In our families, a simple traffic ticket is considered to be a serious offense. When Joe's daughter got a speeding ticket the whole family knew about it and talked to her about the seriousness of even that small crime. Respect for the law runs strong in our families and Joe is suffering not only the approbation of society but of our family. He knows the shame he has brought to a family that prides itself on respect for law and order and good citizenship and he will live with that shame for the rest of his life.

These are serious consequences to someone of Joe's caliber. But these are not the most serious consequences. Time away from his family will damage the family. Lee looks to him for strength on a daily basis and he is largely responsible for her mental health and stability. Joe III relies on him for guidance and support and Nori, who in some sense suffered as much as her mother with the death of Kati, relies on him for the guidance a young woman of twenty needs from her father.

I, perhaps more than others in the family, realize that to some extent your hands are tied by the guidelines. But I hope you have some flexibility and can take into account the contrition of Joe, the embarrassment and shame he feels from his family and his extended family, and the damage his imprisonment will cause to his wife and children. I know prison is meant, in part, to deter future criminal activity. I also believe with all my heart that neither you nor the "system" will ever have to see Joe once this matter is behind him. Knowing Joe as I do, I'm certain that the acts he is pleading guilty are not indicative of his nature but are, instead, the mistakes of a good man not thinking clearly. I believe that the ends of Justice would be best served by sentencing Joe to the minimum time allowed.

Thank you for considering this letter on Joe's behalf.

Sincerely,

James L. Allegretti

# Exhibit I

January 18, 2004

Dear Honorable Judge Moran,

We are writing to you regarding a friend and neighbor, Joe Nicosia. We are both business professionals. Terry is Vice President of Corporate Administration for SPSS, a Chicago based global software company; Selma is Vice President of Process Re-engineering at Citigroup.

Our friendship with the Nicosia's began when our sons started kindergarten and continued to flourish as the boys became best friends. Both boys are now seniors in college and after sixteen years, our friendship is still thriving.

Throughout the years, Joe has been a devoted husband, a loving, engaged father and a loyal friend. The quality that always comes to mind when describing Joe is "generosity of spirit". When their youngest child, Katie, passed away, Joe never left Lee's side and provided comfort to all even though it was he who was struggling with grief. He served as a pillar of strength for Lee and the children in the aftermath of their loss and worked hard to help the family move on.

Joe's generosity extends beyond his family. When life threw anyone a "curve ball", it was Joe who graciously and consistently opened his home for any family in need. He did so with characteristic selflessness and good humor. This included many families affiliated with Loyola Hospital who suffered losses of children from cancer.

Not only is Joe a great husband, father and neighbor, he is also the ideal son. He visited his parents at least once a week, took them on family vacations and invited them to his home for every holiday. During his mother's recent illness, he never left her side and coped with her death with dignity, despite all of his recent problems.

Joe's major achievement has been in raising two outstanding children who would make any parent proud. It has often been said that the "apple doesn't fall far from the tree". The children have been positively influenced by Joe's parenting and example. Both children are excellent students, well adjusted, respected by their peers and are close to the family.

We could cite many examples of Joe Nicosia's characteristics as a husband, father and solid human being. Suffice it to say that Joe is kind, generous, morally upstanding and the quintessential family man. We are fortunate to call him a friend and sincerely wish him all good things in the future.

Respectfully,

*Selma Schohn*

Selma Schohn

*Terry Schohn*

Terry Schohn
624 Ridgewood Ct.
Oak Brook, IL. 60523
630.655.8835

# Exhibit J

June 1, 2004

Judge James B. Moran
United States District Court
for the Northern District of Illinois
Dirksen Federal Building
Chicago, IL

re: Joseph P. Nicosia

Dear Judge Moran:

I am writing on behalf of my friend and business colleague Joseph P. Nicosia. I have known Joe for over 20 years. While Joe has been a client in the past, I have always considered him a personal friend as well. Joe faces some difficult challenges that I know he will meet with dignity and integrity. During the years I have known Joe he has always been a considerate and caring man. Joe never forgot to treat every person he met with total respect. Joe's concern for others was always apparent.

In the past Joe and his family have dealt with the greatest tragedy anyone can imagine, the loss of a young child. After Katie's death Joe had the unenviable duty of holding his family together emotionally. Through those awful times never did he complain. In 1991, in memory of Katie, Joe founded and raised substantial contributions to the Katie Insurance School at Illinois State University. www.cob.ilstu.edu/katie/ . That program continues today as a fitting memorial to Katie and to Joe's efforts to give back to the community.

As you decide on the sentence you will impose on Joe, I urge you to consider Joe's character and contributions to the community.

Respectfully yours,

Richard M. Seligman

RMS
cc:     Joseph P. Nicosia
        Michael Monico

# Exhibit K

Joseph J. Loss
Louis V. Pavone
James D. Orel P.C.

**May 28, 2004**

Telephone: 630/424-1100
Facsimile: 630/424-1101
E-mail: lpolaw@aol.com

The Honorable Judge Moran
U.S. District Court
219 South Dearborn
Chicago, IL 60604

Re:     United States vs. Joseph Nicosia, Jr.
        01CR1129

Dear Judge Moran:

I am the managing partner of Loss, Pavone & Orel, a litigation firm in the western suburbs of Chicago. I have been admitted to the Bar since 1978. Our practice is mainly in the areas of insurance related issues and taxation. I am writing a letter on behalf of my close friend, Joseph Nicosia. We have been friends since our freshman year in college.

Joe has discussed this case with me on many occasions. He has confided in me about the deep shame and remorse that he feels. He is very worried about the impact of this case and his incarceration on his wife and children. Joe has admitted and pled guilty to serious crimes. Joe's conduct in this case is inconsistent with the Joe Nicosia that I know. I would like to share with you my feelings about my close friend.

Joe was raised in very humble surroundings. His father worked at the Water Department in the Village of Melrose Park. In fact, when Joe graduated from college, he went to work in the Water Department as a laborer, working evenings, while at the same time starting an insurance agency as a one-man firm. In the beginning, it was very difficult for Joe to work both days and nights ; however, over the years he persevered and was able to establish a very successful commercial brokerage. There were many weeks when money was tight during those times. Even so, Joe was always willing to help a friend in need.

In 1981, Joe married Leonora Cascino and began a family. He continued to work very hard to support his family as well as assisting and supporting his mother and father in their retirement years.

In 1989, Joe and Leonora's third child, Katie, was diagnosed with cancer. She was two and half years old. A year-long battle to stave off the effects of cancer ensued. During that period of time, as a result of trying to save his daughter's life at Sloan Kettering Hospital in New York, Joe was taken away for months from the company he built. Although valiant efforts were made to save her life, Katie eventually died as a result of her cancer.

The effect Katie's death had on Joe and his family cannot be measured in words. Joe has always been such a family man and had such a close relationship with his children that Katie's death completely consumed him. In the years following Katie's death, the emotional turmoil in Joe's family, especially the mental health of his wife and children, cannot be understated. I witnessed Joe time and time again seeking ways to fill the vacuum created by Katie's loss. No effort or cost was spared to distract his wife and children from the tremendous loss they were feeling. There were weeks that went by when his wife would not open the blinds on the windows in their house, or stop crying both day and night, over their loss.

Joe took on the responsibility of trying to make everyone feel happy again, oftentimes without much success. Although this constant despair weighed heavily on Joe, he never gave thought for his own sense of loss or the emptiness he felt in not being able to save his baby. I have known Joe for many years. I am convinced that this was the catalyst for the constellation of events which were to culminate in 1996.

During these most difficult times, Joe remained a wonderful husband, a loving father, and a charitable and generous individual. Despite the tremendous despair and sadness in his life, Joe reached out to help other family members and even strangers.

Shortly after Katie's death, during a visit to her grave at Queen of Heaven Cemetery, Joe met a grave digger. The grave digger tried to comfort Joe and engage him in conversation. The grave digger told Joe that he had five children and that he and his wife were having a hard time financially. His wife could not find work because she had no skills, but she desperately needed a job to help support the family. Joe told the grave digger to have his wife see him that next Monday morning at First Oak Brook Corp. Syndicate. And, true to his word, Joe hired the grave digger's wife, Maria, as an entry level clerical person.

Over the next several years, Maria advanced in the company and became an administrative assistant. Periodically, One day, she confided in Joe her fear that her daughter would not be able to compete in her high school because they could not afford to buy her a computer. The next day, Joe purchased a computer at his own expense, and had it delivered to their home. Not only did this girl prove to be a successful high school student, but she eventually went Yale Law School.

After Katie's death, Joe also sought to memorialize his daughter by touching the lives of many individuals. He raised millions of dollars to help form the Katie School of Insurance, a nationally recognized school of insurance that is part of the Illinois State University Business School. Through Joe's efforts, the Katie School of Insurance has graduated hundreds of students who are now working throughout the insurance industry in the United Sates and Europe. Joe and his family were also instrumental in the construction of the Ronald McDonald House at Loyola Hospital. Joe personally contributed the funds for the cost of the entire construction and furnishing of one of the wings of the facility.

The last two years have been difficult for Joe and his family. The constant fear and anxiety about the future has taken its toll on the family. Joe constantly worries about how Leonora and their children will cope while he is away. All of the pain and despair surrounding Katie's death have been drudged up by this case. Even so, some good has come of this difficult period. Joe has confided in me his desire to finally confront his excessive alcohol consumption that began after Katie's death. He also begun attending Bible studies that I teach at my office on Monday afternoons during the lunch hour. Joe has expressed a desire to re-evaluate his life and his spiritual condition. He intends to use his time away to refocus his priorities, deal with his alcohol abuse, and reorder his life.

Joe has already paid a significant price for his conduct. As his friend, I pray that in sentencing him, you consider the totality of his life, the good deeds that he has done, and his many contributions to those in need.

Sincerely,

LOSS, PAVONE & OREL

Joseph J. Loss

Joseph J. Loss
Attorney at Law

JJL/cw

**Exhibit L**

May 28, 2004

Dear Judge Moran,

My name is Rafael Casillas, I work at Queen of Heaven Cemetery, I met Joe
Nicosia when he lost his daughter in 1989, and I did the burial service at that
time. Ever since, Joe demonstrated to have a great heart, not only did he
give my daughters a summer job during High School, but he also gave my
wife a full time job, his generosity and kindness allowed my family to
achieve their goals. I believe that Joe Nicosia is a good man, and I will be
forever grateful to him.


Sincerely:

Rafael Casillas
(708) 788-3639

# Exhibit M

May 28, 2004

Dear Judge Moran,

My name is Maria Casillas, I met Mr. Nicosia on October 1990. He offer me a job even when I had no knowledge or experience in the Insurance Industry, I started at the bottom and learned my way up, I have a great deal of respect, admiration and gratitude for Mr. Nicosia because he helped us when we need it the most, by giving me a full time job we were able to put our kids through college, specially my daughter Sandra who graduated from Yale University, without his help, it wouldn't be possible to afford the tuition. Mr. Nicosia gave Sandra her first computer when she was a junior high school, and her first briefcase when she graduated from college, Mr. Nicosia was always there showing his interest for her education, giving her support and advising her on all schooling aspects, that's something that I will never forget, and I really appreciated. God Bless Mr. Nicosia and his family.

Sincerely:

*Maria G. Casillas*
Maria G. Casillas
(708) 788-3639

Exhibit N

TO: Honorable Judge Moran
FROM: Patricia L. Bailey
RE: Joseph Nicosia
DATE: January 12, 2004

Dear Judge Moran:

I have known Joseph Nicosia for 16 years. We met at Loyola University Medical Center in Maywood, Illinois where we both had children battling cancer. These were difficult and painful times and we spent many hours together. We developed a unique friendship that has grown and developed over the years. We see each other whenever we can and remain close in a manner that most people do not share. Unfortunately, both of our children lost their battles with this deadly disease. However, Joseph continues to be a dear friend with strength and deep understanding.

As human beings, when faced with the horrendous task of carrying your child through the brutal treatment of Chemotherapy and Radiation, the pain is unbearable. As parents, we bond in ways that no one else can relate to. Our real self emerges as we shoulder this burden. Joseph Nicosia faced this with not only strength for his daughter, but also strength for our daughter and all the other families in this most devastating situation. I know the real Joseph Nicosia and saw him at this best. Words cannot describe how he rallied for us. He loved our child and our family as his own and was always ready and willing to do whatever he could to help us through the day. I am a Registered Nurse with a keen sense of insight into people. Joseph Nicosia is one of the most genuine and caring people I have ever met. He lost his child early in her battle, yet continued to champion our child. He took a true interest in everyone. Dignity, strength and deep understanding emanated from him as he showed true concern to everyone. He was, and continues to be, a role model for many of us. His deep compassion and true love of all people around him is something I have never witnessed in anyone else. He is an exceptional man who is a credit to those who have the pleasure of knowing him. I am happy to have the opportunity to give you an insight to the real Joseph Nicosia.

Sincerely,

*Patricia L. Bailey*

Patricia L. Bailey

# Exhibit O

TO: Honorable Judge Moran
FROM: Michael G. Bailey
RE: Joseph Nicosia
DATE: January 16,2004

Dear Judge Moran:


I am writing to you on behalf of Mr. Joseph Nicosia, who is our close family friend. I met Mr. Nicosia at Loyola University Medical Center where my sister was being treated for cancer along with Joseph's daughter, Katie. I was in the Navy when my sister was diagnosed was shipped home from overseas. I spent a great deal of time at the hospital and it was here I got to know Mr. Nicosia. We were together through some tough times and got to know each other on a different level than most people.

When I first met Mr. Nicosia I was a young man. He was a wonderful role model for me. I was a bit lost after initially being discharged from the Navy. Mr. Nicosia assisted me in work in an effort to get myself situated. He gave me sound advice and good direction. He is never too busy to help a person. He has good insight, strong values and his family is his priority. I cannot describe all that he means to me.

I hope that you will take into consideration all the good the Mr. Joseph Nicosia has done for many people. He has enriched our lives and I will always look up to him.

Sincerely,

*Michael G. Bailey*

Michael G. Bailey

Exhibit P

TO: Honorable Judge Moran
FROM: Melissa J. Mulka
RE: Joseph Nicosa
DATE: January 16, 2004

Dear Judge Moran:

This letter is in regards to Mr. Joseph Nicosia. I have known Mr. Nicosia for 16 years. I was first introduced to Mr. Nicosia in 1987. His daughter, Katie and my sister Michelle, were both fighting for their lives against cancer. Unfortunately, he lost his daughter in 1989. We lost my sister on 9/11/01. My family and his family have always remained such close friends. I have always been able to talk to Mr. Nicosia and he would always listen, good or bad. He would always lend an ear. Even when times were very difficult he would always lend a shoulder to cry on.

Mr. Nicosia has always been a genuinely nice and caring person. He has always been the type of person to put aside what he was doing and find time for others. Whether it was family or friends, even a stranger.

Mr. Nicosia is a family man. His family is always number one. He has great respect for his wife and children. Mr. Nicosia is respected and upstanding and one of the most unselfish people I have ever met. I wish you knew Mr. Nicosia in the way that I do.

Thank you for your time and I hope you will take this letter into consideration. I mean everything from my heart.

Sincerely,

*Melissa J. Mulka*

Melissa J. Mulka

# Exhibit Q




**orthopaedics ltd.**

**Pediatric Orthopaedics
& Spine Surgery**

ORTHOPAEDIC SURGERY
& SPORTS MEDICINE

E. Thomas Marquardt, M.D.
Steven J. Mash, M.D.
Timothy C. Payne, M.D.
Lawrence D. Lieber, M.D.
John L. Reilly, M.D.
Troy R. Karlsson, M.D.
Debra A. Zillmer, M.D.
Andrew H. Kim, M.D.

SPINE SURGERY
Steven E. Mather, M.D.
Robert T. Vraney, M.D.

HAND SURG.
David J. Tulipan, M.D
Christopher R. Glock, M.D.
Robert L. Welch, M.D.

PODIATRY
Samuel Vinci, D.P.M.
Dale J. Buranosky, D.P.M.

PEDIATRIC ORTHOPAEDICS
& SPINE SURGERY
Kamal Ibrahim, M.D., FRCS(C)
Matthew J. Bueche, M.D.
E. Brian Lindell, M.D.

PHYSIATRY
Ellen Voronov, M.D.

PHYSICIAN ASSISTANT
Kelly Perillo, PA,C
John Sharum, PA,C
Jennifer Johnson, P.A.C.
Marybeth Bolanowski, PA.C.

EXECUTIVE DIRECTOR
Rik Baier, CMPE

January 12, 2004

The Honorable James B. Moran,

Dear Judge Moran,

I am pleased to have an opportunity to offer a character reference for Joe Nicosia. I am an Orthopaedic Surgeon practicing in the western suburbs. In addition to my daily routine of caring for patients I also serve as the managing partner for my eighteen person medical practice, M&M Orthopaedics, Ltd. I am the Medical Director of the Midwest Orthopaedic Network and serve on a number of boards and committees through Advocate Health Care.

I first met Joe and Leonora Nicosia about fifteen years ago. I was the unfortunate physician who made the first diagnosis of the cancer to which Katie, their youngest child, eventually succumbed. In the years that followed, Joe and Lee became dear friends of our family, sharing in both our joys and sorrows. Our children grew to adults together, our parents passed, our lives grew and changed.

Throughout these years I have come to know Joe Nicosia closely. Joe truly has a heart of gold. He has been an avid supporter of Loyola University's Ronald McDonald House and has been personally responsible for several charitable organizations, the most notable being the funding of the Katie School of Insurance at Illinois State College. This school, endowed by Joe as a memorial to his 2 ½ year old daughter continues to provide education, scholarships and training to college students seeking training in the insurance industry. Joe and Leonora are people who give back to society and open their home and hearts to most every one they meet.

Joe is truly a compassionate person, always smiling and always there to offer a kind word and any help that one might need. As but one example, when one of my sons was applying to college, Joe and Lee suggested that he speak with Lee's father, who might have some contacts that could be of help. There has never been any situation where these two people have not gone out of their way to help, often without being asked.

I do not have an intimate knowledge of the circumstance Joe finds himself in at this time, but feel comfortable in knowing that this person would never knowingly do anything, which might hurt another person in any way. To know Joe is to understand that he lives for family, friends and community in a way which most of us wish we could. I have

4115 FAIRVIEW AVE.
DOWNERS GROVE, IL 60515
**(630) 968-1881**
**Fax: (630) 968-3762**

OAK BROOK TERRACE
MEDICAL CENTER
1 S. 224 SUMMIT
SUITE 203
OAK BROOK TERRACE, IL 60181
**(630) 620-4141**
**Fax (630) 620-4174**

1020 E. OGDEN AVE. SUITE 115
NAPERVILLE, IL 60563
**(630) 355-1300**
**Fax (630) 355-3273**

1900 OGDEN AVE. SUITE 210
AURORA, IL 60504
**(630) 375-1900**
**Fax (630) 851-1756**

15900 W.127th ST. SUITE 111
LEMONT, IL 60439
**(630) 243-7385**
**Fax (630) 243-8302**

found him to be an individual of great trust and integrity, who has both compassion and consideration for his fellow man.

I have had the privilege of knowing Joe Nicosia both as his physician and his friend. I would be happy to offer my time to anyone who would like to further discuss the attributes of Joe Nicosia's character.


With respect

Steven Mash MD

670 Grant Court
Burr Ridge, IL 60527

630-789-3759 Home
630-968-1881 Ext 6228 Work

# Exhibit R



# LOSS, PAVONE & OREL

**ATTORNEYS AT LAW**
2311 WEST 22ND STREET
SUITE 315
OAK BROOK, ILLINOIS 60521

**TELEPHONE: 630/572-2200**
**FACSIMILE: 630/572-2299**

JOSEPH J. LOSS
LOUIS V. PAVONE
JAMES D. OREL

FLORIDA OFI
4360 NORTHLAKE BOULEV
SUITE
PALM BEACH GARDENS, FLORIDA 33
TELEPHONE: 561/691-6
FACSIMILE: 561/691-6

**September 26, 1996**

Mr. Ed Zamora
Customer Service
LaSalle Bank, F.S.B.
4242 N. Harlem Ave.
Norridge, IL 60634

Re: Mortgage Loan Number 5032903
    Borrowers: Joseph P. Nicosia, Jr. and Leonora M. Nicosia
    Property Address: 105 Livery Circle, Oak Brook IL 60521

Dear Mr. Zamora:

This letter is given to you pursuant to your instructions to my secretary, Nancy, on September 25. Please be informed that I am the attorney for Joseph P. Nicosia, Jr. and Leonora M. Nicosia. At the closing on August 27, 1996 which concerned the refinance of the above captioned residence, Joseph's social security number was submitted on the IRS Form W-9 for reporting of interest paid by the Nicosia's.

However, for (1) tax purposes, and (2) because the entire beneficial interest of the home located at the above captioned address is vested in Leonora M. Nicosia, as Trustee, of the Leonora M. Nicosia Living Trust, it is hereby requested that you adjust your records to reflect the report of interest expense against Leonora's social security number. A W-9 signed by Leonora is attached.

If you have any questions regarding the above, please do not hesitate to call.

Sincerely,

LOSS, PAVONE & OREL                    AGREED AND CONSENTED TO BY:


Louis V. Pavone                        _____
Attorney At Law                        Joseph P. Nicosia, Jr.

LVP:nct
                                       _____
Enc.                                   Leonora M. Nicosia

# Exhibit S

# SETTLEMENT AGREEMENT

This Settlement Agreement, dated as of ~~April~~ August 12 , 1999, is entered into by and between

Nathaniel S. Shapo, Director of Insurance for the State of Illinois, in his capacity as statutory and

court affirmed Liquidator (the "Liquidator") of First Oak Brook Corp. Syndicate, an Illinois

Corporation and a former Syndicate on the Illinois Insurance Exchange, and Joseph P.

Nicosia, Jr. ("Nicosia").

## RECITALS

WHEREAS, FOB was incorporated in Illinois on April 29, 1986 and was admitted as an

underwriting syndicate on the Illinois Insurance Exchange ("IIE") on June 24, 1986;

WHEREAS, on September 20, 1996, the Director filed a Petition in the Circuit Court of

Cook County in the matter titled *In the Matter of the Conservation of First Oak Brook Corp.*

*Syndicate,* Case No. 96 CH 10138 (the "Liquidation Action") and, on the same date, an Order of

Conservation for FOB was entered;

WHEREAS, on October 26, 1996, the Director filed in the Liquidation Action a Petition

for Leave to File a Verified Complaint for Liquidation against FOB, which was granted, and an

Order of Liquidation was entered on November 12, 1996;

WHEREAS, the Director, in his capacity as Liquidator of FOB, is vested with title to all

of FOB's rights of action and empowered by statute to assert, pursue and resolve any and all

claims and actions against any person on behalf of FOB or any one or more of its creditors or

policyholders;

WHEREAS, from 1986 through September 20, 1996, the date of the Conservation Order,

Nicosia was the President and Chief Executive Officer of FOB, the Chairman of FOB's Board of

Directors and an officer and director of FOB's parent companies and other affiliates, and a shareholder of United Financial Group, Inc. ("UFG"), its first tier parent company;

WHEREAS, the Liquidator contends that he has various claims against Nicosia for damages suffered by FOB and/or its creditors and policyholders as a proximate result of certain acts and omissions by Nicosia in connection with his management and operation of FOB;

WHEREAS, Nicosia denies all claims and allegations of the Liquidator and further denies (i) that he engaged in any wrongdoing or other actionable conduct in connection with FOB or its affairs, (ii) that FOB or its policyholders or creditors suffered any damages as a proximate result of any acts or omissions on his part, and (iii) that he has or will have any liability to the Liquidator or FOB or its policyholders and creditors;

WHEREAS, notwithstanding the foregoing denials, Nicosia desires to settle all claims that the Liquidator, FOB or its creditors and its policyholders have or may hereafter have against him because he believes that the cost of defending against such claims is likely to render him insolvent and impose substantial hardships on the members of his immediate family;

WHEREAS, in an effort to avoid the expense and other burdens of defending such litigation, Nicosia has made an offer of settlement to the Liquidator.

WHEREAS, the Liquidator has investigated Nicosia's financial resources, has obtained a financial statement from him and has conducted a cost-benefit analysis of litigating with Nicosia;

WHEREAS, the Liquidator has concluded that the institution of litigation against Nicosia would produce little or no benefit to FOB's estate, policyholders and creditors based on the costs and expenses that would be involved in prosecuting such litigation and Nicosia's inability to pay any judgment that the Liquidator might ultimately obtain against him; and

WHEREAS, by reason of the foregoing, Nicosia believes that it is in his best interests, and the Liquidator believes that it is in the best interests of FOB's estate, policyholders and creditors, to enter into a settlement on the terms and conditions set forth herein;

## AGREEMENT

NOW THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

1. **Recitals.** The recitals hereinbefore set forth constitute an integral part of this Agreement, evidencing the intent of the parties in executing this Settlement Agreement, and describing the circumstances surrounding its execution. Accordingly, the recitals are, by express reference, made a part of the warranties and covenants of the parties hereto, and this Settlement Agreement shall be construed in the light thereof.

2. **Nicosia's Representations and Warranties**. Nicosia represents and warrants that the following (collectively the "Warranties") are true and correct as of the date of this Settlement Agreement and these representations and warranties shall survive delivery of this Settlement Agreement:

   a.   The Statement of Assets and Liabilities attached as Exhibit "A" accurately states the assets and liabilities of Nicosia as of March 1, 1999 in all material respects (*i.e.* no asset or liability variance in excess of $25,000).

   b.   Except (i) as set forth in this Agreement, (ii) the transfers described on Exhibit "B" hereto, (iii) purchases and sales of personal property, and (iv) personal and family expenditures, Nicosia did not deliver, convey or otherwise transfer any property having a value in excess of $5,000, real or personal, to any

person or entity for a period of time commencing March 1, 1995 to and including March 1, 1999.

c.   On July 2, 1998, U.S. Bank National Association, f/k/a First Bank National Association, settled a $5,368,972.31 judgment against Nicosia for the sum of $225,000 based, in part, upon representations and warranties by Nicosia which were substantially similar to subsections (a) and (b) above.

3.   **Settlement Amount.**  Nicosia shall pay the sum of $100,000 to the Liquidator, $50,000 of which shall be paid immediately following the entry of the Approval Order described in paragraph "6" below and contemporaneously with the execution of this Settlement Agreement and the exchange of releases attached hereto as Exhibits "C" and "D".  The balance of the settlement amount shall be paid in two installments, with the first $25,000 installment to be paid one year after the date of ~~the Approval Order~~ this Agreement and the second $25,000 installment to be paid two years after the date of ~~the Approval Order~~ this Agreement.  These payments shall be made by checks made payable to First Oak Brook Corp. Syndicate in liquidation.  In the event that Nicosia fails to pay either installment payment on or before the specified due dates (one year and two years after the date of the Approval Order), the Liquidator shall have the right to terminate this Settlement Agreement by providing Nicosia with at least ten (10) days prior written notice of the Liquidator's intent to terminate this Settlement Agreement and affording Nicosia a ten (10) day cure period commencing on the date of his receipt of such notice.  If Nicosia fails to pay such installment during the cure period, the Liquidator may elect to terminate this Settlement Agreement, in which case the Settlement Agreement and Release provided to Nicosia hereunder (Exhibit "C") shall be null and void.

4. **Revocation of Irrevocable Proxy**. Immediately following the entry of the Approval Order, and contemporaneously with the payment required by Paragraph "3", Nicosia agrees to revoke, rescind and renounce the irrevocable proxy relating to the Western Specialty Insurance Company ("Western Specialty") common stock owned by FOB, which was issued to him by FOB on June 1, 1996, by executing and transmitting to Western Specialty the Notice of Revocation attached hereto and incorporated by reference as Exhibit "E".

5. **Releases**. After the entry of the Approval Order (defined below), and contemporaneously with the execution of this Settlement Agreement and the initial payment required by Paragraph "3", the Liquidator, on behalf of FOB and FOB's policyholders and creditors, and Nicosia, on behalf of himself, shall execute and exchange the releases attached hereto and incorporated by reference as Exhibits "C" and "D".

6. **Approval Order**. This Settlement Agreement is subject to and conditioned upon the entry of an Order by the Court in the Liquidation Action approving the terms of this Settlement Agreement (the "Approval Order") and the approval, execution and closing of the Stock Purchase Agreement relating to sale of FOB's Western Specialty Insurance Company shares to the Western Specialty shareholder group. As soon as reasonably practicable after agreeing on the form of this Settlement Agreement, the parties shall submit a petition to the Court in the Liquidation Action requesting that the Court enter an Approval Order in a form similar to the proposed order attached as Exhibit "F" hereto. If the Liquidation Court determines not to approve this settlement or the Stock Purchase Agreement relating to the sale of the Western Specialty shares owned by FOB, or if there is no execution and closing of the Stock Purchase Agreement as contemplated by Sections 1.3 and 1.4 thereof, this Settlement Agreement

shall terminate and be null and void, and neither Nicosia nor the Liquidator shall have any further obligations hereunder.

7. **Binding Effect**. This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, devisees, executors, administrators, and personal representatives.

8. **No Admission**. This Settlement Agreement shall not in any way be deemed to be or constitute an admission by Nicosia of any wrongdoing, any acts or omissions which are actionable against him or any liability on his part to the Liquidator, FOB's estate, its creditors and policyholders, or any other person or entity.

9. **Counterparts**. This Settlement Agreement may be executed in multiple counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. The parties hereto stipulate that facsimile signatures shall be deemed originals.

10. **Entire Agreement**. This Settlement Agreement represents the entire agreement between the parties regarding the subject matter hereof and all prior understandings and agreements regarding the subject matter hereof have been incorporated herein.

11. **Arms Length/Good Faith Settlement**. The parties to this Settlement Agreement agree and acknowledge that this Settlement Agreement was entered into in good faith in order to resolve complex and contested claims, that this Settlement Agreement was the result of lengthy and extensive arms length settlement negotiations and that in connection with these negotiations they have had the benefit of representation by independent legal counsel.

12. **Governing Law**. The validity, meaning and effect of this Settlement Agreement shall be determined in accordance with the laws of the State of Illinois applicable to contracts to be performed in that State.

13.    **Authority to Execute**. Each of the parties hereto represents and warrants to the other party hereto that the persons signing this Settlement Agreement are duly authorized to do so on behalf of the parties on behalf of which he or she is signing.

NATHANIEL S. SHAPO, Director of Insurance of the State of Illinois, in his capacity as statutory and court affirmed Liquidator of First Oak Brook Corp. Syndicate

Dated: ~~April 14~~ *August 12* ᴹᵃ, 1999

By: _____
Title: _Director of Insurance_

Dated: ~~April~~ *August 12*___, 1999

_____
**JOSEPH P. NICOSIA, JR.**

## EXHIBIT A

## FINANCIAL STATEMENT
### JOSEPH P. NICOSIA
#### March 1, 1999

## ASSETS

### Cash and Securities

| | | |
|---|---|---|
| Cash on hand (estimated) | $ | 625 |
| IRA Retirement Account | $ | 41,174 |
| United Financial Group, Inc. (600 shares) | $ | 0 |

### Other Property

Suits, ties, shirts, trousers, other apparel,
golf equipment and club membership, two
shotguns, watch, various household goods,
claim against former attorney concerning
South Carolina default judgment                    Unknown

## LIABILITIES

| | | |
|---|---|---|
| Legal bills payable (estimated) | $ | 15,000 |

Note to spouse - legal fees and other expenses;
borrowings were used to fund, among other things,
litigation settlements and defense costs; note is
secured by a security interest in all property     $     763,000

| | | |
|---|---|---|
| Co-signed credit cards (estimated) | $ | 51,000 |
| Miscellaneous other bills (estimated) | $ | 31,000 |

## CONTINGENT LIABILITIES

Possible claims arising out of First Oak Brook insolvency
and legal expenses
Co-signer on line of credit (not yet drawn) obtained by
spouse and others to acquire Western Specialty stock

# REAL PROPERTY TRANSFERS SINCE APRIL 21, 1994

## OAK BROOK PROPERTY

**PURCHASED APRIL, 1983**

| Title on April 21, 1994 | River Forest State Bank Trust No. 2872 (Land Trust) Beneficiaries: Joseph and Leonora Nicosia, Tenants by the Entirety |
|---|---|
| July 21, 1994 | Joseph and Leonora Nicosia, Tenants by Entirety, assigned their beneficial interest in Trust No. 2872 to Leonora Nicosia, as Trustee of Leonora Nicosia Revocable Trust U/T/A dated June 14, 1989. Leonora Nicosia was and continues to be the sole beneficiary of this Trust during her life |
| Mortgage: | Approximately $800,000 |

## FLORIDA PROPERTY

**PURCHASED MAY, 1990**

| Title on April 21, 1994 | Leonora Nicosia, as Trustee of Leonora Nicosia Revocable Trust U/T/A dated June 14, 1989 |
|---|---|
| June 23, 1994 | Trustee's Deed to Joseph Nicosia solely to meet requirements of imposed for mortgage refinancing; new mortgage executed by Joseph Nicosia on same date |
| July 18, 1994 | Property deeded back to Leonora Nicosia Revocable Trust, subject to the above new mortgage |
| October 31, 1994 | Another Trustee's Deed was issued to Joseph Nicosia solely to allow lender to correct recording error |
| November 10, 1994 | Property deeded back to Leonora Nicosia Revocable Trust, subject to the above mortgage |
| February 13, 1997 | House sold for $1,265,000; $750,000 mortgage, taxes and other related expenses paid off |

## NEWBERRY PLAZA CONDOMINIUM

**PURCHASED FEBRUARY, 1995**

| Purchaser | Oak Brook Bank Trust No. 2750, (Land Trust, Joseph Nicosia was sole beneficiary) |
|---|---|
| May 15, 1996 | Joseph Nicosia assigned beneficial interest to Leonora Nicosia |
| September 24, 1997 | Unit sold for $260,000; $117,000 mortgage, taxes and other related expenses paid off |

## OTHER

| Late 1996 or early 1997 | Joseph Nicosia sold shares of stock in Western Specialty, Inc. All proceeds of the sale were used to pay debt incurred in his acquisition of the shares, and the shares secured that debt |
|---|---|

**EXHIBIT B**

**Exhibit C**

**RELEASE**

**Release by Nathaniel S. Shapo, Director of Insurance for the State of Illinois, in his capacity as statutory and court affirmed Liquidator of First Oak Brook Corp. Syndicate to Joseph P. Nicosia, Jr.**

In accordance with the Settlement Agreement (the "Settlement Agreement"), dated as of August 12 ~~April~~ 1999, among Joseph P. Nicosia, Jr. ("Nicosia") and Nathaniel S. Shapo, Director of Insurance for the State of Illinois, in his official capacity as statutory and court affirmed Liquidator ("Liquidator") of First Oak Brook Corp. Syndicate in liquidation ("FOB"), in reliance upon Nicosia's Representations and Warranties in Paragraph "2" of the Settlement Agreement and in return for the consideration required by Paragraph "3" of the Settlement Agreement, along with the Release and other agreements and undertakings set forth in the Settlement Agreement, the Liquidator and FOB, on behalf of themselves and their respective predecessors, successors, assigns, present and former deputies, officers, directors, agents, employees, attorneys, heirs, executors and administrators, and the Liquidator on behalf of FOB's estate and the creditors and policyholders of FOB (collectively, "Releasors"), hereby release and forever discharge Nicosia, his successors, assigns, heirs, executors, administrators and personal representatives, and Nicosia's Immediate Family (collectively, "Releasees") from any and all Claims which Releasors had, have or may have against Releasees or any of them, including, but not limited to, any Claims of the Liquidator, FOB or any policyholders or creditors of FOB or its estate which arise out of or in any way relate, directly or indirectly, to FOB, its parent companies or other Affiliates, or any of their respective affairs, or to Nicosia's service or involvement with or in any of them, whether individually or as an officer, director, employee, agent or shareholder of any of them. Nicosia and Nicosia's Immediate Family are further discharged from all liability that any

of them now or hereafter may have to make any contribution to any tortfeasor having liability to the Liquidator or FOB.

Notwithstanding the foregoing, this Release (a) shall be null and void in the event that the Liquidator terminates the Settlement Agreement pursuant to and in accordance with the provisions of Paragraph 3 of the Settlement Agreement, and (b) shall not apply to the warranties and undertakings made by Nicosia in the Settlement Agreement, including Paragraphs 2 and 3 thereof. In addition, this Release is intended to release only the Releasees, and is not intended to release or have any other effect on the Liquidator's or FOB's Claims against any other persons or entities, including other former officers, directors, employees, agents, attorneys, consultants, actuaries and accountants of FOB or any of its Affiliates. The Liquidator and FOB expressly reserve any and all Claims they may have against all persons and entities other than Releasees.

In addition to other terms defined elsewhere in this Release, the following terms shall have the following meanings unless the context clearly requires otherwise:

(a)     "Affiliate" or "Affiliates" shall mean United Financial Group Inc. of Illinois, United Financial Holdings, Inc., United Commercial Affiliated, Inc., Combined Adjustment Company, Inc., Western Specialty Insurance Company f/k/a Oak Brook Property & Casualty Insurance Company, and their respective subsidiaries.

(b)     "Claim" or "Claims" shall mean any and all causes of action, suits, debts, dues, claims, demands, damages, sums of money, reckonings, contracts, agreements, libels, slanders, frauds, promises, executions and liabilities whatsoever, whether arising in law or equity, whether the same arose upon contract or upon tort, choate or inchoate, mature or unmatured, contingent

or fixed, liquidated or unliquidated, known or unknown, accrued or unaccrued, or asserted or unasserted in any litigation.

(c)    "Nicosia's Immediately Family" shall mean Leonora Nicosia, her children, any trust established by any of them or for any of their benefit, and the respective successors, assigns, heirs, executors, administrators and personal representatives of each.  The members of Nicosia's Immediate Family are expressly intended to be third party beneficiaries of this Release and the Settlement Agreement, and shall be entitled to enforce their provisions on their own behalf.

IN  WITNESS  WHEREOF,  as of the  ____  day of  _____,  1999,  the Liquidator has caused this Release to be duly executed.

<div style="margin-left:50%;">

NATHANIEL S. SHAPO, Director of Insurance for the State of Illinois, in his capacity as statutory and court affirmed Liquidator of First Oak Brook Corp. Syndicate

By: _Nat Smos_____
~~One of His Attorneys~~
_Director of Insurance_

</div>

Dated: ~~April~~ August 12, 1999

**Exhibit D**

**RELEASE**

**Release by Joseph P. Nicosia, Jr. to Nathaniel S. Shapo, Director of Insurance
for the State of Illinois, in his capacity as statutory and court affirmed
Liquidator of First Oak Brook Corp. Syndicate**

In accordance with the Settlement Agreement, dated as of ~~April~~ August 12, 1999, among Joseph

P. Nicosia, Jr. ("Nicosia") and Nathaniel S. Shapo, Director of Insurance for the State of Illinois,

in his capacity as statutory and court affirmed Liquidator ("Liquidator") of First Oak Brook

Corp. Syndicate in Liquidation ("FOB"), and in consideration of the Release the Liquidator was

required by the Settlement Agreement to execute and deliver to Nicosia, receipt of which Nicosia

acknowledges, and except for the obligations of the Liquidator under the Settlement Agreement

Nicosia, for himself, his predecessors, his successors, executors, administrators, heirs and

assigns, does hereby release and forever discharge the Liquidator and FOB, their respective

predecessors, and successors, and the present and former deputies, agents, employees, attorneys,

heirs, representatives, administrators and assigns of the Liquidator (collectively, the "Releasees")

from any and all claims and causes of action of every kind, at law or in equity, which Nicosia

had, has or may have against the Liquidator or FOB, including any claim directly or indirectly

relating to the liquidation of FOB.

This Release is intended to release only the releasees. It is not intended to release or have

any other effect on Nicosia's claims, rights and causes of action against other persons or entities,

including other former officers, directors, employees, agents, attorneys, consultants, actuaries

and accountants of FOB and its affiliates. Nicosia expressly reserves any and all claims, rights

and causes of action he may have against all persons and entities other than Releasees.

262402/E/1  808201_

IN WITNESS WHEREOF, as of the _____ day of April, 1999, has caused this Release to
be duly executed.

Dated: April _____ , 1999
*August 12*

_____

**Joseph P. Nicosia, Jr.**

August 12

~~April~~____, 1999

Joseph P. Loss
Secretary, General Counsel and Director
Western Specialty Insurance Company
125 Windsor Drive, Suite 116
Oak Brook, Illinois 60523

## Revocation of June 1, 1996 Irrevocable Proxy

Dear Mr. Loss:

Please be advised that effective as of the date of this letter, I hereby revoke, rescind and renounce the irrevocable proxy, issued by First Oak Brook Corp. Syndicate (FOB) on June 1, 1996, which grants Joseph P. Nicosia, Jr. an irrevocable right to cast all votes which FOB is and will be entitled to cast with respect to its shares of the Western Specialty Insurance Company common stock for a period of seven years. A copy of the above referenced irrevocable proxy which is being revoked is attached hereto as Exhibit "1".

Very truly yours,

Joseph P. Nicosia, Jr.

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

IN THE MATTER OF THE LIQUIDATION OF      )
FIRST OAK BROOK CORP. SYNDICATE      )
                                    )     NO. 96 CH 10138

## ORDER

This matter having come before the Court on the Petition of Nathaniel S. Shapo, Director of Insurance of the State of Illinois (the "Liquidator"), in his capacity as statutory and court affirmed Liquidator of First Oak Brook Corp. Syndicate ("First Oak Brook"), for approval of a certain settlement agreement with Joseph P. Nicosia, Jr., a potential defendant, due notice having been given, the Court having jurisdiction over the parties and the subject matter, having reviewed the Petition and related documents and having heard the arguments of counsel for the Liquidator, and the Court being otherwise advised in the premises;

THE COURT FINDS:

1.     That the Liquidator has negotiated in good faith a Settlement Agreement with Nicosia.

2.     That the Settlement Agreement is intended as a full and final settlement of any claims between the Liquidator and Nicosia, and the terms of the Settlement Agreement are fair and adequate.

3.     That in accordance with the provisions of Article XIII of the Illinois Insurance Code, 215 ILCS 5/187, et seq., the Liquidator has determined that it would be in the best interests of the First Oak Brook estate, and its policyholders and creditors, to enter into the Settlement Agreement with Nicosia and has recommended that this Court approve the same.

4.    In approving the Petition of the Liquidator and in entering this Order, this Court relies solely upon the representations of the Petitioner, Nathaniel S. Shapo, Director of Insurance of the State of Illinois, in his capacity as statutory and court affirmed Liquidator of First Oak Brook, as to the accuracy of the information contained in the instant Petition, and the Court therefore does not make any judicial determination as to the accuracy of the information contained therein, and said Petition, subject to the above, is approved.

IT IS THEREFORE, ORDERED:

A.    That the Liquidator is authorized to settle any potential claims and liabilities existing between First Oak Brook and the Defendant in accordance with the terms and conditions set forth in the Settlement Agreement reviewed by this Court and accordingly, the Liquidator's instant Petition is approved.

B.    That the Liquidator is authorized to take any and all necessary actions to effectuate the above mentioned Settlement Agreement.

ENTERED:

_____
JUDGE PRESIDING

Cathleen Travis, Esq.
Michael J. Buresh, Esq.
Counsel to the Receiver
222 Merchandise Mart Plaza
Suite 1450
Chicago, Illinois  60654
(312) 836-9500
Attorney Code #16819

# Exhibit T

trustee of the IIE and served on Audit & Regulatory Oversight Committee.

UCA performed all the underwriting, policy issuance, marketing and administrative functions for the insurance entities (including underwriting, quoting and binding coverage, and arranging for loss control inspections.) UCA received a commission of 30% of gross premiums written for the performance of these functions for FOBCS. Out of this, UCA paid brokers a commission of approximately 20% of gross premiums.

On 9/17/96, Mark Boozell, Director for the State of Illinois Department of Insurance, ordered FOBCS to cease and desist its operations.

On 4/23/97, the Office of Special Deputy for the State of Illinois Department of Insurance informed the Chicago Division of the FBI that during a review of FOBCS' financial records, four sets of questionable transactions were uncovered. Estimated losses are approximately $24.0 million. These four transactions materially affected the solvency of FOBCS as of 12/31/95 and 3/31/96.

The first transaction involved two loans from the Capitol Bank of Westmont (CBW), Westmont, Illinois. The first loan was accounted for as a cash asset on the 12/31/95 and 3/31/96 financial statements with no corresponding liability. The second loan was also accounted for as a cash asset with no corresponding liability on the 3/31/96 financial statement.

The second transaction involved two certificate of deposit audit confirmations which are alleged to be forged and sccounted for as a cash asset on the 12/31/95 and 3/31/96 financial statements.

The third transaction involved questionable intercompany transfers of assets without substantiating documentation.

The last transaction involved a systematic reimbursement of payroll taxes to Nicosia and LaMantia through expense checks.

Attached to this memo is a spreadsheet reflecting FOBCS' 12/31/95 and 3/31/96 financial statements as reported to the ILLINOIS INSURANCE EXCHANGE (IIE). The financial statement misrepresents the true financial condition of FOBCS due to the following:

1)  CAPITOL BANK OF WESTMONT LOANS:

# Exhibit U

# AFFIDAVIT OF JOHN F. SNYDER

I, John F. Snyder, being first duly sworn, on oath states as follows:

1. I am the President and CEO of Strategic Consulting, Inc, located in Streamwood, Illinois.

2. I am a Certified Fraud Examiner in good standing with the Association of Certified Fraud Examiners.

3. I have over 25 years of insurance accounting, operations and consulting experience.

4. I have industry experience with various insurance companies where I was responsible for accounting, financial reporting, and the design, implementation, and review of accounting controls for premium and claims database systems.

5. I was retained by Monico Pavich & Spevack in December 2002 to review an array of financial statements and certain records of First Oakbrook Corp. Syndicate ("FOB").

6. Pursuant to the retainer, I reviewed the following:
   o   Various filings in the criminal case;
   o   Company prepared annual statutory financial statements of FOB for 1993 through 1995;
   o   Company prepared quarterly statutory financial statements of FOB for 1993 through 1995 and the 1st quarter of 1996 prepared as of March 31, 1996;
   o   Annual statutory audited financial statements with the accompanying opinion letter prepared by Schwartz, Frumm & Milliman for 1995/1994 and for 1994/1993.
   o   Insurance Regulatory Information System ("IRIS") ratios prepared by the National Association of Insurance Commissioners ("NAIC") in conjunction with the filed 1994 Annual Statement of FOB;
   o   Actuarial reports prepared by Stergiou & Gruber Risk Consultants, Inc.. This included the Statement of Actuarial Opinion prepared in conjunction with the 1994 and 1995 Annual Statements of FOB. Also provided was the Actuarial Analysis of FOB's Reserve Requirements as of 12/31/94.
   o   Various premium and claim/claim adjustment expense data files provided to me by staff at Monico, Pavich & Spevack which was purportedly provided to them by the Government ("government's evidence").

7. In my opinion, the above referenced materials do not lead to the conclusion that the insureds of First Oak Brook were any worse off because FOB continued to issue policies of insurance on and after April 1, 1996.

8. Based on my review of the above materials, I am not able to conclude that FOB's continuing to issue insurance policies on and after April 1, 1996 substantially reduced benefits to insureds or placed FOB in substantial jeopardy of being unable to fully meet its financial obligations.

9. Further, the premium and claim/claim adjustment expense data referred to above do not provide standard industry information that would allow the user to determine:

    o    Whether the premium data provided is written, collected or earned;

    o    Whether the claims/claims adjustment expense data is developed, paid or outstanding;

    o    Neither the premium nor the claims/claims adjustment expenses indicate what the effect of the company's reinsurance programs or Guaranty Fund arrangements would have on the data provided.

10.    In my opinion, a determination as to whether additional, substantial losses were caused by FOB continuing to issue policies of insurance on and after April 1, 1996 cannot be made with the available evidence.

11.    While assumptions can be made about what the premium and loss numbers represent, any conclusion that the effect of FOB continuing to issue policies of insurance on and after April 1, 1996 substantially diminished benefits to insureds or the company's ability to meet its financial obligations is speculative and requires more information.

12.    Further, even assuming an extraordinary loss ratio of 200% on the premiums associated with policies issued on and after April 1, 1996 [1] claims paid on those premiums would be $9.2 million. Using the total financial insolvency of First Oak Brook as asserted by the Government of $35 million, only 13.2% of that loss could be attributed to the Company continuing to write business on an after April 1, 1996. However, with a more reasonable loss ratio of 125% the percentage would be reduced to 3.3%. [2] No evidence was provided that indicates that the loss ratio on premiums associated with policies of insurance issued on or after April 1, 1996 was even 100%.

John F. Snyder

SUBSCRIBED AND SWORN TO
before me this _____ day of August, 2004.

Notary Public

---

[1] The premium data provided and referenced above shows that the premium associated with policies of insurance issued by FOB on or after April 1, 1996 totaled $4,606,528.

[2] The $35 million "loss" refers to the overall financial statement position of FOB, measured on a statutory basis. That is, it is an estimate of FOB's statutory net worth as of a point in time and is, therefore, implicitly the net of FOB's assets less its liabilities after taking into account its net income or loss (premiums minus claims and other expenses) up to that point in time. The "Loss Ratio" in its simplest terms, without factoring in expenses, is the relationship between the amount of premiums written and the claims ultimately paid by the Company. If the claims paid are less than the premiums written then the Company has an underwriting profit. If the claims exceed the premium collected then the Company has an underwriting loss. In the context of this example, a 200% loss ratio against premiums of $4.6 million would result in claims of $9.2 million which, in turn, would result in an underwriting loss of $4.6 million. If the loss ratio is 125%, then there would be claims paid of $5.750 million and an underwriting loss of $1.150 million. The $1.150 million underwriting loss would be 3.3% of the $35 million overall insolvency.

# Exhibit V

# AFFIDAVIT
# OF
# RICHARD M. SELIGMAN

I, Richard M. Seligman, being first duly sworn, on oath state as follows:

1) I have been a practicing attorney since 1973, focusing my practice primarily in the corporate insurance and insurance regulatory area.

2) I have over 30 years of experience with insurance industry regulation, including experience with the Illinois Insurance Exchange ("IIE") and its member syndicates.

3) From April 1975 to November 1976, I was the Chief Counsel at the State of Illinois Department of Insurance ("Department of Insurance").

4) I have represented Joseph Nicosia and certain of his business interests for more than ten years, during which time I represented First Oakbrook Corp Syndicate, Inc, in numerous matters involving the IIE and the Department of Insurance.

5) In particular, I represented First Oakbrook during the IIE investigation in 1996 and the subsequent liquidation proceedings initiated by the Department of Insurance.

6) I have reviewed the relevant legal filings in this case and am familiar with the events leading to Mr. Nicosia's guilty plea. Based on the information I have reviewed and my background with the insurance industry, it is my opinion that the government's assertion that Mr. Nicosia abused a position of trust with respect to the IIE and the Department of Insurance is based upon false assumptions and inaccurate.

7) In 1995 and 1996 the IIE was a self-regulatory body created by statute. The statute and IIE regulations set-forth periodic reporting requirements that were applicable to all member syndicates.

8) In 1995 and 1996 every syndicate that was a member of the IIE had a representative serving on the IIE Board. Therefore, it is my opinion that no syndicate was viewed differently or monitored less critically merely because it had a representative on the Board.

9) It is my opinion that the IIE regulations did not create a fiduciary relationship between the representative serving on the IIE Board and the IIE, its syndicate and broker members, insureds or any other person. It is also my opinion that the requirement that the principal officers of the member syndicate verify the periodic financial submissions to the IIE do not create a position of trust between the IIE and the member syndicates or their officers.

10) It is my opinion that the title of "trustee" used by the statute to describe the persons serving as the governing body of the IIE was not intended and does not create any fiduciary relationship between such person and the IIE.

11) The documents in this case which I reviewed, disclosed no evidence that Mr. Nicosia's position as a member of the governing body of the IIE conferred upon him any special

privilege or treatment that allowed him to conceal his fraudulent conduct.

12) Further, it was the practice of the IIE, that when matters related to a syndicate arose, the representative from that particular syndicate abstained from voting.

13) On information and belief, IIE Board minutes of several meetings reflect that Mr. Nicosia abstained from voting on matters involving First Oak Brook.

14) There is no evidence in the record I reviewed to suggest that the IIE monitored First Oak Brook less closely than other syndicate because Mr. Nicosia served on the IIE Board or for any other reason.

15) Based on my review of the evidence in this case, it is my opinion that the Government has not shown how Mr. Nicosia's position as a member of the of the IIE Board allowed him to facilitate or conceal the fraud in this case from First Oak Brook's regulators.


Richard M. Seligman


SUBSCRIBED AND SWORN TO
before me this _____ day of August, 22
2004.

Notary Public

Exhibit W

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

IN THE MATTER OF THE LIQUIDATION OF () )
FIRST OAK BROOK CORP. SYNDICATE ) NO. 96 CH 10138

### NOTICE OF FILING

To: See Attached Service List

  **YOU ARE HEREBY NOTIFIED** that on December 8, 2004, the Liquidator filed, pursuant to 215 ILCS 5/202(D)(1) (1998), with the Clerk of the Circuit Court of Cook County, Illinois, the attached Liquidator's Statement of Changes in Cash and Invested Assets for the period of July 1, 2004 through September 30, 2004.

              _____
              Counsel to the Receiver

### CERTIFICATE OF SERVICE

  I, Marybeth S. Claypool, a non-attorney, on oath state, that I served a copy of this Notice and the Liquidator's Statement of Changes in Cash and Invested Assets to all persons on the attached service list by depositing the same in the U.S. Mail depository located at 222 Merchandise Mart Plaza, Chicago, Illinois, 60654 on December 8, 2004 with proper postage prepaid.

             _____

Subscribed and sworn to before me
This 8th day of December, 2004

_____
Notary Public

> **OFFICIAL SEAL**
> **JEANIE SMITH**
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES:07/08/06

Cathleen Travis
D. Daniel Barr
Michael Buresh
222 Merchandise Mart Plaza, Suite 1450
Chicago, Illinois 60654
(312) 836-9500
Attorney Code #16819

## FIRST OAK BROOK CORPORATION SYNDICATE
### LIQUIDATION DATE NOVEMBER 12, 1996
### STATEMENT OF CHANGES IN CASH AND INVESTED ASSETS
### JULY 1 THROUGH SEPTEMBER 30, 2004

|  | CURRENT PERIOD | YEAR TO DATE |
|---|---|---|
| Beginning Cash & Invested Assets | $ 11,624,364 | $ 11,050,057 |
| Cash Receipts: | | |
| Investment Income (Note 1) | $ 79,467 | $ 146,854 |
| Reinsurance Receipts | 8,669 | 659,059 |
| Release of Escrow Funds | 7,007 | 30,571 |
| Receipts from INEX Insurance Exchange | 24 | 1,551 |
| Total Cash Receipts | $ 95,167 | $ 838,035 |
| Cash Disbursements: | | |
| Salaries | $ 41,969 | $ 133,089 |
| Professional Fees: | | |
| Legal Fees & Expenses (Note 2) | 58 | 1,039 |
| Audit Fees (Note 3) | 285 | 4,217 |
| Compensation: | | |
| Employee Benefits | 8,366 | 40,164 |
| Payroll and Other Taxes | 3,295 | 11,310 |
| Other Expenses of Administration | | |
| of Company and its Property: | | |
| Loss and Loss Adjustment Expense | 51 | 196 |
| Rent and Rent Items | 7,939 | 26,786 |
| Equipment Expenses | 301 | 884 |
| Travel and Travel Items | 14 | 211 |
| Postage and Freight | 626 | 2,131 |
| Office Expenses | 1,189 | 3,647 |
| Data Processing | 285 | 3,869 |
| Investment Expenses | 726 | 2,398 |
| Other Expenses | 218 | 3,942 |
| Total Cash Disbursements | $ 65,322 | $ 233,883 |
| Ending Cash & Invested Assets | $ 11,654,209 | $ 11,654,209 |

Exhibit X

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS 00008034 163626/-0
COUNTY DEPARTMENT, CHANCERY DIVISION 99
4251-P

IN THE MATTER OF THE LIQUIDATION OF )
FIRST OAK BROOK CORP. SYNDICATE ) NO. 96 CH 10138

## ORDER

This matter coming before the Court on the Petition of Nathaniel S. Shapo, Director of

Insurance of the State of Illinois (the "Liquidator"), in his capacity as Liquidator of First Oak

Brook Corp. Syndicate ("First Oak Brook"), for approval of a Settlement Agreement with

Program Underwriters Inc. ("PUI"), due notice having been given, the Court having jurisdiction

over the parties and the subject matter, the Court having reviewed the pleadings filed and having

heard from counsel for the Liquidator, and being otherwise advised in the premises:

THE COURT FINDS:

1.     That the Liquidator and PUI have negotiated in good faith a settlement of any and

all claims of First Oak Brook against PUI including the following:

    a.     The Liquidator has billed PUI in the amount of $1,574,658.57 in premium
allegedly due First Oak Brook based upon policies produced by PUI in the
months prior to First Oak Brook's liquidation.

    b.     The Liquidator has filed a Petition to Avoid Preference pursuant to 215
ILCS 5/204 against PUI, Santos & Dutton, and Cobb, Cole & Bell seeking
the return of First Oak Brook premium held in PUI's premium account and
garnished by Santos & Dutton in the amount of $113,986 (hereafter
referenced as the "Santos Action").

    c.     The Liquidator filed a second Petition to Avoid Preference pursuant to 215
ILCS 5/204 against PUI and Cameron, Walsh, Marriot, Hodges &
Coleman ("Cameron") seeking the return of First Oak Brook premium held
in PUI's premium account and garnished by Cameron in the amount of
$44,785 (hereafter referenced as the "Cameron Action").



E N T E R E D
CLERK OF THE CIRCUIT COURT

JUL 2 8 1999

GE STEPHEN A. SCHILLER #167
DEPUTY CLERK

**D!H!**

C03913

2.     That in accordance with the provisions of Article XIII of the Illinois Insurance
Code, 215 ILCS 5/187, et seq., the Liquidator has determined that it would be in the best interests
of the First Oak Brook estate, and its policyholders and creditors, to enter into the Settlement
Agreement with PUI and requests that this Court approve the Liquidator's recommendation.

IT IS HEREBY ORDERED:

A.     That PUI is dismissed with prejudice without costs from the pending voidable
preference actions, (the Santos Action and the Cameron Action), pursuant to the terms of the
Settlement Agreement.

B.     That the Liquidator is authorized to settle the claims between the First Oak Brook
and PUI in accordance with the terms and conditions set forth in the Settlement Agreement
reviewed by this Court, and accordingly, pursuant to 215 ILCS 5/193(2), the Liquidator's
recommendation and instant petition is approved.

C.     That the Liquidator is authorized to take and all necessary actions to effectuate the
above referenced Settlement Agreement.

ENTERED:

_____
JUDGE PRESIDING

ENTERED
CLERK OF THE CIRCUIT COURT

JUL 28 1999

JUDGE STEPHEN A. SCHILLER #187
DEPUTY CLERK

Cathleen A. Travis
D. Daniel Barr
Michael Buresh
Counsel to the Receiver
222 Merchandise Mart Plaza
Suite 1450
Chicago, Illinois 60654
(312) 836-9500
Attorney Code #16819                    2

C03013

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

IN THE MATTER OF THE LIQUIDATION OF )
FIRST OAK BROOK CORP. SYNDICATE )     NO. 96 CH 10138

### ORDER

This matter having come before the Court on the Petition of Arnold Dutcher, Acting Director of Insurance of the State of Illinois in his capacity as Liquidator (the "Liquidator") of First Oak Brook Corp. Syndicate ("First Oak Brook"), for approval of a certain settlement agreement with a certain unnamed potential defendant (the "Defendant"), due notice having been given, the Court having jurisdiction over the parties and the subject matter, the Court having reviewed the pleadings filed, the Settlement Agreement and having heard the arguments of counsel for the Liquidator, and the Court being otherwise advised in the premises;

THE COURT FINDS:

1.     That the Liquidator and the Defendant have negotiated in good faith a settlement of those allegations and claims.

2.     That the Settlement Agreement is intended as a full and final settlement of any claims between the Liquidator and the Defendant.

3.     That in accordance with the provisions of Article XIII of the Illinois Insurance Code, 215 ILCS 5/187, et seq., the Liquidator has determined that it would be in the best interests of First Oak Brook estate, and its policyholders and creditors, to enter into the Settlement Agreement with the Defendant.

4.     In approving the Petition of the Liquidator and in entering this Order, this Court relies solely upon the representations of the Petitioner, Arnold Dutcher, Acting Director of Insurance of the State of Illinois, as Liquidator of First Oak Brook, as to the accuracy of the

I.G.

information contained in the instant petition, and the Court therefore does not make any judicial determination as to the accuracy of the information contained therein, and said Petition, subject to the above, is approved.

IT IS, THEREFORE, ORDERED:

A.    That the Liquidator is authorized to settle any potential claims and liabilities existing between First Oak Brook and the Defendant in accordance with the terms and conditions set forth in the Settlement Agreement reviewed by this Court, in camera, and accordingly, the Liquidator's recommendation and instant Petition is approved.

B.    That the Liquidator is authorized to take any and all necessary actions to effectuate the above mentioned Settlement Agreement

ENTERED:

JUDGE PRESIDING

Peter G. Gallanis
Cathy Travis
Michael Buresh
Counsel to the Receiver
222 Merchandise Mart Plaza
Suite 1450
Chicago, Illinois 60654
(312) 836-9500
Attorney Code #16819                    2

C0207

**ENTERED**

APR 1 0 1998

0000020 0345E
STEPHEN A SCHILLER-187

IN THE CIRCUIT COURT OF COOK COUNTY ~ILLINOIS
CC )TY DEPARTMENT, CHANCERY DIV .3ION

98

IN THE MATTER OF THE LIQUIDATION OF        )
FIRST OAK BROOK CORP. SYNDICATE            )        NO. 96 CH 10138

### ORDER

This matter having come before the Court on the Petition of Arnold Dutcher, Acting Director of Insurance of the State of Illinois (the "Liquidator"), in his capacity as Liquidator of First Oak Brook Corp. Syndicate ("First Oak Brook"), for approval of a certain settlement agreement with a certain unnamed defendant (the "Defendant"), due notice having been given, the Court having jurisdiction over the parties and the subject matter, the Court having reviewed the pleadings filed, the Settlement Agreement, and the Joint Statement Concerning Basis of Settlement and having heard the arguments of counsel for the Liquidator, and the Court being otherwise advised in the premises;

THE COURT FINDS:

1.      That the Liquidator and the Defendant have negotiated in good faith a settlement of those allegations and claims.

2.      That the Settlement Agreement is intended as a full and final settlement of any claims between the Liquidator and the Defendant.

3.      That in accordance with the provisions of Article XIII of the <u>Illinois Insurance Code</u>, 215 ILCS 5/187, <u>et seq.</u>, the Liquidator has determined that it would be in the best interests of First Oak Brook estate, and its policyholders and creditors, to enter into the Settlement Agreement with the Defendant and requests that this Court approve the Liquidator's recommendation.

*T.F.*

4.    In approving the Petition of the Liquidator and in entering this Order, this Court 00000020_0716 relies solely upon the representations of the Petitioner, Arnold Dutcher, Acting Director of Insurance of the State of Illinois, as Liquidator of First Oak Brook, as to the accuracy of the information contained in the instant petition, and the Court therefore does not make any judicial determination as to the accuracy of the information contained therein, and said Petition, subject to the above, is approved.

IT IS, THEREFORE, ORDERED:

A.    That the Liquidator is authorized to settle any potential claims and liabilities existing between First Oak Brook and the Defendant in accordance with the terms and conditions set forth in the Settlement Agreement reviewed by this Court, in camera, and accordingly, the Liquidator's recommendation and instant Petition is approved.

B.    That the Liquidator is authorized to take any and all necessary actions to effectuate the above mentioned Settlement Agreement

ENTERED:

_____
JUDGE PRESIDING

Peter G. Gallanis
Michael J. Buresh
Counsel to the Receiver
222 Merchandise Mart Plaza
Suite 1450
Chicago, Illinois 60654
(312) 836-9500
Attorney Code #16819

2

C01808

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

IN THE MATTER OF THE LIQUIDATION OF    )
FIRST OAK BROOK CORP. SYNDICATE    )    NO. 96 CH 10138

**ENTERED**

### <u>ORDER</u>

JUN 1 8 1996

    This matter having come before the Court on the Petition of Arnold Dutcher, Acting JUDGE
Director of Insurance of the State of Illinois (the "Liquidator"), in his capacity as Liquidator of STEPHEN SCHILLER 167
First Oak Brook Corp. Syndicate ("First Oak Brook"), for approval of a Settlement Agreement
with the Trustee in Bankruptcy for United Financial Group, due notice having been given, the
Court having jurisdiction over the parties and the subject matter, the Court having reviewed the
pleadings filed, the Settlement Agreement and having heard argument of counsel for the
Liquidator, and the Court being otherwise advised in the premises;

    THE COURT FINDS:

    1.    That the Liquidator and the Defendant have negotiated in good faith a settlement
of those allegations and claims.

    2.    That the Settlement Agreement is intended as a full and final settlement of any
claims between the Liquidator and the Trustee in Bankruptcy for UFG.

    3.    That in accordance with the provisions of Article XIII of the <u>Illinois Insurance
Code</u>, 215 ILCS 5/187, <u>et seq</u>., the Liquidator has determined that it would be in the best interests
of First Oak Brook estate, and its policyholders and creditors, to enter into the Settlement
Agreement with the Defendant and requests that this Court approve the Liquidator's
recommendation.

    4.    In approving the Petition of the Liquidator and in entering this Order, this Court
relies solely upon the representations of the Petitioner, Arnold Dutcher, Acting Director of
Insurance of the State of Illinois, as Liquidator of First Oak Brook, as to the accuracy of the
information contained in the instant petition, and the Court therefore does not make any judicial

C0186

determination as to the accuracy of the information contained therein, and the Petition, subject to the above, is approved.

IT IS, THEREFORE, ORDERED:

A.    That the Liquidator is authorized to settle any potential claims and liabilities existing between First Oak Brook and the Trustee in Bankruptcy for UFG in accordance with the terms and conditions set forth in the Settlement Agreement reviewed by this Court, and accordingly, the Liquidator's recommendation and instant Petition is approved.

B.    That the Liquidator is authorized to take any and all necessary actions to effectuate the above mentioned Settlement Agreement.

**ENTERED**

ENTERED:

JUN 1 8 1998

JUDGE
STEPHEN A SCHILLER 167

JUDGE PRESIDING

Peter G. Gallanis
Michael J. Buresh
Counsel to the Receiver
222 Merchandise Mart Plaza
Suite 1450
Chicago, Illinois 60654
(312) 836-9500
Attorney Code #16819

2

Recent Unreported Cases

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**Case No. 02-CR-163**

**JOHN SMITH**
　　　　　**Defendant.**

---

## SENTENCING MEMORANDUM

The government charged defendant John Smith with possession with intent to distribute more than 50 grams of cocaine base. The charge arose out of an investigation into the origin of a fire at defendant's home, during which officers discovered crack and powder cocaine. Defendant pled guilty, and the probation office prepared a pre-sentence report ("PSR") which calculated defendant's offense level as 31 and his criminal history category as II, producing a guideline imprisonment range of 121-151 months. Under 21 U.S.C. § 841(b)(1)(A), a 10 year mandatory minimum sentence also applied.

Defendant objected to one guideline enhancement recommended by the PSR. In addition, the government moved for a downward departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) based on defendant's substantial assistance. In this memorandum, I discuss how I arrived at defendant's sentence. First, I set forth the sentencing methodology that I believe is appropriate after the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005).

# I. POST-**BOOKER** SENTENCING METHODOLOGY

Following Booker, a court will typically follow a three-step sentencing process. First, the court must determine the applicable advisory guideline range. Ordinarily, this will require resolution of objections to the PSR's guideline calculations as well as any factual disputes.

Second, the court must determine whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply. See U.S.S.G. ch. 5K. For example, in the present case the government moved for a substantial assistance departure under § 5K1.1.

Finally, the court must determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). The court may impose a sentence within the applicable guideline range (after any clearly applicable departures) if such is consistent with the court's consideration of the § 3553(a) factors, or impose a non-guideline sentence if such is justified by the § 3553(a) factors. See United States v. Crosby, No. 03-1675, 2005 U.S. App. LEXIS 1699, at *25 (2d Cir. Feb. 2, 2005). A non-guideline sentence need not be supported by factors that would have justified a departure under the old, mandatory regime, United States v. Ranum, No. 04-CR-31, 2005 U.S. Dist. LEXIS 1338, at *6 (E.D. Wis. Jan. 19, 2005), and the court need not definitively resolve any departure issues if it has decided to impose a non-guideline sentence, Crosby, 2005 U.S. App. LEXIS, at *21. However, the court is free to rely upon departure case law in determining whether a guideline sentence is appropriate and in translating its

3

findings into a numerical sentence. See United States v. Galvez-Barrios, No. 04-CR-14, 2005 U.S. Dist. LEXIS 1997, at *16-17 (E.D. Wis. Feb. 2, 2005).

## II. DISCUSSION

### A.    Advisory Guideline Range

The PSR assigned a base offense level of 32 based on the weight of the drugs found in defendant's home. Officers discovered 69.99 grams of crack cocaine in a cooler and 653.19 grams of powder cocaine in a cell phone box. These amounts converted to 1528 kilograms of marijuana, U.S.S.G. § 2D1.1 cmt. n.10, producing a level of 32, U.S.S.G. § 2D1.1(c)(4). Defendant did not quarrel with this calculation.

Officers also located two loaded handguns in a dresser, and pursuant to § 2D1.1(b)(1) the PSR assigned a two level enhancement for possession of a dangerous weapon.[1] Defendant objected, arguing that the government did not prove a connection between the weapons and drug trafficking beyond a reasonable doubt. However, he did not deny possessing the guns.

I first noted that Booker did not change the government's burden of proving the applicability of enhancements under the now advisory guidelines. As the Seventh Circuit stated in McReynolds v. United States, Nos. 04-2520, 04-2632 & 04-2844, 2005 U.S. App. LEXIS 1638, at *6 (7th Cir. Feb. 2, 2005): "The remedial portion of Booker held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application." See also Crosby,

---

[1]The PSR also recommended a three level reduction under § 3E1.1, which neither party contested, resulting in a final level of 31.

4

2005 U.S. App. LEXIS 1699, at *25-26 (stating that, as before, judges are entitled to find all facts necessary to determining a guideline or non-guideline sentence).

Application note three to § 2D1.1, which addresses the enhancement for possession of a dangerous weapon, provides: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1 cmt. n.3. The Seventh Circuit has held that to establish the enhancement the government need only demonstrate, by a preponderance of the evidence, that the defendant possessed the weapon during the relevant period of drug activity. Once it has done so, the defendant must demonstrate that it was clearly improbable that the weapon was connected to the offense. United States v. Martin, 287 F.3d 609, 617 (7th Cir. 2002).

Courts have consistently held that guns found in the same house as drugs may justify the enhancement. United States v. Garcia, 925 F.2d 170, 173-74 (7th Cir. 1991) (collecting cases). Defendant made no effort to show that the weapons were not connected to the offense. The PSR reported that defendant purchased the guns for protection. As the court noted in Garcia, it is likely that a loaded pistol, which is commonly possessed for protection, when found in the same location as controlled substances, is connected to drug activity. Id. at 174; see also United States v. Coleman, 149 F.3d 674, 768 (7th Cir. 1998) ("Here, the district court correctly inferred that it was not clearly improbable that the fully loaded .38 caliber Taurus revolver found

in his home – the same place where defendant was conducting his business – was connected to the drug offense."). Therefore, I concluded that the enhancement applied and overruled defendant's objection.

## B.  Departures from Advisory Range[2]

The government moved for a 6 level downward departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e)[3] based on defendant's substantial assistance.  In ruling on such a motion, a court considers the following factors:

(1) the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

While the government's recommendation as to the extent of the departure is the starting point for the court's analysis, United States v. Winters, 117 F.3d 346, 349 (7th

---

[2]Defendant argued for a sentence below the guideline range based on post-offense rehabilitation, family circumstances, and the disparity between the guidelines' treatment of crack and powder cocaine.  I concluded that I should address these arguments in determining whether to impose a guideline or non-guideline sentence at step three.

[3]Section 3553(e) allows the court to depart below any applicable mandatory minimum on the government's motion.

Cir. 1997), the extent of any departure granted is within the court's discretion, see United States v. Newman, 148 F.3d 871, 875 n.2 (7th Cir. 1998). The departure must be "linked to the structure of the guidelines," but the Seventh Circuit has eschewed any rigid methodology. However, I have typically employed the method suggested in United States v. Thomas, 930 F.2d 526, 531 (7th Cir. 1991), overruled on other grounds by United States v. Canoy, 38 F.3d 893, 906 (7th Cir. 1994), and Winters, 117 F.3d at 349-50, awarding a two-level adjustment for each § 5K1.1 factor found to be fully present, see, e.g., United States v. Washington, 293 F. Supp. 2d 930, 934 (E.D. Wis. 2003).

### 1. Significance and Usefulness

Defendant zealously assisted the government, and his cooperation proved enormously useful, leading to multiple arrests and convictions. While undercover, he purchased firearms, and the purchase led to the government's seizure of multiple firearms and a rocket launcher, and to its conviction of the seller. Defendant's efforts led to another conviction when he persuaded an individual wanted for felony theft to turn herself in. Defendant provided information that enabled the government to obtain a search warrant, and as a result to discover cocaine, guns and cash, and to convict the owner of these items. Defendant wore a wire and purchased three cell phones from a telephone company aiding drug traffickers. He also discovered that the company was engaged in misappropriating personal information and so advised the government. Defendant provided information that led to the apprehension of a fugitive with multiple outstanding warrants. He also provided information that led to the arrest of one of

7

Milwaukee's most wanted criminals, the purported leader of a gang known as the "Murder Mob." Defendant assisted the government in prosecuting a money laundering offense and would have testified in the case except that the defendant pleaded guilty on the second day of trial. Defendant provided information that enabled the government to obtain another search warrant, and the warrant led to the seizure of crack, marijuana and weapons, and to the arrest of their owner, who agreed to cooperate, leading to another conviction. Defendant provided information that led to the arrest of a second person with an outstanding felony warrant. While wearing a wire, he obtained admissions from a murder suspect to two shootings. He made six purchases of small amounts of contraband in connection with an FBI investigation involving sending proceeds of illegal activity overseas. He wore a wire during a conversation with a store owner involved in a WIC voucher scam. He also wore a wire and made contact with a drug suspect, who the government is now investigating. Finally, he provided information concerning the possession and sale of counterfeit green cards, as well as several additional drug and money laundering operations.

In sum, defendant's cooperation was highly significant and useful, leading to multiple arrests, convictions and seizures of contraband. His assistance was as productive as that of any defendant I have seen. Thus, based on the significance of his cooperation, I reduced his offense level by three.

## 2. Truthfulness, Completeness and Reliability

The government vouched for defendant's truthfulness and stated that the information he provided was consistently reliable. Law enforcement relied upon him to

obtain warrants and repeatedly used him in various different operations, displaying a high level of trust. Thus, I awarded defendant a two level reduction for this factor.

### 3. Nature and Extent

As discussed, defendant did far more than provide information to the government. He made controlled buys, repeatedly wore a wire and conducted surveillance. Thus, I awarded a two level reduction based on the nature and extent of his efforts.

### 4. Risk of Injury

By engaging in such high risk forms of cooperation as making controlled buys and wearing a wire, defendant exposed himself to serious risk of injury from many dangerous persons. Thus, this factor entitled him to a two level reduction.

### 5. Timeliness

The government indicated that defendant did not begin cooperating when he was charged but did so upon being released from pre-trial detention. Because his cooperation was timely but not immediate, I awarded him a one level reduction for this factor.

Thus, I granted a total substantial assistance departure of 10 levels. With this departure, defendant's offense level became 21 and the advisory guideline imprisonment range 41-51 months. I next turned to the imposition of sentence under § 3553(a).

### C. Imposition of Sentence

Title 18 U.S. Code § 3553(a) now governs federal sentencing. It requires courts to consider seven factors:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed –
(A) to reflect the seriousness of the offense, to promote respect for the
law,     and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational
training,          medical care, or other correctional treatment in the most effective
manner;

(3) the kinds of sentences available;

(4) the sentencing range established by the guidelines;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

After considering all of these factors, a court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Galvez-Barrios, 2005 U.S. Dist. LEXIS 1997, at *3-5.

I typically group these factors into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and any victims of the offense. I analyze each category and in so doing consider the specific statutory factors under § 3553(a). I then determine whether to impose a guideline or non-guideline sentence. Ranum, 2005 U.S. Dist. LEXIS 1338, at *14.

1.     Nature of Offense

10

As indicated, a fire investigator discovered the drugs after investigating the cause of a fire at defendant's house. Police found the guns in a dresser drawer pursuant to a subsequent consent search. Law enforcement had no prior knowledge that defendant was dealing drugs.

Although the offense was serious, no aggravating circumstances were present. Defendant did not appear to have ever committed or threatened violence or to have sold large quantifies of drugs. As noted, his guideline offense level was high because he possessed crack cocaine. Had he possessed only powder, his offense level (prior to the departure) would have dropped from 32 to 26, cutting the low end of his imprisonment range in half.

### 2.     Character of Defendant

Defendant had a minimal prior record consisting of two convictions of possessing marijuana, for which he received short jail terms. I considered it significant that defendant had maintained a clean record since 2000 when the instant office occurred (the government did not charge him until 2002). I also considered defendant's extensive cooperation with the government indicative of positive character development. Further, defendant accepted responsibility for his crime and appeared both genuinely remorseful and cognizant of the effects of his actions on others.

Defendant had a stable employment history. Although he dropped out of high school, he subsequently obtained a cosmetology certificate from Milwaukee Area

Technical College ("MATC") and worked as a barber for the better part of 10 years. Recently, he returned to MATC to obtain his high school degree.

Defendant has demonstrated a high level of responsibility in his personal and familial relationships. He has been in a stable relationship with Tenisha Adams for several years, and the two share 10 month old twins. Defendant lives with and supports his children. He also provides care and assistance for his mother, who has serious health problems including bladder cancer. After she underwent surgery, defendant lived with and cared for his mother, sleeping on the floor. He also demonstrated his commitment to his family when he came to the aid of his sister when she was attacked by an ex-boyfriend. The assailant struck defendant on the head with a shotgun seriously injuring defendant and requiring him to undergo brain surgery. Based on the above facts, I concluded that defendant's lengthy absence from the home would have a serious adverse impact on his family.

I also noted that since 2002, defendant has been an active member of the Freewill Community Baptist Church, and that his pastor submitted a positive letter on his behalf. Other persons also submitted letters attesting to defendant's good character.

In sum, the record contained much positive evidence about defendant's character and indicated that he had renounced criminal activity.

### 3.   Needs of Public

For the reasons discussed, I did not believe that defendant posed a danger to the public or that he was likely to re-offend. Nevertheless, because of the seriousness

of the offense, I believed that the sentence had to be sufficiently severe so as to promote respect for the law and provide just punishment.

### 4. Consideration of Guidelines

The sentence called for by the guidelines was driven largely by the weight of the drugs recovered from defendant's house. And, because defendant possessed crack cocaine, the sentence was greatly enhanced. As is now notorious, the guidelines create a 100 to 1 ratio between crack and powder cocaine. In other words, the guidelines treat possession of 50 grams of crack cocaine the same as they treat possession of 5000 grams (5 kilograms) of powder cocaine. See U.S.S.G. § 2D1.1(c)(4). Thus, in the present case, the 69.9 grams of crack that defendant possessed converted to 1399.80 kilograms of THC, while the 653.19 grams of powder converted to just 130.63 kilograms of THC.

Courts, commentators and the Sentencing Commission have long criticized this disparity, which lacks persuasive penological or scientific justification, and creates a racially disparate impact in federal sentencing. See, e.g., United States v. Dumas, 64 F.3d 1427, 1432 (9th Cir. 1995) (Boochever, J., concurring); United States v. Willis, 967 F.2d 1220, 1226 (8th Cir. 1992) (Heaney, J., concurring); United States v. Clary, 846 F. Supp. 768 (E.D. Mo.), rev'd, 34 F.3d 709 (8th Cir. 1994); United States v. Patillo, 817 F. Supp. 839 (C.D. Cal. 1993); David A. Sklansky, Cocaine, Race, and Equal Protection, 47 STAN. L. REV. 1283 (1995); Matthew F. Leitman, A Proposed Standard of Equal Protection Review for Classifications Within the Criminal Justice System that Have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines'

Classification Between Crack and Powder Cocaine, 25 U. Tol. L. Rev. 215 (1994); The Debate on 2002 Federal Drug Guideline Amendments, 14 Fed. Sen. Reptr. 123, 188-242 (Nov./Dec. 2001-Jan./Feb. 2002); Rethinking the Crack Cocaine Ratio, 10 Fed. Sen. Reptr. 179, 184-208 (Jan./Feb. 1998).

The 100:1 ratio first appeared in the Anti-Drug Abuse Act of 1986, Pub. L. 99-570, 100 Stat. 3207 (1986), a law prompted in large part by the sudden death of basketball star Len Bias, purportedly from a crack overdose. See William Spade, Jr., Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy, 38 Ariz. L. Rev. 1233, 1249 (Winter 1996). In response to a perceived crack epidemic and in a climate that "some have characterized as frenzied," Congress dispensed with the normal deliberative process and hurriedly passed a bill.[4] Id. at 1250; see also Clary, 846 F. Supp. at 784-85 (discussing legislative history); United States v. Walls, 841 F. Supp. 24, 29-30 (D.D.C. 1994), aff'd in part, remanded in part, 70 F.3d 1323 (D.C. Cir. 1995) (same). The 1986 Act established severe mandatory minimum penalties for even first time offenders: 5 years in prison for those possessing 5 grams of crack (or 500 grams of powder), and 10 years for possessing 50 grams of crack (or 5 kilograms of powder). Subsequently, the guidelines incorporated the statutorily established disparity in penalties between crack and powder. See 21 U.S.C. § 841(b); U.S.S.G. § 2D1.1(c); Spade, supra, at 1249.

Because of its expedited passage, the Act left little legislative history. However, it appears that Congress associated crack with crime and violence, considered it more

---

[4]The fact that Bias probably snorted cocaine rather than smoked crack may have been lost in the frenzy. Id. at 1250-51.

addictive than powder, and was concerned that its low cost and ease of manufacture would lead to more widespread use. Id. at 1252. Members of Congress stated that their goal was to target "serious" and "major" crack dealers. Id. at 1253. However, the legislative history, such as it is, contains no rationale for the 100:1 ratio; legislators suggested other ratios – 50:1 and 20:1 – but Congress rejected them. Id. at 1252, 1254. A former staff member of the House Judiciary Committee characterized the process as "the crassest political poker game," "I'll see your five years and I'll raise you five years." Id. at 1255.

The Commission has studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported by data. First, while legislators may have intended to target serious drug traffickers, the Commission's data indicate that two-thirds of federal crack cocaine defendants are street level dealers. Diana Murphy, Statement to Senate Judiciary Committee, May 22, 2002, reprinted in 14 FED. SEN. RETPR. 236, 237 (Nov./Dec. 2001-Jan./Feb. 2002). Indeed, the 100:1 ratio actually targets low level dealers in a manner inconsistent with the intent of the 1986 Act. As one commentator estimated, at offense level 32 (defendant's initial level),

> dealers of drugs other than crack would have been dealing between $500,000 and $8 million worth of drugs, while crack defendants would have been dealing roughly $5750 worth of the drug.

> Another way of illustrating the problem is that five grams of crack, which triggers a five-year mandatory minimum sentence, represents only 10-50 doses with an average retail price of $225 - $750 for the total five grams. In contrast, a powder cocaine defendant must traffic in 500 grams of powder, representing 2500-5000 doses with an average retail price of $32,500 - $50,000, in order to receive the same five-year sentence. The 500 grams of cocaine that can send one powder defendant to prison for

five years can be distributed to eighty-nine street dealers who, if they converted it to crack, could make enough crack to trigger the five year mandatory minimum for each defendant. The result is that local-level crack dealers get average sentences quite similar to intrastate and interstate powder cocaine dealers; and both intra- and interstate crack dealers get average sentences that are longer than international powder cocaine dealers.

Spade, supra, at 1273 (internal footnote omitted).

Second, although legislators may have believed that crack was associated with other harmful conduct, Commission data indicate that "aggravating conduct occurs in only a small minority of crack cocaine offenses." Murphy, supra, at 238. "For example, an important basis for the establishment of the 100-to-1 drug quantity ratio was the understanding that crack cocaine trafficking was highly associated with violence. More recent data indicate that significantly less systemic violence . . . is associated with crack cocaine trafficking than was reported earlier." Id. More importantly, the prevalence of aggravating factors in crack cases "does not differ substantially from the prevalence in powder cocaine offenses."[5] Id.

Third, the Commission concluded that pharmacological differences between crack and powder do not justify the disparity in penalties. "Cocaine is a powerful stimulant and in any form produces the same physiological and psychotropic effects." Id. at 239. Even the expert who testified before Congress before it adopted the 100:1 ratio acknowledged the absence of reliable evidence indicating that crack was more addictive or dangerous than powder. Clary, 846 F. Supp. at 791-92 (citing testimony of

[5]The Commission has also collected evidence suggesting that any "spike" in violence in the mid-1980s was related to the "newness of the market" and has since leveled off. See U.S. SENTENCING COMMISSION HEARING, 2/25/02: Cocaine Pharmacology, "Crack Babies," Violence, reprinted in 14 FED. SEN. REPTR. 191, 199 (Nov./Dec. 2001-Jan./Feb. 2002) (testimony of Dr. Alfred Blumstein).

16

Dr. Robert Byck). Since then, other prominent experts have opined that crack is not more dangerous than powder – in fact, the converse may be true – and that crack is not physically more addictive, though it is possibly psychologically more addictive. See United States v. Maske, 840 F. Supp. 151, 155 (D.D.C. 1993) (discussing testimony of Dr. George Schwartz); see also Willis, 967 F.2d at 1226 (Heaney, J., concurring) ("More recently, drug researchers have concluded that the short-term and long-term effects of crack and powder cocaine are identical"); Walls, 841 F. Supp. at 28 (citing testimony of Dr. Schwartz). The Commission's most recently obtained evidence confirms that the disparity in penalties is disproportionate to any reasonable assessment of crack's harmful effects. See U.S. SENTENCING COMMISSION HEARING, 2/25/02: Cocaine Pharmacology, "Crack Babies," Violence, reprinted in 14 FED. SEN. REPTR. 191, 193 (Nov./Dec. 2001-Jan./Feb. 2002) (testimony of Dr. Glen Hanson of National Institute on Drug Abuse) (stating that the pharmacological effects of crack and powder cocaine are "very similar"); see also Murphy, supra, at 239. Finally, the evidence collected by the Commission shows that, in comparison to the mid-80s, the use of crack has decreased. U.S. SENTENCING COMMISSION HEARING, 2/25/02, supra, at 191 (testimony of Dr. Hanson).[6]

Thus, none of the previously offered reasons for the 100:1 ratio withstand scrutiny. Perhaps most troubling, however, is that the unjustifiably harsh crack penalties disproportionately impact on black defendants. Blacks comprise between

---

[6]The Commission has also learned that the phenomena of "crack babies," another horrible discussed when Congress implemented the 100:1 ratio, is essentially a "myth." See U.S. SENTENCING COMMISSION HEARING, 2/25/02, supra, at 197 (testimony of Dr. Deborah Frank). Further, there is no evidence that crack is more harmful to unborn children than powder cocaine. Id. at 198 (testimony of Dr. Ira J. Chasnoff).

17

80% and 90% of federal crack cocaine defendants, compared to just 20% to 30% of powder cocaine offenders.[7] See Murphy, supra, at 239; U.S. SENTENCING COMMISSION HEARING, 2/25/02, supra, at 205 (testimony of Wade Henderson of the Leadership Council on Civil Rights); see also Clary, 846 F. Supp. at 786; Walls, 841 F. Supp. at 28; Maske, 840 F. Supp. at 154; Patillo, 817 F. Supp. at 843 n.6. This is so despite the fact that statistics suggest that the majority of crack users are white. See Clary, 846 F. Supp. at 787 n.68 (citing National Institute on Drug Abuse statistics).

Primarily as the result of the different penalties for crack and powder cocaine, and contrary to one of the Sentencing Reform Act's primary goals, the sentencing guidelines have led to increased disparity between the sentences of blacks and whites. Before the guidelines took effect, white federal defendants received an average sentence of 51 months and blacks an average of 55 months. After the guidelines took effect, the average sentence for whites dropped to 50 months, but the average sentence for blacks increased to 71 months. Spade, supra, at 1266-67 (citing 1993 U.S. Department of Justice, Bureau of Justice Statistics Report). Although there is no indication that the legislators intended that the law have a discriminatory effect, [8] as Commissioner Michael Gelacak noted, "If the impact of the law is discriminatory, the problem is no less real regardless of the intent." UNITED STATES SENTENCING

---

[7]The Commission's data show that only 5% of crack defendants are white, compared to 30% of powder cocaine defendants. Murphy, supra, at 239.

[8]But cf. Clary, 846 F. Supp. at 785-87 (suggesting that, based on media articles inserted into the congressional record, racism infused the process); Walls, 841 F. Supp. at 29 (noting statements that drug trafficking by blacks corrupted white users and communities).

18

COMMISSION, Special Report to Congress: Cocaine and Federal Sentencing Policy (Apr. 1997), reprinted in 10 FED. SEN. REPTR. 184, 189 (Jan./Feb. 1998).

Finally, the disparity in sentences involving crack and powder brings irrationality and possibly harmful mischief into the criminal justice system. All crack begins as powder, and transforming one into the other involves a quick and uncomplicated operation. Thus, guideline sentences vary widely based on facts that have little to do with culpability. For example, in United States v. Sheperd, 857 F. Supp. 105 (D.D.C. 1994), remanded by, 102 F.3d 558 (D.C. Cir. 1996), the defendant agreed to sell powder to an undercover officer. However, the officer, pursuant to his office "policy," insisted that the defendant cook the powder into crack. She did so in her microwave and thus raised her guideline range from 46-57 (with a 5 year mandatory minimum) to 108-135 months (with a 10 year mandatory minimum). Id. at 106-08. In its 1995 submission to Congress, the Commission reported a case in which two crack dealers, dissatisfied that the 255 grams of powder they had purchased converted to only 88 (rather than the usual 200) grams of crack, arranged to return the drugs to their supplier, who had agreed to replace the powder at no cost. However, before they returned the drugs, the crack dealers were arrested. At sentencing, their guideline range was 121-151 months, while the supplier's range was just 33-41 months. Spade, supra, at 1273.

To its great credit, the Commission has repeatedly sought to reduce the disparity. See UNITED STATES SENTENCING COMMISSION, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Criminal Justice System is Achieving the

Goals of Sentencing Reform, at 132 (2004); Diana Murphy, Statement to Senate Judiciary Committee, May 22, 2002, reprinted in 14 FED. SEN. RETPR. 236 (Nov./Dec. 2001-Jan./Feb. 2002); UNITED STATES SENTENCING COMMISSION, Special Report to Congress: Cocaine and Federal Sentencing Policy (Apr. 1997), reprinted in 10 FED. SEN. REPTR. 184, 189 (Jan./Feb. 1998); UNITED STATES SENTENCING COMMISSION, Special Report to Congress: Cocaine and Federal Sentencing Policy (1995); see also U.S. SENTENCING COMMISSION HEARING, 3/10/02: Cocaine Sentencing, reprinted in 14 FED. SEN. REPTR. 217, 224 (Nov./Dec. 2001-Jan./Feb. 2002) (testimony of Judge Sim Lake on behalf of the U.S. Judicial Conference, in favor of "dramatically lowering the current 100 to 1 crack to powder cocaine ratio"). Unfortunately, the disparity remains, both in the context of mandatory minimum sentences under 21 U.S.C. § 841(b) and under the guidelines. Only Congress can correct the statutory problem,[9] but after Booker district courts need no longer blindly adhere to the 100:1 guideline ratio.

In the present case, I concluded that adherence to the guidelines would result in a sentence greater than necessary and would also create unwarranted disparity between defendants convicted of possessing powder cocaine and defendants convicted of possessing crack cocaine. The question then became what ratio to apply. Everyone seems to agree that 100:1 is too high. Spade, supra, at 1284. Even the House sponsor of the bill that rejected the Commission's initial effort to eliminate the disparity stated that the Commission should close the gap though "'not completely eliminate it.'" Id. at 1284-85 (quoting 141 Cong. Rec. H10,274 (daily ed. Oct. 18, 1995)

---

[9]In the present case, the government's § 3553(e) motion allowed a sentence below the mandatory minimum.

(statement of Rep. McCollum)). At least some evidence suggests that crack is psychologically (if not physically) more addictive than powder (when inhaled),[10] and its lower cost per dose may also make crack dealing somewhat more harmful than trafficking in powder. See Maske, 840 F. Supp. at 157-57; see also Patillo, 817 F. Supp. at 843 n.6 (citing United States v. Harding, 971 F.2d 410, 413 (9th Cir. 1992)).

Most recently, the Commission recommended that the disparity be reduced but not eliminated. In its 2002 proposal, the Commission suggested that the threshold for the 5 and 10 year mandatory minimum penalties be increased from 5 and 50 grams to 25 and 250 grams, respectively. Murphy, supra, at 240. Because the Commission has studied this issue and acquired expertise, I gave its recent recommendation heavy weight. See 18 U.S.C. §§ 3553(a)(5) & (a)(6).

Although the Commission did not propose guideline amendments in 2002, its proposal for modifying the mandatory minimum thresholds, translated into guideline terms, would have resulted in a roughly 20:1 ratio. Using this conversion, defendant's drug weight would have been 410 kilograms of THC: [653.19 g of power x 200 g = 130,638 g THC] + [69.99 g of crack x (200 x 20 = 4000) = 279,960 g THC]. This calculation produced a base offense level of 28 rather than 32. With the § 5K1.1 departure and other adjustments, the offense level was 17 (28 + 2 - 3 - 10), creating a range of 27-33 months.

### 5. Sentence

---

[10]When powder cocaine is injected it may be more powerful and addictive than when smoked. See Spade, supra, at n.19.

Even after modifying the advisory guideline range based on the Commission's recommendations regarding crack cocaine, I believed the range to be somewhat greater than necessary because it did not take into account defendant's good conduct since he committed this offense over four years ago, his employment history and community involvement, and his importance to his family. I concluded that it would be appropriate to impose a non-guideline sentence to allow small reductions for these factors. Cf. United States v. Manasrah, 347 F. Supp. 2d 634, 637 (E.D. Wis. 2004) (granting two level departure based on defendant's family circumstances); United States v. Smith, 311 F. Supp. 2d 801, 810 (E.D. Wis. 2004) (granting two level departure for post-offense rehabilitation). Considering all of the § 3553(a) factors, I concluded that a sentence of 18 months was sufficient, but not greater than necessary to serve the purposes of sentencing.

### III. CONCLUSION

For the above reasons, I sentenced defendant to 18 months in prison, followed by 5 years of supervised release. Other conditions appear in the judgment.

Dated at Milwaukee, Wisconsin, this _____ day of March, 2005.


LYNN ADELMAN
District Judge

22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                             )
        v.                   )
                             )    Criminal No. 02-CR-10201-NG
                             )
ISSA M. JABER,               )
PHILIP MOMOH,                )
____Defendants.____          )

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: SENTENCING UNDER UNITED STATES v. BOOKER
March 3, 2005

Issa Jaber ("Jaber") and Philip Momoh ("Momoh") were charged with conspiracy to possess or distribute pseudoephedrine, possession or distribution of pseudoephedrine with the knowledge that it would be used to manufacture a controlled substance, and conspiracy to commit money laundering. Jaber pled guilty to all counts of the indictment. Momoh, named only in four counts of the indictment, also pled guilty. Before I discuss their sentences, I address the applicable legal framework in light of United States v. Booker, 125 S. Ct. 738 (2005).

On January 12, 2005, the United States Supreme Court in Booker concluded that the Federal Sentencing Guidelines (hereinafter "Guidelines") were unconstitutional. The Court found that the Guidelines violated the Sixth Amendment because they were not "guidelines" in any meaningful sense of the word. They obligated judges to find facts with specific consequences, consequences which were pre-ordained by the United States Sentencing Commission (hereinafter "Commission") and which

increased a defendant's sentence beyond the range required by a jury's verdict or a plea of guilty. This constitutional defect required severance of the provisions of the Sentencing Reform Act of 1984 (hereinafter "SRA"), 28 U.S.C. § 994 et seq., 18 U.S.C. § 3551 et seq., that made the Guidelines mandatory, namely, 18 U.S.C. § 3553(b)(1).[1] The Guidelines are now to be deemed "advisory," such that courts are to "consider" Guidelines ranges, see § 3553(a)(4), but are permitted to tailor sentences in light of other statutory concerns. See § 3553(a); Booker, 125 S. Ct. at 757-69.

The Booker decision obliged many courts to reconsider individual sentences imposed under the mandatory regime. Cases before me, however, were in a somewhat different posture. The above-captioned defendants were among those sentenced by me between July 26, 2004, when I also concluded that the Guidelines were advisory in United States v. Mueffelman, 327 F. Supp 2d 79 (D. Mass. 2004), and the present date. While I will review each case separately, in the light of my approach in Mueffelman, I do

---

[1] 18 U.S.C. § 3553(b)(1) provides:

> (B) Application of guidelines in imposing a sentence.-
>
> (1) In general.--Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described . . . ."

not believe that <u>Booker</u> necessitates reconsideration of any of these sentences.

At the same time, an "**advisory**" regime makes it all the more important that I adhere to my practice of writing opinions, outlining the reasons for the sentences I have imposed. As I describe in greater detail below, "advisory" does not mean a regime without rules, or a return to the standardless sentencing which preceded the SRA.[2] Nor does it mean slavish application of the Guidelines under the guise of fair "consideration," an approach which is now unconstitutional. "Advisory" means something in-between, which I articulate below.

The two defendants, Issa Jaber and Philip Momoh, whose cases constitute the subject of this opinion, are among those raising complicated sentencing questions.[3] I first present a framework for approaching sentencing after <u>Booker</u>, and then address the details of these defendants' individual cases.[4]

---

[2] <u>See</u> Marvin E. Frankel, Criminal Sentences: Law Without Order (1972).

[3] Additional sentencing opinions will be issued shortly in other complex cases. As for other defendants sentenced by me after <u>Mueffelman</u>, some of whom I refer to below, I have outlined carefully my reasons on the record, and in the appended public statements of reasons.

[4] To be sure, these cases are not necessarily representative of the universe of cases I have heard in this period. In other instances, I have found that the Guidelines ranges <u>do</u> reflect § 3553(a) sentencing factors, or that statutory directives precluded any change from the Guidelines scheme. In <u>United States v. DeOliveira</u>, docket # 04-10016, the defendant was charged with mail fraud and impersonating an officer of the United States. Mr. DeOliveira preyed on numbers of illegal aliens, pretending to be a lawyer, or an immigration official, offering them the false hope that he could make them "legal." I heard from the victims about the money they had given him and the impact of this on their lives. The Guidelines range was entirely appropriate, implementing the purposes of § 3553(a).

# I. **BOOKER v. UNITED STATES; UNITED STATES v. FANFAN**

Booker was the culmination of a series of decisions,
beginning with Apprendi v. New Jersey, 530 U.S. 466 (2000), and
ending with Blakely v. Washington, 124 S. Ct. 2531 (2004), in
which the Court implicitly acknowledged a troubling pattern.
Since the days of indeterminate sentencing, when a judge had
unreviewable authority to sentence an offender anywhere within
the statutory range, the pendulum had swung completely in the
opposite direction. In fact, the term "guidelines" had become a
misnomer. The Guidelines were rules, even "diktats,"[5]
mechanistically applied.

As the Second Circuit underscored in United States v.
Crosby, _ F.3d _, 2005 WL 240916 (2d Cir. February 2, 2005), it
was the mandatory aspect of the Guideline regime that implicated
the Sixth Amendment's requirement of a jury trial. The Court
highlighted the following quote in Booker:

> We have never doubted the authority of a
> judge to exercise broad discretion in
> imposing a sentence within a statutory range.
> Indeed, everyone agrees that the
> constitutional issue presented by these cases
> would have been avoided entirely if Congress
> had omitted from the SRA the provisions that
> make the Guidelines binding on district
> judges . . . For when a trial judge exercises
> his discretion to select a specific sentence
> within a defined range, the defendant has no

---

[5] Jose Cabranes & Kate Stith, **Fear of Judging**: Sentencing Guidelines in
the Federal Courts 95 (1998) [hereinafter Stith & Cabranes, Fear of Judging]
(describing Guidelines as a set of "administrative diktats" that the
Commission "promulgated and enforced ipse dixit").

> right to a jury determination of the facts
> that the judge deems relevant.

Booker, 125 S. Ct. at 750 (internal citations omitted).

The Supreme Court's rationale was clear: pre-guidelines, judges and juries each had specialized roles. Juries found facts, while judges exercised discretion -- judgment -- in imposing sentences. Jury decision-making was constrained by the rules of evidence and the highest burden of proof that could be imposed -- beyond a reasonable doubt. Sentencing decisions were not so constrained. Judges could consider virtually all facts and circumstances about the offense and the offender. See 18 U.S.C. § 3661.

With mandatory rules, the roles began to blur. What the judge did mirrored precisely what the jury did -- finding facts with determinate consequences, only in a setting with few

procedural safeguards, and even less legitimacy.[6]  As I noted in <u>Mueffelman</u>

> 'guidance' turned to mandatory rules,
> mechanistically applied -- if the judge finds
> 'x' fact (quantity, the amount of the fraud,
> for example), 'y' sentence is essentially
> compelled.  More and more issues of
> consequence to the punishment of an offender
> were being pushed into the sentencing realm,
> with few safeguards.  And to the degree that
> the judge's role was transformed to 'just'
> finding the facts, now with Commission-
> ordained consequences, what the *judge* was
> doing began to look precisely like what the
> *jury* was doing, only with fewer safeguards,
> less formality, and far less legitimacy.
> With respect to this area -- fact-finding
> with determinate consequences -- the judge
> had no specialized role, added no unique
> expertise to the process.  The only
> difference --and it was a troubling one --
> was that judicial decision-making took place
> in what has been described graphically as the
> 'second string fact-finding process.'

<u>Mueffelman</u>, 327 F. Supp. 2d 79, 83 n.8 (internal citations
omitted).

---

[6] I have described this phenomenon in greater detail in Judge Nancy
Gertner, <u>Circumventing Juries, Undermining Justice: Lessons from Criminal
Trials and Sentencing</u>, 32 Suffolk U.L. Rev. 419 (1999) (arguing that as more
and more significant issues were shifted away from the jury to the judge at
sentencing, both decision makers, rather than being specialists in their
respective spheres, seemed to be doing exactly the same thing--finding facts
with determinate consequences--but with very different procedural
protections).  Pre-guidelines, "the model of sentencing was a therapeutic one,
with the goal of rehabilitating the offender.  Each offense carried a broad
range of penalties.  Like a social worker or doctor, the judge exercised his
or her clinical judgment to arrive at a sentence.  In order to maximize the
information available to the judge, and to minimize constraints on her
discretion, sentencing procedures were less formal than trial procedures."
<u>Id</u>. at 422.  But however powerful the judge was, that power did not diminish
the jury's role: "The judge was the expert at sentencing--the jury, at trial.
Each was critically important in its sphere."  <u>Id</u>.  With mandatory Guidelines,
the Commission supplanted -- not supplemented -- the judicial experts, whose
work then began to tread on the jury's role.

In _Booker_, the trial court followed the Guidelines, increasing the sentence range of 210-262 months (the range based on the facts implied by the jury's verdict) to 360 months to life (the range based on facts of the defendant's "relevant conduct," _see_ U.S.S.G. § 1B1.3, as found by the judge). _See United States v. Booker_, 375 F.3d 508 (7th Cir. 2004). In _Fanfan_, the applicable Guidelines range increased from 63-78 months to 188-235 months based on the sentencing judge's determination of relevant conduct. _See Fanfan_, 2004 WL 1723114 (D. Me. June 28, 2004). The judge, however, concluded that the Supreme Court's decision in _Blakely_ precluded him from sentencing above the range dictated by the jury's verdict, and thus imposed a sentence of 78 months. _See id._

The Supreme Court rejected both the former approach, which would have continued to blur the role of judge and jury, and the latter approach, which would have eliminated judicial enhancements while maintaining all other aspects of the Guidelines. The Court found that the constitutional jury trial requirement was not compatible with the SRA as written. Accordingly, the Court required that 18 U.S.C. § 3553(b)(1), which made the Guidelines mandatory, be "sever[ed] and excise[d]." 125 S. Ct. at 764.

Significantly, section 3553(a) remains, requiring a sentencing judge to "consider" a number of factors, including

"the nature and circumstances of the offense, and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing court must also weigh the purposes of sentencing listed in the SRA, including the need for the sentence to "reflect the seriousness of the offense," deter future criminality, protect the public, and provide the defendant with needed training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a)(2)(A-D). The Guidelines and their policy statements are now factors to be weighed among the others.[7] Thus, a judge is also to consider:

> (4) the kinds of sentence and the sentencing range established for -
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines -
>
> (i) issued by the Sentencing Commission. . . .
>
> (5) any pertinent policy statement --
>
> (A) issued by the Sentencing Commission. . . .

18 U.S.C. § 3553(a)(4, 5).[8]

---

[7] Professor Freed suggested just such an interpretation of § 3553(a) over ten years ago. See Daniel J. Freed, Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers, 101 Yale L.J. 1681, 1701-1702 (1992).

[8] In a number of decisions pre-Booker, I tried to apply § 3553(a) to give force to all of the listed factors, not simply to Guideline factors. See e.g., United States v. Ribot, 97 F. Supp. 2d 74 (D. Mass. 1999). I noted that, in order to determine whether departure from the Guidelines was warranted (as involving an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission," 18 U.S.C. 3553(b)), the Court must have "a perspective independent of the Guidelines -- all the facts the case involves, and not just those facts made relevant by the Guidelines." Id. at 75 n.2.

The next question is, how is a judge to balance these factors in an advisory regime?  What, precisely, does "advisory" mean?

## A.    The Advisory Framework

One way to identify what is permissible in an advisory framework is first to identify what is impermissible.  Sentencing approaches can now be tracked along a continuum.  At one end lies the mandatory extreme.  To the extent that judges enforce the federal sentencing guidelines without exercising any discretion, i.e., as if they are "mandatory," the <u>Blakely-Booker</u> line of cases suggest that judges are behaving in an unconstitutional manner.  They are arrogating to themselves fact-finding decisions which appropriately belong to juries.

On the other end of the continuum is what I have come to describe as the "free at last" regime, or a return to pre-1984 indeterminate sentencing.  Put another way, this end describes an approach to sentencing in which judges feel free to disagree about the fundamental premises of sentencing, to implement their own perceptions of what policies should drive punishment.[9]  The "free at last" mentality is characterized by comments like, "I

---

[9] In fact, the prevalence of disagreements about the fundamental premises of punishment pre-Guidelines was overstated.  <u>See</u> Stanton Wheeler, Kenneth Mann, & Austin Sarat, <u>Sitting in Judgment: The Sentencing of White Collar Criminals</u> 144-45 (1988).

won't sentence according to the Guidelines because I simply don't agree that sale of marijuana deserves such severe penalties."[10]

Advisory guidelines should fall somewhere in-between these poles; they should constitute a regime based on rules of general application -- what many have described as a common law of sentencing, supplementing, not supplanting, judges.[11] To be sure, in this regime, the existing set of rules -- the Guidelines -- are very important, but they cannot be outcome-determinative without running afoul of **Booker**.

I agree with the Second Circuit in **United States v. Crosby**, _ F.3d _, 2005 WL 240916 (2d Cir. February 2, 2005), that it is not useful to determine in advance the weight that sentencing judges should give to applicable Guidelines ranges. Rather, in **Crosby**, the Court concluded that it is "more consonant with the

---

[10] In **United States v. Gonzalez**, No. 03-10027, the defendant plead guilty to illegal reentry after deportation and passing false social security cards. The applicable statute, 8 U.S.C. § 1326, already distinguished between defendants who had simply reentered the country, and those who did so after conviction of a crime. Mr. Gonzalez's reentry had not followed the conviction of a crime. Counsel did nothing to individualize Mr. Gonzalez (i.e., to suggest why he was different from all others in that category of offense). In my judgment, her argument translated into -- "I don't agree that people who have committed these offenses ought be punished so severely." While I agreed with counsel's predilections, I rejected that approach. It was not a judgment for me to make, so I sentenced according to the Guidelines.

[11] **See** Douglas A. Berman, **A Common Law For This Age of Federal Sentencing: The Opportunity and Need For Judicial Lawmaking**, 11 Stan. L. & Pol'y Rev. 93, 94 (1999) [hereinafter Berman, Common Law] (arguing that common law of departures could eventually emerge from appellate review of reasoned departures); Marc Miller, **Purposes at Sentencing**, 66 S. Cal. L. Rev. 413, 419 (1992) [hereinafter Miller, **Purposes at Sentencing**] (criticizing the Sentencing Commission for failing to articulate a sentencing philosophy); Louis F. Oberdorfer, **Mandatory Sentencing: One Judge's Perspective--2002**, 40 Am. Crim. L. Rev. 11, 17-18 (2003) (arguing that the Guidelines are flawed and suggesting that a common law of sentencing would produce fairer penalties).

-10-

day to day role of district judges in imposing sentences and the
episodic role of appellate judges in reviewing sentences . . . to
permit the concept of 'consideration' in the context of the
applicable Guideline range to evolve. . . ."[12] Id. at 24.

At the same time, I have concerns about the approach in
United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005)
(Wilson I), and United States v. Wilson, _ F. Supp. 2d _, 2005 WL
273168 (D. Utah Feb. 2, 2005) (Wilson II), adopted in United
States v. Wanning, _ F. Supp. 2d _, 2005 WL 273158 (D. Neb. Feb.
3, 2005). In Wilson, the Court noted that the Guidelines are
entitled to "heavy" weight, and that deviation from Guidelines
ranges is only appropriate in unusual cases, for clearly
identified and persuasive reasons. See Wilson, 350 F. Supp. 2d
at 912.

I have concerns about such an approach, both as a practical
and as a legal matter. As a practical matter, the Wilson method
comes perilously close to the mandatory regime found to be
constitutionally infirm in Booker. Guidelines ranges had always

---

[12] The Court outlined a few general principles and approaches to
sentencing post-Booker: 1) the Guidelines are no longer mandatory, 2)
sentencing judges are to consider them alongside all of the other factors in §
3553(a), 3) "consideration" of the Guidelines will normally require a
determination of the applicable Guideline range and policy statements, 4)
after considering the Guidelines and the factors in § 3553(a), the sentencing
judge should decide whether to impose the sentence that would have been
imposed under the Guidelines (meaning either a sentence within the range or
within the permissible departure authority), or to impose a non-Guidelines
sentence, and 5) the sentencing judge is entitled to find all facts
appropriate for determining a Guidelines sentence or a non-Guidelines
sentence. Crosby, 2005 WL at *7.

been the presumptive sentences, and perhaps became even more compulsory after the amendments of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today (PROTECT) Act. See Pub. L. No. 108-21, 117 Stat. 650, 667 (codified in scattered sections of 18 and 42 U.S.C., with the Feeney Amendment set forth in a note to 18 U.S.C. § 3553). Deviations from the Guidelines for certain facts were permitted only in "extraordinary" circumstances. In fact, departure authority was always framed in the terms used by the court in Wilson.

Furthermore, I have concerns about the premises on which the Wilson approach is based. In Wilson I (reaffirmed in Wilson II), the court noted that the Guidelines are entitled to "heavy" weight for a number of reasons: 1) they were promulgated by an "expert agency," 2) that expert agency promulgated "comprehensive guidelines", and 3) these Guidelines directly reflected the congressionally-mandated purposes of the SRA.[13]   From the Court's perspective, there was nothing more a trial judge could do to effectuate the purposes of the statute in a given case than to impose the Guidelines sentence. The Commission, with Congress' concurrence, had done it all. As the Wilson Court noted:

---

[13] The Wilson Court concluded that Congress had ratified each and every Guideline because it "had an opportunity both to review the initial Guidelines and all subsequent amendments to insure that they fulfill congressional purposes." Wilson, 350 F. Supp. 2d at 915.

> It would be startling to discover that while
> Congress had created an expert agency,
> approved the agency's members, directed the
> agency to promulgate Guidelines, allowed
> those Guidelines to go into effect, and
> adjusted those Guidelines over a period of
> fifteen years, that the resulting Guidelines
> did not well serve the underlying
> congressional purposes. The more likely
> conclusion is that the Guidelines reflect
> precisely what Congress believes is the
> punishment that will achieve its purposes in
> passing criminal statutes.

Wilson, 350 F. Supp. 2d at 915.

Apart from congressional approval, the Court found that the

Guidelines *in fact* achieved the statutory purposes: They

achieved just punishment because they precisely reflected

society's views about punishment, as described in the

Commission's own studies, and they achieved the goal of

deterrence, enumerated in § 3553(a), by their impact on crime

rates. Crime rates, the Court noted, had declined since the

inauguration of Guidelines. Indeed, relative to the sentencing

experts on the Commission, courts were poorly suited to consider

"elasticities and other factors that would go into a sensible

deterrence calculation, "particularly with respect to classes of

crimes. Id. at 920. In contrast to the courts, "the Sentencing

Commission with its ability to collect sentencing data, monitor

crimes rates, and conduct statistical analyses, is perfectly

situated to evaluate deterrence arguments." Id.

While I have considerable respect for the United States Sentencing Commission, and as the sentences below suggest, for the Guidelines it has promulgated, the Court in _Wilson_ overstates the case for deference to the Commission, particularly in individual cases.

1. **The Guidelines Were Not in Fact Comprehensive, and Could Not Be.** Under 28 U.S.C. § 991(b)(1), the Sentencing Commission was directed to establish policies that would "[a]void[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct _while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices._" 28 U.S.C. § 991 (b)(1)(B) (emphasis added). The original Commission recognized that its understanding of the factors that could legitimately affect sentencing was not exhaustive. In part, the Commission was limited by a regime in its preliminary stages. In part, and this is particularly relevant today, the Commission conceded the inherent complexity of the sentencing enterprise. It acknowledged "the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch. I, pt. A, intro. cmt. 4(b). Indeed, it saw that

"[c]ircumstances that may warrant departure from the guideline range . . . cannot, by their very nature, be comprehensively listed and analyzed in advance." U.S.S.G. § 5K2.0(a) (prior to amendment). With few exceptions, the Commission refused to "limit the kind of factors (whether or not mentioned anywhere else in the Guidelines) that could constitute grounds for departure in an unusual case." U.S.S.G. ch. I, pt. A, intro. cmt. 4(b).

The Commission's concerns, and its approach, apply with particular force today after the Supreme Court's decision in Booker. From the start, the Guidelines were intended to advance both the goals of uniformity and proportionality. See U.S.S.G. ch. I, pt. A, intro. cmt. 3. Congress did not seek to impose a regime with absolutely uniform sentences across the country. It sought to eliminate only "unwarranted" disparities, while enabling judges to consider those factors that cannot be tallied in advance, but that may create "warranted" disparities in sentencing.[14]

Indeed, the drafters of the Guidelines regime envisioned an important role for judges in articulating what those factors

_____

[14] Kate Stith and Jose Cabranes described it as follows: "The overriding statutory directive to the Sentencing Commission was to eliminate 'unwarranted disparity.' The concept of disparity that is _unwarranted_, however, is intelligible only in the context of some accepted criteria for determining what disparity is _warranted_ – that is, what factors should be taken into account in sentencing." Stith & Cabranes, Fear of Judging, supra note 5, at 51-52.

might be. As judges applied the Guidelines, they were supposed to highlight issues and concerns that the Guidelines had not addressed, in effect, to create a common law of sentencing in the interstices of the Guidelines. As one scholar noted: "[t]he notion of judicial development of a 'common law of sentencing' was a fundamental component of the guidelines model which hoped to take advantage of 'the interlocking substantive lawmaking competencies of the commission and judiciary.'"[15] Berman, Balanced and Purposeful Departures, supra note 15, at 34; see also Kevin R. Reitz, Sentencing Guideline Systems and Sentence Appeals: A Comparison of Federal and State Experiences, 91 Nw. U. L. Rev. 1441, 1455 (1997). Judges were to articulate the purposes of sentencing, and to "consider what impact, if any, each particular purpose should have on the sentence in each case." S. Rep. No. 98-225, at 77 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. In short, the drafters understood that fairness in the individual case meant something other than rote application of the Guidelines.

---

[15] Through a "common law of sentencing" there would be a judicial contribution to the principled evolution of the guidelines system. "The initial drafting of the sentencing guidelines would make certain policy determinations and set a course for the development of substantive sentencing rules. But then trial and appellate judges, through their articulation and review of reasons supporting decisions to depart from the guidelines in individual cases, would have their say in the evolution of principled and purposeful sentencing law and policy." Douglas A. Berman, Balanced and Purposeful Departures: Fixing a Jurisprudence that Undermines the Federal Sentencing Guidelines, 76 Notre Dame L. Rev. 21, 34 (2000) [hereinafter Berman, Balanced and Purposeful Departures].

This approach is not only consistent with the SRA and the Guidelines, but also, I would argue, is now compelled by Booker. (Indeed, had the Guidelines been interpreted more consistently with this early vision, perhaps Booker would have had a different outcome.)

**2. The Guidelines Do Not Implement the Purposes of Sentencing.** Indeed, the Commission made no effort to implement the statutory purposes of sentencing. The first Commission noted that choosing among purposes would be "difficult," that the selection of purposes was often "irrelevant," and that, therefore, it would simply not identify its purposes at all (or would claim that *all* purposes were relevant to all cases). Marc L. Miller, Purposes at Sentencing, supra note 12, at 424-25. In effect, the purposes enumerated under § 3553(a) became irrelevant to the Guideline enterprise. This is so even as the Guidelines have been amended over the years.[16]

**3. The Commission Has Not Functioned as a Sentencing Expert in the Way the Statute Envisioned.** The Commission's mandate was to develop Guidelines that "reflect, to the extent practicable, advancement in knowledge of human behavior as it

---

[16] Indeed, the assumption that the Commission must have thought about purposes -- when it did not -- is responsible in part for the overly rigid enforcement of the Guidelines. See Paul J. Hofer & Mark Allenbaugh, The Reason Behind the Rules: Finding and Using The Philosophy of the Federal Sentencing Guidelines, 40 Am. Crim. L. Rev. 19, 22 (2003) ("Mechanical judging fails to subject the rules to the ongoing critical scrutiny needed when applying them to the particular circumstances of individual defendants.")

relates to the criminal justice process." 28 U.S.C. §
991(b)(1)(C). Moreover, it was to "develop means of measuring
the degree to which the sentencing, penal, and correctional
practices are effective in meeting the purposes of sentencing as
set forth in section 3553(a)(2)." 28 U.S.C. § 991(b)(2). One
can imagine these directives leading to scientific studies on the
efficacy of different guidelines, how they relate to crime
control objectives, to what extent they deter crime, or, to quote
one judge, "what works." Judge Michael Marcus, Archaic
Sentencing Liturgy Sacrifices Public Safety: What's Wrong and How
We Can Fix It, 16 Fed. Sent. Rep. 76 (2003).

But, with few exceptions, the Commission has done no such
analysis. Without an agreement on the purposes of sentencing,
there was no way for the Commission to measure sentences against
particular objectives.[17] Even after the Guidelines were
promulgated, all discussions of delay for "field testing" were
rebuffed. Id. at 58. Instead, the Commission simply took the
average national sentences for a given offense, and then
increased them, without explanation, much less scientific
studies.[18]

---

[17] Stith and Cabranes concluded that this was the reason why "the
Commission has never presented empirical evidence or substantial argument to
support the proposition that its rules achieve, even imperfectly, any of the
four well-established possible objectives of criminal sentencing --
retribution, deterrence, incapacitation or rehabilitation." Stith & Cabranes,
Fear of Judging (1998), supra note 5, at 53.

[18] And even the data on which the averages were culled was problematic.
See Stith & Cabranes, Fear of Judging, supra note 5, at 64.

-18-

The Commission did not try to justify its Guidelines in any meaningful way either.  It did not have to.  Like other administrative agencies' rules, the Commission's proposed rules become law unless disapproved by Congress.  See infra Part I.A.4. But, unlike other rule making agencies of the federal government, the Commission is not subject to the Administrative Procedure Act.  Since the Guidelines could not be challenged as "arbitrary" or "capricious," the Commission had no pressure to provide explanations.  Stith & Cabranes, Fear of Judging, supra note 5, at 57; see also Joseph W. Luby, Reigning in the Junior Varsity Congress: A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines, 77 Wash. U. L.Q. 1199, 1221 (1999).

**4.  Congress Has Approved the Guidelines Generally -- Not Their Use In Any Particular Case.**  Proposed Guidelines become law unless disapproved by legislation.  To disapprove a proposed guideline, Congress must pass a bill.  If the president vetoes that bill, it can become law only by a two-thirds vote of both Houses of Congress.  If Congress does not adopt disapproval legislation within 180 days, any Guideline becomes legally binding.  See 28 U.S.C. § 994(a, p) (1994).  It is no surprise that, with some exceptions, Congress has not played an active role in the promulgation of individual Guidelines.

**5.  While the Guidelines May Reflect Public Opinion to a Degree, They Do Not Reflect the Public's View of Individual**

**Cases.** In fact, the studies cited in _Wilson I_ found that, while there was agreement between the Guidelines and the public in ranking crimes, "on the level of sentences given to individual vignettes, there was only a very modest amount of agreement between the sentences given by individual respondents and those prescribed by the guidelines." Peter H. Ross & Richard A. Berk, _Just Punishment: Federal Guidelines and Public Views Compared_ 208 (1997). Moreover, there were "major departures" from "close agreement" with respect to crimes, such as drug trafficking, that the Commission had determined required lengthy sentences. Nor did the general consensus about ranking offenses extend to an agreement about the length of the sentence in an individual case, which is precisely the decision that judges have to make. In short, it is not at all clear that the public would agree with mechanistically-derived Guidelines outcomes, if it had all the information that judges possess, instead of just sound bytes or incendiary headlines.

6. **Finally, There Is Substantial Debate About the Role of the Federal Sentencing Guidelines In Crime Rate Reduction.** Even assuming that incarceration contributes heavily to the drop in crime, federal sentencing comprises only a fraction of the sentences meted out in courts around the country every year. In 2001, 59,363 defendants were convicted of felonies in federal court. _See_ Bureau of Justice Statistics, Sourcebook of Criminal

-20-

Justice Statistics Online ("**Sourcebook** Online"), Table 5.18, "Federal defendants convicted in U.S. District Courts" (fiscal year 2001), <u>available at</u> http://www.albany.edu/sourcebook/pdf/t518.pdf. In contrast, in 2000, fully 924,700 felony convictions took place in state courts. <u>See</u> Sourcebook Online, Table 5.44, "Felony convictions in State courts" (2000), <u>available at</u>: http://www.albany.edu/sourcebook/pdf/t544.pdf. Furthermore, state sentencing policies vary widely from federal sentencing policy. Some states have guideline systems, some do not, and others use hybrid structures.

Indeed, most studies attribute falling crime rates to factors other than incarceration rates, much less to the Federal Sentencing Guidelines. <u>See e.g.</u>, Henry Ruth & Kevin R. Reitz, <u>The Challenge of Crime: Rethinking Our Response</u> 5, 15-18 (2003). In fact, although drug offenders are incarcerated for longer and longer periods, the drug crime rate has increased. <u>See id</u>. at 211-214; <u>see also</u> Jeffrey A. Roth, <u>Review of an Analysis of Non-Violent Drug Offenders with Minimal Criminal Histories</u>, 7 Fed. Sent. Rep. 18, at 4-5 (1994).

But, having said all of the above, I have absolutely no doubt that, however one characterizes the Guidelines, their advantages and their flaws, the Guidelines will continue to play an important part in sentencing. They have shaped the vocabulary we use to describe sentences, and the standards we use to

evaluate and compare cases. Since there were no alternative rules prior to the Sentencing Guidelines -- no empirical studies linking particular sentences to particular crime control objectives, no common law of sentencing -- and there have been none since, the Guidelines will continue to have a critical impact. At the same time, as I describe below, the only way for courts to truly "consider" the Guidelines, rather than to follow them by rote, is to do in each case just what the Commission failed to do -- to explain, correlate to the purposes of sentencing, cite to authoritative sources, and be subject to appellate review. As for the Commission, it can now return to what it was supposed to do as well -- to studying the impact of sentences on crime control, as well as monitoring disparity. See e.g., Barbara M. Vincent, Research in Sentencing, 6 Fed. Sent. Rep. 22 (1993).

In the final analysis, the SRA sought to eliminate "unwarranted disparity" between "similarly situated offenders." It did not call for *identical* sentences from one end of the country to another. Differences justified by "differences among offenses or offenders" are *warranted* differences. S. Rep. No. 98-225, at 38 (1984), reprinted in 1984 U.S.C.C.A.N. 3183, 3221-29 ("Sentencing disparities that are not justified by differences among offenses or offenders are unfair both to offenders and to the public."). Differences in the treatment of offenders based

on identifiable, sustainable standards, spelled out in decisions, statements of reasons, or transcripts, and subject to review, or even testing, are not "unwarranted."

The devil, however, is in the details to which I now turn. Below, I begin a discussion of my two sentencing decisions in the cases of Issa Jaber and Philip Momoh with a review of the Guidelines -- an effort to interpret them, to determine what factors each guideline comprised and, to the extent possible, why these factors are important. I then review the sentences that resulted with a view to the statutory purposes of sentencing. In my judgment, each of these sentences could be described as "Guidelines" sentences, as they hark back to the original statute and intended approach.[19]

## II. ISSA JABER and PHILIP MOMOH

---

[19] Neither of these cases required that I take into account factors discouraged or prohibited under the Guidelines, although Booker anticipated such situations. Booker plainly allows courts to look carefully at those factors and to determine to what degree they are relevant to individual cases. For example, the Guidelines prohibit consideration of socioeconomic factors in determining a sentence. See U.S.S.G. § 5H1.10. In reconstructing the debate that raged around the Guidelines -- not, of course, through Commission materials, since they provide little -- it becomes clear that the rationale for such exclusion was this: Socioeconomic factors point in two directions at once, serving as both aggravating and mitigating factors. They can predict recidivism, as well as explain past behavior. If a judge has a case in which a socioeconomic factor points only in one direction (i.e., providing an explanation for the past behavior), but not in the other (i.e., because the defendant now has a more stable life, he is less likely to commit a crime again), he or she may well consider it. That kind of analysis does not challenge the Guidelines per se, but only their application to individuals. In addition, Booker also suggests that judges may now do with the Guidelines what they have done with respect to other administrative regulations -- determine whether they are consistent with the statutory mission.

-23-

Issa Jaber ("Jaber") and Philip Momoh ("Momoh") were charged in an eight count superceding indictment alleging conspiracy to possess or distribute a list I chemical, namely pseudoephedrine, in violation of 21 U.S.C. § 846 (Count 1), possession or distribution of a listed chemical knowing that it would be used to manufacture a controlled substance (in violation of 21 U.S.C. 841(c)(2) (Counts 2-7), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1965(h) (Count 8). Jaber is named in all counts, to which he pled guilty. Momoh is named in Counts 1, 4, 7 and 8, to which he also pled guilty.

The nub of the offense according to the indictment was the charge that, from January 2000 until July 2000, Jaber, working through a phony pharmaceutical wholesale business, illegally diverted pseudoephedrine for use in methamphetamine trafficking organizations. Momoh was his employee, essentially a functionary. Jaber had been introduced to the business by Khalid Abu-Lawi ("Abu-Lawi"), who was not a defendant in this case.

But the indictment and the pleas only told part of the story. I requested Abu-Lawi's presentence report to learn more about the scope of the charges than what was framed by the Momoh-Jaber indictment.[20] The presentence report revealed that Jaber's operation was a very small part of a much larger conspiracy, and

---

[20] The presentence report was obtained and distributed to the parties. Neither party contested the facts in the report on which the Court relied.

that Abu-Lawi was more than simply a facilitator of an illegal Massachusetts operation.

Abu-Lawi was indicted with 26 co-defendants in the Southern District of Florida. The indictment charged a conspiracy beginning over nine months before Jaber's introduction, namely, beginning in April of 1999. The conspiracy was national in scope, including transactions in Florida, California, Oregon, Chicago, and Houston. As the Abu-Lawi presentence report described:

> The investigation revealed a structured network of individuals, international in scope, involved in providing pseudoephedrine to various methamphetamine organizations in the United States. Individuals would acquire pseudoephedrine through the use of 'front' business. Bulk quantities of the drug were then shipped to California for further distribution to those involved in the manufacture of methamphetamine.

> The acquisition of quantities necessary to make even small amounts of methamphetamine is difficult due to limitation on the retail sale of pseudoephedrine [which is an ingredient in common over the counter cold medications.] Therefore, organizations that have formed to procure and illegally divert pseudoephedrine are critically important to the criminal organizations that actually distribute methamphetamine.

The leader of the organization was Habes Habbas ("Habbas"), now a fugitive. He supplied pseudoephedrine to Tarek Zaki Abu-Lawi ("Zaki"), also a fugitive. Since Zaki is Abu-Lawi's uncle, Abu-Lawi was plainly an insider. He played a significant role in

the business, obtaining bulk quantities of the drug through a number of front groups, and then diverting it to methamphetamine manufacturers on the West Coast. In effect, he franchised his operation to others, whose "fronts" would purchase the drug for him. He provided them with money, tips on obtaining a Drug Enforcement Administration ("DEA") registration, money laundering, shipping sources, purchasers, giving advice on pill size, etc.

In effect, Jaber was one such franchisee. Abu-Lawi encouraged Jaber to set up his own pseudoephedrine business, told him how to do it, and gave him cash to get started. He even tutored Jaber about the use of pseudoephedrine and its manufacture. From October 1, 1999, Jaber did what Abu-Lawi suggested. He set up a phony company, obtained a DEA license, opened accounts, and started to purchase pseudoephedrine from legitimate distributors. In November 1999, Abu-Lawi sent Jaber money, as well as the telephone numbers of additional distributors from whom to purchase the drug. When Abu-Lawi had a buyer, he provided Jaber with the address, taking the lion's share of the profits. To use just one example, from the first sale, Abu-Lawi received $80,000; Jaber received $20,000.

Jaber met Momoh when Momoh was purchasing furniture at Jaber's father's business. A naturalized citizen, Momoh was a married man with three (soon to be four, at the time of

sentencing) small children **and an** ill wife.[21]  While he had an
advanced degree from the University of Massachusetts, he was
unable to get a job commensurate with his skills.  He began
working for Jaber in January 2000 for $350 per week; his salary
was later raised to $500.

In June 2000, Abu-Lawi and Jaber had a falling out.  For a
very short time thereafter, until some time in July 2000, Jaber
and Momoh worked directly with a customer in California.

But the Jaber operation began to fall apart as well.  On
July 29, 2000, agents seeking a different suspect searched
Jaber's residence in Florida.  The fruits of that search,
receipts for purchases of pseudoephedrine, led the DEA agents to
Jaber's business address in Massachusetts.  By August 3, 2000,
Jaber told Momoh to dispose of their inventory and then to
pretend that there had been a break-in.  (Jaber reports that the
reason for destroying the drugs was because they could not find a
buyer.)  Momoh complied.  The business was over.

On July 30, 2002, Jaber was arrested.  In a sealed document,
counsel outlined his considerable efforts to cooperate with the
government -- four proffers, meetings in Florida.  These efforts
were not considered substantial enough in Massachusetts, and were
ignored in Florida.

---

[21] See _infra_ n.28.

Momoh was arrested on August 1, 2002. He immediately tried to cooperate too, but unlike Jaber, he had no basis -- no contacts.

Abu-Lawi had been arrested earlier, on July 31, 2000. He pled guilty and cooperated with the government, offering up all of the individuals, including Jaber and Momoh, whom he set up in the business in the first place. Notwithstanding the scope of his participation in these charges, his Guidelines sentence, initially set at 135 months, was first reduced to 78 months and, finally, to 51 months. The government sought a sentence of 87 months for Jaber, and 70 months for Momoh.

I now turn to an analysis of the Guidelines, their application to this case, and the relationship between the Guideline categories and the statutory purposes of federal sentencing. The sentences I imposed are Guideline sentences, reflecting how many originally conceived of the Guideline regime.

## A.  Jaber

### 1.  Guideline Analysis

The government and the defendant agreed that a base offense level of 30 reflected the amount of pseudoephedrine that Jaber possessed. In addition, the money laundering charge yielded a base offense level of 29. The parties also agreed that the defendant was entitled to a three-level adjustment for "acceptance of responsibility" under U.S.S.G. § 3E1.1(a) and (b).

The parties differed on: a) whether the grouping provisions
(which would reduce the sentence) of the Guidelines applied; b)
the extent of the enhancement Jaber was subject to under U.S.S.G.
§ 3B1.1(c) for his "role in the offense" -- two points, as the
defendant suggested, or four points as the government urged; and,
c) whether Jaber was subject to the two-point enhancement
proposed by probation pursuant to U.S.S.G. § 3C1.1 (obstruction
of justice) for concealing material evidence and lying to the
DEA.

I agreed with probation that Jaber's offenses -- money
laundering and drugs -- should be grouped together. And the
parties eventually agreed that an enhancement for obstruction of
justice was beyond the scope of the plea.[22]

Both the issue of "role" and "drug quantity" should have
raised serious Guideline questions, even pre-Booker, given the
relationship between the instant charges and the Abu-Lawi
prosecution. In one sense, considering the breadth of Abu-Lawi's
case is nothing more than a variation on the theme of "real
offense" sentencing -- looking beyond the four corners of the
charge to what the conduct truly comprised.[23]  If the government

---

[22] Indeed, in my judgment, "obstruction of justice" enhancements raise
concerns under both Booker and Blakely where the government has a choice of
charging a separate offense -- which would have been subject to a jury trial
and the full panoply of procedural safeguards -- but instead seeks to enhance
a sentence for another offense.

[23] As Justice Breyer noted, the Guideline system "that diminishes
sentencing disparity--depends for its success upon judicial efforts to
determine, and to base punishment upon, the real conduct that underlies the

had indicted these defendants in an East Coast conspiracy, Jaber's participation would have been minor relative to the others.[24]

Section 3B1.1 of the Guidelines provides for an increase in the offense level when the defendant was: (a) "an organizer or leader of a criminal activity that involved five or more participants or that was otherwise extensive" (an increase of four levels), b) "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive" (an increase of three levels), or c) if the defendant was "an organizer, leader, manager, or supervisor in any criminal activity other than that described in (a) or (b)" (an increase of two levels). <u>See</u> U.S.S.G. § 3B1.1(a-c). Unlike other sections, the role adjustment provision does connect this enhancement to concerns about culpability, public safety, and recidivism:

> This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the

---

crime of conviction." 125 S.Ct. at 759.

[24] The government claims that joining Jaber and Abu-Lawi in a single conspiracy would have been wrong. But whether or not the cases can be formally joined is irrelevant. A "real offense" approach entitles me to consider both.

> size of the organization and the degree of
> defendant's responsibility.

U.S.S.G. § 3 B1.1, cmt. (backg'd). While the significance of the enhancement varies, depending on the seriousness of the offense, there is no commentary suggesting how the Commission arrived at those fixed enhancement scores (2, 3, or 4 levels) or why it chose that approach rather than some other.[25]

Section 3B1.1 does direct the court to look at the "real offense" and consider a number of factors, including (but obviously not limited to): "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3 B1.1, cmt. n.4.

Jaber had no criminal record before his encounter with Abu-Lawi. He had had no contacts with, or even information about, pseudoephedrine and its uses. He did essentially what Abu-Lawi directed him to do during most of his involvement with the organization. When he was on his own, he fell on his face. The operation ended in August of 2000.

---

[25] The category "otherwise extensive" is even more ambiguous. See <u>United States v. Footman</u>, 66 F. Supp. 2d 83, 93 (D. Mass. 1999) (affirmed).

Between that date and the date of his arrest, he never tried
to restart the business. While he may have garnered profits from
the operation, his portion pales in comparison to Abu-Lawi's.

Measuring the relative culpability of the participants
against the scope of the Abu-Lawi operation suggests that Jaber
should receive no enhancement. Moreover, this conclusion is
buttressed by the other concerns, reflected in the Guidelines --
danger to the public and recidivism.

With respect to the amount of drugs in Jaber's possession --
what largely drove the Guidelines sentence -- I concluded that
the amount did not accurately reflect his culpability. Sometimes
quantity is an entirely appropriate proxy for culpability. At
other times, it is not. All other things being equal, one who
distributes a greater amount of illegal drugs is more culpable
than one who distributes a lesser amount. But, as Judge Lynch
noted in United States v. Emmenegger, 329 F. Supp. 2d 416, 427
(S.D. N.Y. 2004), a case dealing with fraud amounts, "[i]n many
cases . . . the amount stolen is a relatively weak indicator of
the moral seriousness of the offense or the need for deterrence."
Drug quantity may well be a kind of accident, depending on the
fortuities of law enforcement or even the market, as much as it
reflects the defendant's culpability.

Jaber did not set out to distribute a particular quantity of
pseudoephedrine. At first, from January to July, he purchased

only the quantities that Abu-Lawi required; nothing more, and nothing less. Then, when he started out on his own, he purchased ten cases of pseudoephedrine, or 62 kilograms, in a single transaction, which he paid for in three installments, but then could not sell. While the quantity may be an appropriate indicator of culpability for Abu-Lawi, it is not for Jaber. It does not, in short, reflect the true "nature and circumstances" of Jaber's offense.

With respect to Jaber's cooperation and acceptance of responsibility, Jaber labored mightily to cooperate with the government. In a sealed affidavit, the defendant revealed his considerable efforts to do so. In Florida, his cooperation did not produce any prosecutions, ostensibly because of a change in personnel in the United States Attorney's office. I cannot give Jaber "credit" for that cooperation simply because I do not have all of the information in the government's possession. Nevertheless, Jaber's repeated efforts to help law enforcement surely bear on his extraordinary acceptance of responsibility, which is both a Guidelines factor and something that impacts on the likelihood of recidivism.

The aforementioned factors suggest that a departure is warranted. However, they do not suggest the appropriate amount of departure, to which I now turn.

2. **18 U.S.C. § 3553(a)**

Jaber's counsel requested a sentence of "time served." I rejected that suggestion. Congress and the Commission have expressed their deep concern that pseudoephedrine be treated seriously. I am not free to reject that approach based on my personal predilection (what I have earlier called the "free at last" regime). Whatever his role vis-a-vis Abu-Lawi, Jaber knew what he was doing; he knew that he had embarked on an illegal career that promised substantial rewards.

The Guideline sentence, computed as I have set out, would have been a base offense level of 27 with a criminal history of I, or 70-87 months. But to arrive at a sentence under Booker, I must go beyond the Guideline framework, directly to the purposes of sentencing under 18 U.S.C. § 3553(a). Ironically, in this case, the Guidelines concerns about "unwarranted disparity among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), call for an out-of-Guidelines adjustment. Ordinarily, the Guidelines do not permit me to make adjustments as between co-defendants in a single case, much less between defendants in separate indictments. See United States v. Kneeland, 138 F.3d 6, 16 (1st Cir. 1998). However, in the instant case, there is something troubling about the extent to which differences in sentencing were driven not by difference in the crime, but by the happenstance of the way the government indicted, the jurisdictions of indictment, and who ran to

-34-

cooperate first. Because of Abu-Lawi's prominence, and the timing of his cooperation, the government had virtually all it needed before it got to Jaber. Some adjustment is essential to reduce unwarranted disparity in the case at bar.

With respect to public safety and recidivism, 18 U.S. C. § 3553(A)(2)(c), I conclude that it is exceedingly unlikely that Jaber (or Momoh, as I describe below) will re-offend. They were marginal players at the outset. This experience surely capped their illegal career.

Following the Guidelines template, I departed downward four levels for Jaber, sentencing him to 51 months, roughly equivalent to the sentence of Abu-Lawi.

B. **Momoh**

1. **Guidelines Analysis**

With respect to Philip Momoh, all the parties agree that at the outset of his employment with Jaber, he had absolutely no idea that he was involved in an illegal operation. Plainly, that changed at some point during the eight months of the Jaber operation. The government maintains that the sentence it seeks already reflects these circumstances because they dismissed two counts dating from the period when Momoh did not know what he had gotten into. They suggest that I need do no more. I disagree.

Momoh is entitled to three points for acceptance of responsibility and, perhaps even more, for extraordinary

efforts.[26]  He did everything he could to help the government but like the defendant in <u>United States v. Jurado-Lopez</u>, 338 F. Supp. 2d 246 (D. Mass. 2004), he did not have much to offer.

His base offense level was 30, minus two for his minor role, and minus three for acceptance of responsibility.[27]  Grouping the offenses as probation has done leads to 25 as the final offense level.  His Guideline range is 57 to 71 months.

Under the Guidelines strictly construed, Momoh would not be eligible for any further reductions.  The safety valve, <u>see</u> 18 U.S.C. § 3553(f)(1)(5), which allows for further reductions is reserved for individuals subject to a mandatory minimum sentence. There is no mandatory minimum for pseudoephedrine; the Guideline drafters simply excluded that substance from the provision describing the safety valve.  Had the 57-71 months of the Guidelines range been a 60 month mandatory minimum, he would have qualified for safety valve relief.

But, at the very least, Momoh's situation reflects the concerns that animated the enactment of the "safety valve," which enabled certain low-level drug offenders to escape out from under mandatory minimum drug sentences, provided the offenders met

---

[26] Significantly, probation characterized Momoh's cooperation as extraordinary.  Indeed, it recommended that he receive an acceptance of responsibility departure even while also recommending an enhancement for obstruction of justice (a recommendation probation offered pre-<u>Booker</u>).

[27] Jaber's and Momoh's offense levels are the same because the pseudoephedrine Guidelines are at such a high level that it does not take much to trigger a higher category.

-36-

fairly rigorous criteria. Prior to the safety valve's passage, a high level offender would offer to cooperate with the government against his subordinates. The subordinates -- particularly those at the bottom -- were unable to cooperate meaningfully because they knew nothing. It was not at all unlikely that the subordinates would be sentenced to terms longer than that of the "kingpin."

That is precisely the situation in the case at bar. Abu-Lawi got 51 months; Momoh was facing 57-71 months.

## 2. **18 U.S.C. § 3553(a)**

While the government believes that the Guidelines are entirely adequate to reflect Momoh's culpability and the appropriate sentence, I do not agree. The two level minor role adjustment does not begin to reflect his position in this enterprise -- an employee, on a salary, taking directions from Jaber. Moreover, if the drug quantity did not adequately reflect Jaber's culpability, it surely does not reflect Momoh's.

Momoh was a functionary. Although his responsibilities were growing, he still did not take a profit; he was on salary. He had even less control over the direction of the enterprise than Jaber. He took orders from Jaber. The amount of pseudoephedrine that passed through his hands reflects someone else's decisions, not his own. Even in a Guidelines regime, I would have concluded that Momoh's sentence falls outside of the heartland of like

offenders. See United States v. Costello, 16 F. Supp. 2d 36 (D. Mass. 1998).

Moreover, between 2000 and the date of Momoh's arrest in 2002, there is no evidence that he engaged in any criminal acts. Indeed, just the opposite: He worked as a mental health worker in Lowell. He counseled individuals on a crisis hotline and gave referrals to hospitals. His hours were from 11:00 p.m. to 7:00 a.m. In addition, Momoh worked at the University of Massachusetts Memorial Health Alliance Hospital in the same capacity.

On pretrial release until sentencing, his record was perfect. This was especially significant given the stressors in his life -- a wife who was hospitalized and dysfunctional, with Momoh effectively taking over the care of four young children.[28] His residence was foreclosed; he was unable to find a meaningful job. Measuring a departure for "extraordinary family obligations" now in the light of Booker and the purposes of sentencing (particularly the likelihood of recidivism), I would find that Momoh qualified for a downward departure on these grounds as well.

---

[28] Momoh's wife has diabetes, high blood pressure and panic attacks. She refused to drive a car and has been suffering from depression. In June of 2003, she was hospitalized for pancreatitis, and underwent surgery to remove her gallbladder. Momoh has essentially assumed responsibility for the care of the children.

None of the purposes of sentencing outlined in 18 U.S.C. §
3553(a) were served by Momoh's incarceration. Accordingly, I
sentenced Momoh to "time served," and 2 years of probation, 6
months of which were to be spent in home detention.

## III. **CONCLUSION**

The sentences of Philip Momoh and Issa Jaber are essentially
Guideline sentences informed by the teachings of <u>Booker</u>.  Each
Guideline provision was interpreted with a view to the statutory
purposes of sentencing, and their application to the cases at
bar.  In addition, each composite sentence was evaluated against
the same statutory purposes.  Such a common law process lies at
the heart of judging.

**SO ORDERED.**

**Date:  March 3, 2005          /s/NANCY GERTNER, U.S.D.J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAR 16 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>JOSEPH NICOSIA, )<br>)<br>Defendant. ) | No. 01 CR 1129<br><br>Hon. James B. Moran |

## NOTICE OF FILING

To:   Brian R. Havey
      Assistant United States Attorney
      219 South Dearborn Street
      5th Floor
      Chicago, Illinois 60603

   PLEASE TAKE NOTICE that on **March 16, 2005**, we filed with the Clerk of the District Court Defendant's Exhibits in Support of **Sentencing** Memorandum In Light of *Booker*, a copy of which is hereby served upon you.

## CERTIFICATE OF SERVICE

   Barry Spevack, an attorney, states that he caused copies of the above document to be hand delivered to the above party at the address indicated on March 16, 2005 before 5:00 p.m.

Barry A. Spevack

MONICO, PAVICH & SPEVACK
20 South Clark Street
Chicago, Illinois 60603
312-782-8500